**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CYPRUS MINES CORPORATION,<br><br>Debtors. | Chapter 11<br><br>Case No. 21-10398 (LSS) |
| In re:<br><br>IMERYS TALC AMERICA, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10289 (LSS)<br><br>Jointly Administered<br><br>Hearing Date: October 28, 2024 at 10:00 a.m. EDT<br><br>Objection Deadline: October 7, 2024 at 4:00 p.m. EDT (extended for these parties to October 7, 2024 by agreement of Debtors) |

**OBJECTING INSURERS' OBJECTION TO PLAN PROPONENTS' PROPOSED SOLICITATION PROCEDURES**

**Table of Contents**

INTRODUCTION ................................................................................................................................4

I.    The Court should deny the Motion because it is procedurally improper. ...................................4

II.    The proposed Solicitation Procedures and schedule are inadequate. .........................................6

    A.    The Voting Procedures are inadequate. ................................................................................6

        1.    The Solicitation Procedures do not safeguard the vote. .......................................................6

    B.    The proposed confirmation schedule is unreasonable. ............................................................12

III.    Conclusion ..................................................................................................................................14

## Table of Authorities

**Cases**

*In re Boy Scouts of America*, No. 20-10343-LSS (Bankr. D. Del. Feb. 16, 2022) ......................... 8

*In re Boy Scouts of America*, No. 20-10343-LSS, *Order Approving Disclosure Statement* (D. Del. Sept. 30, 2021) ................................................................................................................ 10

*In re HandPicked, Inc.*, 653 B.R. 229 (Bankr. D.S.C. 2023) ........................................................ 5

*In re Las Torres Development, L.L.C.*, 413 B.R. 687 (Bankr. S.D. Tex. 2009) ............................ 5

*In re McKenzie Energy Corp.*, 228 B.R. 854 (Bankr. S.D. Tex. 1998) ......................................... 5

*In re Reider*, 31 F.3d 1102 (11th Cir. 1994) ................................................................................. 5

**Statutes**

Bankruptcy Rule 1015(b) ................................................................................................................ 5

**Other Authorities**

https://www.duncanstubbs.com/lp/talcum-powder-and-cancer/ ..................................................... 8

https://www.forthepeople.com/practice-areas/defective-product-lawyers/talcum-powder-ovarian-cancer/criteria-for-lawsuit/ ............................................................................................................. 8

https://www.talclawsuitsupport.com/talc-lawsuit-long/ ................................................................. 8

Insurers[1] hereby object to the Motion seeking approval of solicitation procedures in connection with the Imerys Debtors' Revised Second Joint Plan (Imerys Dkt. 6079) and Cyprus Debtor's Revised First Amended Plan (Cyprus Dkt. 2132) (the "Motion").

## INTRODUCTION

The Debtors seek approval of highly unorthodox solicitation procedures that do nothing to address a known problem of invalid claims and that would entail, in effect, a substantive consolidation of the Imerys estates with the Cyprus estate, all while expressly disclaiming that result. Despite pushing this unorthodox and apparently unprecedented process, the Debtor seeks a compressed schedule that leaves no time for the necessary discovery and briefing. The Court should refuse to approve the solicitation procedures and proposed confirmation schedule.

## ARGUMENT

**I.  The Court should deny the Motion because it is procedurally improper.**

The Motion fails to provide any authority for this Court to combine proceedings involving two unrelated corporate debtors in separate Chapter 11 cases. Nonetheless, the plan proponents

---

[1] The Objecting Insurers are Century Indemnity Company, Federal Insurance Company, and Central National Insurance Company of Omaha (collectively, the "Century Insurers"), TIG Insurance Company, International Surplus Lines Insurance Company, Mt. McKinley Insurance Company, Fairmont Premier Insurance Company, Everest Reinsurance Company, and The North River Insurance Company (collectively, the "RiverStone Insurers"), Columbia Casualty Company, Continental Casualty Company, in its own right, and as successor to CNA Casualty of California, The Continental Insurance Company, as successor in interest to certain insurance policies issued by Harbor Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent they issued policies to Cyprus Mines Corporation prior to 1981; and AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York and as successor in interest to certain policies issued by London Guarantee & Accident of New York, and Republic Insurance Company to the extent they issued policies to Standard Oil of Indiana prior to 1986 (collectively, the "RMI Insurers"), Employers Mutual Casualty Company, and Hartford Accident and Indemnity Company and First State Insurance Company (collectively, the "Insurers").

seek approval of (i) a joint disclosure statement hearing, (ii) combined solicitation procedures, (iii) joint ballots, and (iv) a combined confirmation hearing. *See* Imerys Dkt. No. 6079.

In effect, the Imerys debtors and Cyprus are seeking joint administration of their estates. But while Bankruptcy Rule 1015(b) provides for the joint administration of bankruptcy cases when "two or more petitions are pending in the same court by . . . a debtor and an affiliate," it does not authorize the situation presented by the Motion, where petitions filed by unaffiliated corporations are pending in this Court. Indeed, even in cases where affiliates have filed multiple petitions, courts must "give consideration to protecting creditors of different estates against potential conflicts of interest." *Id.* Here, the plan proponents have not given any consideration to that issue and ask that the Court ignore it.

Joint administration is "a procedural device" that is "designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates."[2]  For example, it "permit[s] use of a single docket for administrative matters, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other ministerial matters that may aid in expediting the cases."[3] Joint administration may be denied, however, where it would not "serve a useful purpose in increasing administrative efficiencies and preserving limited judicial resources."[4]

---

[2] *In re Las Torres Development, L.L.C.*, 413 B.R. 687, 693 (Bankr. S.D. Tex. 2009), quoting *In re McKenzie Energy Corp.*, 228 B.R. 854, 874 (Bankr. S.D. Tex. 1998).
[3] *In re Reider*, 31 F.3d 1102, 1109 (11th Cir. 1994).
[4] *In re HandPicked, Inc.*, 653 B.R. 229, 230 (Bankr. D.S.C. 2023) (denying motion for joint administration of cases filed by a corporate debtor and an individual debtor owning 100% of the corporate debtor's stock, where the debtors planned to file separate plans, creditors would file proofs of claim against the estate of the particular debtor indebted to such creditor, and separate monthly operating reports would be filed in each case).

5

The fact that the Bankruptcy Rules do not joint administration of unaffiliated debtors, means that the Debtors' solicitation procedures motion must be denied. But even if the Rules permitted joint administration in this circumstance, the Imerys Debtors and Cyprus have made no showing of any convenience or cost saving in seeking to combine the proceedings to approve their separate disclosure statements, solicit votes from their separate creditor bodies using joint ballots, and seek confirmation of their separate plans.[5] Indeed, the proposed proceedings are likely to create confusion, generate additional litigation, and consume more of the Court's time than if the proceedings were handled separately in each case. At a minimum, Debtors should be required to file a motion seeking joint administration, demonstrate why the proceedings should be combined, and identify what statute or rule authorizes joint administration of the bankruptcies of unaffiliated debtors.

**II.     The proposed Solicitation Procedures and schedule are inadequate.**

    **A.     The Voting Procedures are inadequate.**

The Motion proposes voting procedures that do not adequately account for the unconsolidated cases, the evidence of fraud in the prior vote in the *Imerys* matter, recent issues in voting in mass tort bankruptcy cases, and the likelihood of present abuse.

    **1.    The Solicitation Procedures do not safeguard the vote.**

The solicitation and voting procedures are inadequate because they do not contain measures sufficient to ensure that (1) only holders of valid Talc Claims vote on the Plan, (2) only individuals who have not released their claims (either directly or indirectly, such as through a

---

[5] Sending the combined solicitation materials to law firms and creditors as requested will likely result in claimants filing claims in both cases in all instances when that has not been the historical practice. This will further increase litigation and claims processing costs. It also will potentially dilute creditor recoveries.

settlement with J&J that also released the Imerys Debtors, ITI, and/or Cyprus) are able to vote, and (3) those with valid claims are able to use their own judgment in casting their ballot. Nor do the procedures contain mechanisms to ensure that the vote count is handled fairly or allow anyone to determine the nature of the alleged claims against the various debtors (including whether the claim being voted is a J&J Claim, a claim against one of the Imerys debtors, a claim against Cyprus, or some alleged mix of such claims).

The Court previously wrestled with these issues when it authorized solicitation of votes on the Ninth Amended Joint Plan in the *Imerys* case. The solicitation procedures applicable to that plan gave law firms representing alleged Talc Claimants broad discretion to cast ballots on behalf of their clients. Following the disclosure of several irregularities in the voting process, including a late change in over 14,000 votes from several firms from 'reject' to 'accept,' objecting parties moved to designate the votes from three of the law firms that attempted to change their votes after the voting deadline. This Court concluded that at least one firm, Bevan & Associates, voted on behalf of more than 14,000 alleged Talc Claimants without consulting any of its clients and without considering clients' individual interests or even whether they had a claim against Imerys. *See* Oct. 14, 2021 Order Denying Motion to Designate Votes to Accept the Ninth Amended Joint Chapter 11 Plan [Imerys Dkt. No. 4239] at 20-21.[6] The Bevan firm cast its clients' votes without conducting any analysis of whether its clients had exposure to the Imerys Debtors' talc and while knowing that its clients were ineligible for compensation under the plan. *See id.* at 23. Rather, the firm simply assumed that its clients were incapable of deciding for themselves what was in their own respective best interests.

---

[6] Other claimants' attorneys also voted for thousands of claimants and many of those votes are equally suspect, even if they did not undergo the scrutiny that the Bevan firm bore in connection with the Ninth Amended Plan.

7

The Court determined that those votes could not be counted. In reaching that conclusion, this Court was motivated by two factors: first, ensuring that only holders of valid claims vote on the plan; and second, ensuring that valid claim holders are afforded a genuine opportunity to vote on the plan, either directly or through their lawyers if so authorized. The Bevan's firm voting of more than 15,000 claims accomplished neither of these goals.

Another issue raised by the proposed procedures is that they allow the Solicitation Agent and the Debtors to contact voters regarding defective ballots and to extend ballot deadlines on an individual case basis. *See* Imerys Dkt. No. 6079 at 31-32, Dkt. No. 6079-2 (proposed solicitation procedures order) at 12. During the last vote process, there were numerous communications with objecting creditors seeking to change their vote, and apparent quid pro quos were given for those vote changes. That is exactly the sort of process that led to the irregularities with the votes challenged in connection with the Ninth Plan. Such communications (and the deals that were reached following such communications) should not be allowed as part of the plan solicitation process. Nor should the Debtors have the power to alter the voting deadline for select claimants. The same deadline should apply to all creditors.

The risk of improper voting remains unchanged. Indeed, recent experience suggests that the risk has increased. Despite a purportedly more rigorous process, the vote in the *Boy Scouts* matter was marred by multiple instances of attorneys voting claims, purportedly on behalf of clients, without those clients actually having granted their lawyers authority to cast votes on their behalf. *See, e.g., See In re Boy Scouts of America*, No. 20-10343-LSS, Dkt. No. 8858-1 at 8-14. Similarly, the Court has seen multiple motions from BSA claimants contending that their signatures on claims were forged or placed into an improper category without their consent, and the Court concluded that at least three BSA claimants proved "by a preponderance of the evidence

that the signature on the ballot attributed to him is a forgery."[7] Moreover, J&J reportedly has settled many claims in a manner that includes a release of the settling claimants' claims against the Imerys debtors, rendering those settled claimants ineligible to vote, yet the proposed solicitation procedures contain no safeguards to prevent those claimants from voting in these cases. Indeed, the Imerys debtors acknowledge that J&J has told them that it has settled claims against Imerys, but Imerys conveniently purports to have no knowledge of which claims have been settled.

Last, the debtor in the new bankruptcy case filed by J&J affiliate Red River Talc LLC asserts that there was widespread voting fraud in the pre-petition solicitation of votes on Red River's prepackaged bankruptcy plan. Specifically, Red River alleges that a particular law firm cast an unauthorized master ballot on behalf of thousands of its clients,[8] while an ad hoc committee of law firms whose clients oppose the Red River prepack plan asserts that "most of the law firms that support J&J's third bankruptcy case represent holders of non-compensable claims—claims that are unenforceable under applicable law and cannot be treated as allowed claims under the Bankruptcy Code for purposes of voting or distribution."[9] Many of the same claimants and law firms are involved in these cases.

The Plan Proponents' proposed solicitation order does not account for these facts and would repeat the mistakes from prior solicitations and enable the voting of non-compensable claims, including released claims. The proposed order permits master ballot voting with only

---

[7] Dkt. No. 11903 at 2, *In re Boy Scouts of America, LLC*, Case No. 20-10343 (Bankr. D. Del. March 14, 2024). *See also id*. at 3.

[8] *See* Debtor's Statement and Reservation of Rights With Respect to the Verified Statement Filed Pursuant to Federal Rule of Bankruptcy Procedure 2019, Dkt. No. 203, *In re Red River Talc LLC*, Case No. 24-90505 (Bankr. S.D. Tex. Oct. 4, 2024) at 2-3.

[9] Motion of the Coalition of Counsel for Justice for Talc Claimants to Transfer Venue, Dkt. No. 43, *In re Red River Talc LLC*, Case No. 24-90505 (Bankr. S.D. Tex. Sept. 21, 2024) at 29.

minimal safeguards. It requires only that a law firm seeking to vote by master ballot certify that it has the authority to vote for its clients. But it does not also require any certification that the clients who are "voting" have valid claims against any of the debtors (and that those claims have not been released),[10] nor is there any requirement that the lawyers submitting master ballots have to establish and/or certify they are voting each of their clients' claims as instructed by their clients. Against the backdrop of previous abuse of master ballots in the *Imerys* and *Boy Scouts*, and the alleged abuse in *Red River*, the cursory procedures proposed by the Debtors are insufficient, particularly where there is no bar date for direct talc claims and, as the Court has already observed in the context of the previous Rule 3018 motions, any attempt to determine which claimants are voting presents a "moving target."[11] This is especially so given that many of the claims against the debtors may have been released pursuant to settlements with J&J. Moreover, as discussed further in Insurers' objection to the Imerys disclosure statement, the procedures currently allow voting from claims that are not compensable in the tort system and as to which several claimant firms have objected. *See* Objection to Imerys Disclosure Statement at 24-25.

Accordingly, the voting procedures should bar the use of master ballots, require each claimant to sign their own ballot (rather than allowing attorneys to sign claimants' ballots), and the ballots should require each claimant to certify, at a minimum, that (1) they have a credible

---

[10] Counsel who represented the clients in claims against J&J, and settled those claims under terms that include releases of the Imerys Debtors or Cyprus, are presumably well-aware of the terms of such releases. As a condition to submitting a master ballot, they should be required to certify, as an officer of the court under penalty of perjury, that after due investigation each client on whose behalf a vote is cast on a master ballot is believed to have a compensable claim that has not been released as against the Imerys debtors, ITI, and/or Cyprus.

[11] Indeed, it may be wise to impose a bar date before holding a vote so that each claimant is forced to attest, under penalty of perjury, that they have a claim against a debtor prior to voting on the Plan. That is especially so where many claims are alleged to have been settled since the petition date.

basis for a valid claim against the named debtor for a disease that will be compensable by the Trust (mesothelioma, ovarian cancer or lung cancer, but not "non-ovarian gynecological cancer)) and (2) have not settled or released that claim, either directly or indirectly as part of a settlement with another talc defendant, such as J&J. Requiring each claimant to submit his or her own ballot is the manner mostly likely to ensure that each claimant has the opportunity to consider and vote their own interest, as well as to ensure that law firms do not simply vote their entire inventories of claims, but instead that only individuals who are entitled to vote do so. Indeed, direct claimant voting, where each claimant certifies that they are a valid claim holder, is particularly appropriate in mass tort cases such as these, where most claimants have heretofore submitted nothing to the Court, under penalty of perjury or otherwise, to substantiate their individual claim.

To the extent that the Court permits law firms to vote on behalf of their clients by master ballot, the Court shouwld implement procedures reasonably calculated to ensure that the law firms voting in this manner are actually authorized to do so. A simple certification that a law firm may vote on behalf of everyone on a master list is insufficient and inappropriate. Instead, the Court should implement measures that are at least as rigorous as those that this Court required in *Boy Scouts*. There, this Court recognized that protections are required to ensure that law firms voting on behalf of claimants as part of a master ballot are entitled to do so. The Court required any firm proposing to vote by master ballot to file disclosures paralleling those required under Rule 2019, including: (1) a statement of the facts and circumstances of the law firm's representation; (2) a complete list of all represented claimants; and (3) an exemplar retention letter setting forth the firm's authority to vote on behalf of the claimant. *See In re Boy Scouts of America*, No. 20-10343-LSS, *Order Approving Disclosure Statement* [Dkt. 6438] (D. Del. Sept. 30, 2021) ¶ 29. The Court should require no less here, particularly where (unlike in *Boy Scouts*) there has been no bar date

and the firms voting on behalf of clients have client lists that remain in flux. The Court also should require that each law firm voting by master ballot certify that they have communicated with each claimant for whom they are voting and obtained their affirmative instruction for the "yes" or "no" vote being cast.

\*   \*   \*

It is essential that the balloting process be completely above-board. This Court has the power to ensure that it is so. There is enough recent experience with actual or alleged voting irregularities in mass tort bankruptcy cases—including earlier in this case—to necessitate taking all reasonable steps to ensure the integrity of the vote. Debtors' proposed order is blind to this past history. No balloting and solicitation procedures should be approved until the known problems have been fully addressed.

**B.    The proposed confirmation schedule is unreasonable.**

Any reasonable schedule must include a period for document discovery, followed by adequate time for depositions. Further, the schedule should allow time following the completion of fact discovery for the designation of experts (including rebuttal experts), submission of expert reports, and expert discovery. These efforts will take a substantial investment of time and effort, particularly if Debtors renew their previous request that the Court require all confirmation objections to set forth "any evidentiary support" for the objections. Also, given the Plan Proponents' history of refusing to cooperate in discovery, it would also be advisable to build into any schedule sufficient time for litigation of motions to compel. The Plan Proponents' proposed schedule totally ignores these realities.

For example, the Plan Proponents propose that discovery requests all be served by November 4, 2024, one week after the hearing on the Disclosure Statement. *See* Dkt. No. 6507

(updating proposed schedule). Just one week later—three weeks before responses to any written discovery requests would be due, and a full month from the proposed end of written discovery—they would have parties identify topics for expert discovery. As a practical matter, that schedule is impossible.

Debtors would have all depositions take place in an extraordinarily truncated period between December 9 and December 20, but their proposal allows no time for resolution of discovery disputes or any follow-up on written discovery. Moreover, Debtors do not even propose to file the Plan Supplement until December 2, just before the proposed written discovery window has closed—thereby essentially precluding any written discovery concerning the terms of the Plan Supplement. As discussed in Insurers' objections to the disclosure statements, the Plan Supplement contains critical information and many discovery requests will likely pertain to the information contained therein. Plan Proponents would have all fact discovery end on December 6, 2024, effectively insulating the Plan Supplement from discovery.

This compressed schedule is further complicated by the fact that it pertains to *two* contested confirmation proceedings. Unlike Imerys, Cyprus has not attempted to confirm a plan previously and there has been no prior plan discovery taken of Cyprus. Accordingly, there is no earlier round of plan discovery that can be used to attempt to streamline discovery now. The proposed accelerated and compressed schedule makes little sense in these circumstances. The compressed schedule in the Boy Scouts case created logistical difficulties that prevented the parties from streamlining the confirmation trial. There was insufficient time to organize and present the Court with exhibit binders. Instead, with little time to organize their respective cases, the parties appear to have massively over-designated exhibits. The Insurers submit that a longer schedule will enable a more orderly pre-trial process, ensure that due process is served, and will be more practical for

all parties and the Court.

Objecting Insurers are prepared to meet and confer with the Plan Proponents to agree on a schedule that works for all parties and permits post-balloting discovery if additional voting irregularities make such discovery necessary.

### III. Conclusion

The proposed solicitation procedures are procedurally improper and fail to adequately ensure a valid vote. The Court should refuse to approve solicitation procedures until the Disclosure Statement and Plan are more readily capable of confirmation.

DATED: October 7, 2024

Respectfully submitted,

| | |
|---|---|
| Timothy Martin<br>White and Williams LLP<br>Courthouse Square<br>600 N. King Street, Suite 800<br>Wilmington, Delaware 19801<br>Phone: (302) 467-4509<br>E-mail: martint@whiteandwilliams.com | */s/ Marc Cassarino*<br>Marc Casarino<br>Kennedys LLP<br>222 Delaware Avenue<br>Suite 710<br>Wilmington, DE 19801<br>marc.casarino@kennedyslaw.com |
| Mark D. Plevin (admitted *pro hac vice*)<br>Plevin & Turner LLP<br>580 California Street, 12th Floor<br>San Francisco, California 94104<br>Phone: (415) 580-6640<br>E-mail: mplevin@plevinturner.com | George R. Calhoun (admitted *pro hac vice*)<br>Ifrah PLLC<br>1717 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20006<br>Phone: (202) 525-4147<br>george@ifrahlaw.com |
| Tacie H. Yoon (admitted *pro hac vice*)<br>Plevin & Turner LLP<br>1701 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006<br>Phone: (202) 580-6640<br>Email: tyoon@plevinturner.com<br><br>*Attorneys for Century Indemnity Company, Federal Insurance Company,* | *Attorneys for TIG Insurance Company, as successor by merger to International Insurance Company, International Surplus Lines Insurance Company, Mt. McKinley Insurance Company (formerly known as Gibraltar Insurance Company), Fairmont Premier Insurance Company (formerly known as Transamerica Premier Insurance Company), Everest Reinsurance Company (formerly known as Prudential Reinsurance Company), and The North River Insurance Company* |

14

*and Central National Insurance Company of Omaha*

**KLEHR HARRISON HARVEY BRANZBURG LLP**

Richard M. Beck (DE Bar No. 3370)
Sally E. Veghte (DE Bar No. 4762)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:	(302) 426-1189
Facsimile:	(302) 426-9193
Email:	rbeck@klehr.com
sveghte@klehr.com

- and -

James P. Ruggeri (*pro hac vice*)
Joshua D. Weinberg (*pro hac vice*)
Joshua P. Mayer (*pro hac vice*)
**RUGGERI PARKS WEINBERG LLP**
1875 K Street NW, Suite 600
Washington, DC  20006-1251
Telephone: (202) 984-1400
Facsimile: (202) 984-1401
Email: jruggeri@ruggerilaw.com
	jweinberg@ruggerilaw.com
	jmayer@ruggerilaw.com

*Counsel for Hartford Accident and Indemnity Company and First State Insurance Company*

**DILWORTH PAXSON LLP**

Martin J. Weis (No. 4333)
800 N. King Street
Suite 202
Wilmington, DE  19801
mweis@dilworthlaw.com
(T):  302-571-9800
(F):  302-351-8735
*Attorney for Employers Mutual Casualty Company*

**STAMOULIS & WEINBLATT LLC**

Stamatios Stamoulis (#4606)
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: 302 999 1540
Facsimile: 302 762 1688

-and-

**O'MELVENY & MYERS LLP**

Tancred Schiavoni (pro hac vice)
Adam P. Haberkorn (pro hac vice anticipated)
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
tschiavoni@omm.com
ahaberkorn@omm.com

*Counsel for Columbia Casualty Company, Continental Casualty Company, in its own right, and as successor to CNA Casualty of California, The Continental Insurance Company, as successor to and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company),*

>*National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent they issued policies to Cyprus Mines Corporation prior to 1981; and AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York and as successor in interest to certain policies issued by London Guarantee & Accident of New York, and Republic Insurance Company to the extent they issued policies to Standard Oil of Indiana prior to 1986.*