**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| CYPRUS MINES CORPORATION,[1] | Case No. 21-10398 (LSS) |
| Debtor. | |

**FOURTH MODIFIED FIRST AMENDED PLAN OF REORGANIZATION OF CYPRUS MINES CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF A CHANNELING INJUNCTION PURSUANT TO SECTIONS 105(a) AND 524(g) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4A AND CLASS 4B TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTOR AND THE PROTECTED PARTIES (AS DEFINED HEREIN) TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN ARTICLE XII OF THE PLAN.

---

[1] The last four digits of the Debtor's taxpayer identification number are 0890. The Debtor's address is 333 N. Central Ave., Phoenix, AZ 85004.

# TABLE OF CONTENTS

Page

ARTICLE I.    DEFINITIONS AND RULES OF INTERPRETATION ................................. 1

1.1    Capitalized Terms .............................................................. 1

1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time ............................................ 27

1.3    Exhibits ...................................................................... 27

1.4    Ancillary Documents ........................................................... 28

ARTICLE II.    TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS ................................................... 28

2.1    Administrative Claims ......................................................... 28

2.2    Allowed Priority Tax Claims ................................................... 29

2.3    Fee Claims .................................................................... 29

2.4    DIP Claims .................................................................... 29

ARTICLE III.    TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ................................................................. 30

3.1    Claims and Equity Interests Classified ........................................ 30

3.2    Treatment and Classification of Claims and Equity Interests ............. 30

3.3    Debtor's Rights with Respect to Unimpaired Claims ........................ 34

ARTICLE IV.    THE TALC PERSONAL INJURY TRUST .................................... 34

4.1    Establishment of the Talc Personal Injury Trust ................................ 34

4.2    Purpose and Trust Distribution Procedures ......................................... 34

4.3    Initial Talc Trustees ......................................................... 34

4.4    Delaware Trustee .............................................................. 34

4.5    Advising the Talc Personal Injury Trust ........................................... 34

4.6    Transfer of Talc Personal Injury Claims to the Talc Personal Injury Trust ...................................................................... 35

4.7    Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust ................................................................ 36

4.8    Talc Personal Injury Trust Expenses ................................................. 37

4.9    Excess Talc Personal Injury Trust Assets ........................................... 38

4.10    Institution and Maintenance of Legal and Other Proceedings ............ 38

4.11    Dissolution of the Talc Personal Injury Trust ..................................... 38

4.12    Funds and Investment Guidelines ...................................................... 38

|       | 4.13        | Indemnification of the Protected Parties for Talc Personal Injury Claims ........................................................................ 38 |
|       | 4.14        | Post-Effective Date Liabilities ............................................ 38 |
|       | 4.15        | Forbearance of Claims by Talc Personal Injury Trust ........ 39 |
| ARTICLE V.   | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................................. 40 |
|       | 5.1         | General Treatment ............................................................... 40 |
|       | 5.2         | Claims Based on Rejection of Executory Contracts or Unexpired Leases ................................................................. 40 |
|       | 5.3         | Cure of Defaults for Executory Contracts and Unexpired Leases ................................................................................... 41 |
|       | 5.4         | Modifications, Amendments, Supplements, Restatements or Other Agreement .................................................................. 42 |
|       | 5.5         | Reservation of Rights ........................................................... 42 |
|       | 5.6         | Talc Insurance Policies, Cyprus Historical Insurance Settlements, and Talc Insurance Settlement Agreements ........ 42 |
|       | 5.7         | Non-Talc Insurance Policies ................................................ 42 |
| ARTICLE VI.  | DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS OTHER THAN TALC CLAIMS ............................................ 43 |
|       | 6.1         | Distributions ........................................................................ 43 |
|       | 6.2         | Timing and Calculation of Amounts to be Distributed ........ 43 |
|       | 6.3         | Disbursing Agent ................................................................. 43 |
|       | 6.4         | Rights and Powers of Disbursing Agent .............................. 44 |
|       | 6.5         | Distributions on Account of Claims Allowed After the Effective Date ..................................................................... 44 |
|       | 6.6         | Delivery of Distributions and Undeliverable or Unclaimed Distributions ........................................................................ 44 |
|       | 6.7         | Time Bar to Cash Payments ................................................. 45 |
|       | 6.8         | Record Date for Holders of Claims ..................................... 45 |
|       | 6.9         | Compliance with Tax Requirements and Allocations .......... 45 |
|       | 6.10        | Transfers of Claims ............................................................. 46 |
|       | 6.11        | Interest on Impaired and Disputed Claims .......................... 46 |
|       | 6.12        | Setoffs ................................................................................. 46 |
| ARTICLE VII. | RESOLUTION OF DISPUTED CLAIMS OTHER THAN TALC CLAIMS AND ADMINISTRATIVE CLAIMS ................................... 46 |
|       | 7.1         | Disputed Claims .................................................................. 46 |
|       | 7.2         | Prosecution of Claims Generally ........................................ 47 |

| | 7.3 | Prosecution of Disputed Debtor Claims and Claims Objection Deadline | 47 |
| | 7.4 | Distributions on Account of Disputed Claims | 47 |
| | 7.5 | No Distributions Pending Allowance | 48 |
| | 7.6 | Estimation of Claims | 48 |
| ARTICLE VIII. | | ACCEPTANCE OR REJECTION OF PLAN | 48 |
| | 8.1 | Classes Entitled to Vote | 48 |
| | 8.2 | Acceptance of Holders of Talc Personal Injury Claims | 48 |
| | 8.3 | Acceptance by Unimpaired Classes | 48 |
| ARTICLE IX. | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 48 |
| | 9.1 | Conditions Precedent to the Confirmation of the Plan | 48 |
| | 9.2 | Conditions Precedent to the Effective Date of the Plan | 53 |
| | 9.3 | Waiver of Conditions Precedent | 54 |
| | 9.4 | Notice of Effective Date | 54 |
| | 9.5 | Concurrent Effectiveness of the Plan and the Imerys Chapter 11 Plan | 54 |
| ARTICLE X. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 54 |
| | 10.1 | General | 54 |
| | 10.2 | Operations of the Debtor Between Confirmation and the Effective Date | 54 |
| | 10.3 | Effective Date Corporate Transactions | 55 |
| | 10.4 | Charter and Bylaws | 55 |
| | 10.5 | Corporate Action | 55 |
| | 10.6 | Post-Effective Date Governance, Continued Existence of the Reorganized Debtor | 55 |
| | 10.7 | Cyprus Settlement | 56 |
| | 10.8 | Form of Certain Documents | 59 |
| | 10.9 | Resolution of Talc Personal Injury Claims | 59 |
| | 10.10 | Sources of Consideration for Plan Distributions | 59 |
| | 10.11 | Modification of the Plan | 59 |
| | 10.12 | Revocation or Withdrawal of the Plan | 60 |
| | 10.13 | Certain Technical Modifications | 60 |
| ARTICLE XI. | | EFFECT OF CONFIRMATION | 60 |
| | 11.1 | Preservation of Certain Estate Causes of Action | 60 |
| | 11.2 | Preservation of Talc Personal Injury Trust Causes of Action | 61 |

| | | | |
|---|---|---|---|
| | 11.3 | Talc Insurance Actions | 61 |
| | 11.4 | Insurance Provisions | 62 |
| | 11.5 | Institution and Maintenance of Legal and Other Proceedings | 63 |
| | 11.6 | Terms of Injunctions and Automatic Stay | 64 |
| | 11.7 | The FCR and the Tort Claimants' Committee | 64 |
| | 11.8 | Lack of Precedential Value | 65 |
| | 11.9 | Expungement of Talc Claims from the Claims Register | 65 |
| | 11.10 | Provisions Related to the J&J Settlement | 65 |
| ARTICLE XII. | | RELEASES, INJUNCTION AND EXCULPATION | 66 |
| | 12.1 | Discharge and Injunctions | 66 |
| | 12.2 | Releases | 67 |
| | 12.3 | The Channeling Injunction and the Insurance Entity Injunction | 69 |
| | 12.4 | Supplemental Settlement Injunction Order | 74 |
| | 12.5 | Reservation of Rights | 74 |
| | 12.6 | Disallowed Claims | 75 |
| | 12.7 | Exculpation | 75 |
| | 12.8 | No Successor Liability | 75 |
| | 12.9 | Prepetition Indemnification and Reimbursement Obligations | 75 |
| | 12.10 | Survival of Environmental Claims and Liabilities | 76 |
| | 12.11 | Survival of Foreign Claims. | 76 |
| ARTICLE XIII. | | JURISDICTION OF BANKRUPTCY COURT | 77 |
| | 13.1 | Jurisdiction | 77 |
| | 13.2 | General Retention | 77 |
| | 13.3 | Specific Purposes | 77 |
| | 13.4 | District Court Jurisdiction | 80 |
| | 13.5 | Reservation of Rights | 80 |
| | 13.6 | Compromises of Controversies | 80 |
| | 13.7 | Talc Personal Injury Claims | 80 |
| ARTICLE XIV. | | MISCELLANEOUS PROVISIONS | 80 |
| | 14.1 | Closing of Chapter 11 Case | 80 |
| | 14.2 | Timing of Distributions or Actions | 80 |
| | 14.3 | Governing Law | 80 |
| | 14.4 | Entire Agreement | 80 |
| | 14.5 | Headings | 81 |

14.6    Severability ........................................................................................... 81

14.7    Notices .................................................................................................. 81

14.8    Notice to Other Entities ...................................................................... 84

14.9    Plan Supplement ................................................................................. 84

14.10   Inconsistencies .................................................................................... 84

14.11   Withholding of Taxes .......................................................................... 85

14.12   Transfer Taxes ..................................................................................... 85

14.13   Binding Effect ...................................................................................... 85

14.14   Payment of Statutory Fees .................................................................. 85

14.15   Effective Date Actions Simultaneous ................................................. 85

14.16   Consent to Jurisdiction........................................................................ 85

14.17   Further Assurances.............................................................................. 85

## <u>EXHIBITS AND SCHEDULES TO PLAN</u>

Exhibit A       Talc Personal Injury Trust Agreement

Exhibit B       Trust Distribution Procedures

Exhibit C       J&J Settlement Agreement

Schedule I      Cyprus Corporate Parties

Schedule II     Talc Insurance Policies

## INTRODUCTION

Cyprus Mines Corporation, as debtor and debtor-in-possession in the above-captioned Chapter 11 Case, together with the other Plan Proponents, respectfully propose the following chapter 11 plan of reorganization.

Nothing in the Plan Documents constitutes an admission by the Debtor or any Protected Party as to the existence, merits, or amount of the Debtor's or any Protected Party's actual present or future liability on account of any Claim or demand (including, but not limited to, any Talc Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for, among other things, a discussion of the history, businesses and properties of the Debtor, settlements contained in the Plan, and risks associated with the Plan. The Disclosure Statement also provides a summary of the Plan. YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.
### DEFINITIONS AND RULES OF INTERPRETATION

1.1     Capitalized Terms. The capitalized terms used herein have the respective meanings set forth below. Any term that is not otherwise defined in this Section 1.1 of the Plan, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.

1.1.1   "**Acceptance and Release**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.2   "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Case under section 503(b) of the Bankruptcy Code, including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estate or maintenance of assets and properties of the Debtor, (2) any payment to be made under the Plan to cure a default on an assumed Executory Contract or Unexpired Lease, (3) post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtor in the ordinary course of business, (4) any Fee Claim, including any Claim for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provisions of the Plan, (5) any claim that has been granted super-priority administrative expense status in connection with financing provided to the Debtor, including any DIP Claim, and (6) any fee or charge assessed against the Estate under 28 U.S.C. § 1930(6).

1.1.3   "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims and DIP Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.4    "**Affiliate**" means, with respect to any specified entity: (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity.  As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.5    "**Affirmation Order**" means an order of the District Court affirming Confirmation of the Plan and issuing or affirming the issuance of the Channeling Injunction in favor of the Protected Parties.

1.1.6    "**Allowed**" means (a) with respect to Non-Talc Claims, and including applicable premiums and penalties to the extent allowable:  (i) any Claim proof of which is timely filed by the applicable Claims Bar Date; (ii) any Claim that is listed in the Schedules as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (iii) any Administrative Claim that is allowed and payable pursuant to the Plan; *provided, however*, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been allowed by a Final Order, and (b) with respect to Equity Interests:  (i) any Equity Interest registered in the stock register (or its equivalent) maintained by or on behalf of the Debtor as of the Confirmation Date; (ii) any Equity Interest that is allowed pursuant to the Plan; or (iii) any other Equity Interest that has been allowed by a Final Order of the Bankruptcy Court.

1.1.7    "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars.

1.1.8    "**Amended Bylaws**" means the amended and restated bylaws of the Reorganized Debtor, in substantially the form contained in the Plan Supplement.

1.1.9    "**Amended Certificate of Incorporation**" means the Reorganized Debtor's amended and restated certificate of incorporation, in substantially the form contained in the Plan Supplement.

1.1.10    "**Amended Charter Documents**" means, collectively, the Amended Bylaws and the Amended Certificate of Incorporation.

1.1.11    "**Amoco**" is defined in accordance with Section 1.1.52 of the Plan.

1.1.12    "**Assignment**" means the transfer to the Talc Personal Injury Trust of (i) the Talc Insurance Assets, and (ii) any and all Cyprus Indemnity Rights, as provided in Section 4.7.1.1 of the Plan.

1.1.13    "**AZ Big Sandy**" means AZ Big Sandy, LLC, a Nevada limited liability company.

1.1.14 "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

1.1.15 "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

1.1.16 "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.1.17 "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

1.1.18 "**California Coverage Action**" means the lawsuit styled as *Columbia Cas. Co., et al. v. BP Corp. N. Am., Inc., et al.*, Case No. CGC-17-560919 in the California Superior Court, County of San Francisco.

1.1.19 "**CAMC**" means Cyprus Amax Minerals Company, a Delaware corporation and the immediate parent company of the Debtor.

1.1.20 "**CAMC Funding Agreement**" means that certain capital contribution and funding agreement, in substantially the form contained in the Plan Supplement (as amended), to be executed by CAMC and the Debtor upon the occurrence of the Effective Date, pursuant to which CAMC will agree (i) to provide capital contributions to the Reorganized Debtor for all Distributions to holders of Allowed Non-Talc Claims (but not to holders of any Talc Claims) at such times and in such amounts as required pursuant to the terms of the Plan, (ii) to make a contribution to the Debtor in the amount of $25,016,584, which shall be used by the Debtor solely for the purpose of purchasing 100% of the membership interests in AZ Big Sandy from Byner Cattle Company on the Effective Date, (iii) to provide capital contributions to the Reorganized Debtor to fund Environmental Obligations at such times and in such amounts as may be requested by the Reorganized Debtor to meet such obligations up to an aggregate amount of $4,609,208.00, (iv) to provide capital contributions to the Reorganized Debtor to satisfy any expense or other financial obligation (including any tax obligation) of the Debtor if the Debtor lacks sufficient cash or cash equivalents to do so after accounting for the payments to fund the Environmental Obligations, at such times and in such amounts as may be requested by the Reorganized Debtor to meet such obligations up to an aggregate amount of $4,000,000.00, and (v) as between CAMC and the Reorganized Debtor, to satisfy all joint and several obligations due under the Plan Note as and when they become due and payable or, alternatively, provide capital contributions to the Reorganized Debtor at such times and in such amounts as is necessary for the Reorganized Debtor to timely satisfy CAMC's and

the Reorganized Debtor's joint and several obligations pursuant to the terms of the Plan Note.

1.1.22  "**CAMC Intercompany Note**" means that certain Promissory Note, dated as of January 11, 2021, pursuant to which the Debtor promised to pay to the order of CAMC the principal sum of $1,650,000.00, plus any accrued and unpaid interest.

1.1.23  "**CAMC Intercompany Note Claim**" means a right to payment held by CAMC on account of any and all of the Debtor's obligations under the CAMC Intercompany Note.

1.1.24  "**Canadian Claims**" means Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

1.1.25  "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.26  "**Certain Cyprus Historical Settled Insurers**" means the Cyprus Historical Settled Insurers excluding the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Claims pursuant to (i) the London Market Settlement and Release Agreement or (ii) the Seaton Settlement and Release Agreement.

1.1.27  "**Channeling Injunction**" means the permanent injunction provided for in Section 12.3.1 of the Plan with respect to Talc Personal Injury Claims against the Protected Parties to be issued pursuant to the Confirmation Order.

1.1.28  "**Chapter 11 Case**" means the Debtor's case under Chapter 11 of the Bankruptcy Code, captioned *In re: Cyprus Mines Corporation*, Case No. 21-10398 (LSS), pending in the Bankruptcy Court.

1.1.29  "**Claim**" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code .

1.1.30  "**Claims Agent**" means Kroll Restructuring Administration LLC (f/k/a Prime Clerk LLC).

1.1.31  "**Claims Bar Date**" means (i) July 2, 2021, which is the deadline to file Proofs of Claim (subject to the exceptions contained in the General Bar Date Order), or (ii) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for submitting certain Claims.

1.1.32  "**Claims Objection Bar Date**" means the deadline for objecting to Claims against the Debtor set forth in Section 7.3 of the Plan which shall be one hundred and twenty (120) days after the Effective Date, unless extended by operation of the Bankruptcy Rules or order of the Bankruptcy Court prior to the expiration of such period.

1.1.33 "**Claims Register**" means the register of Claims filed against the Debtor in the Chapter 11 Case maintained by the Claims Agent as such register is updated from time to time to reflect, among other things, Claims that have been Allowed or Disallowed.

1.1.34 "**Class**" means a category of holders of Claims or Equity Interests established pursuant to §§ 1122 and 1123 of the Bankruptcy Code and described in Article III of the Plan.

1.1.35 "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.36 "**Compensation Procedures Order**" means that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [D.I. 200].

1.1.37 "**Confirmation**" means the entry of the Confirmation Order in the Chapter 11 Case.

1.1.38 "**Confirmation Date**" means the date on which the Confirmation Order is entered in the Chapter 11 Case.

1.1.39 "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.1.40 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.41 "**Contribution Claim**" is defined in accordance with Section 12.3.1 of the Plan.

1.1.42 "**Cure Amount**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default of the Debtor in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtor and applicable non-bankruptcy law and (ii) permit the Debtor to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

1.1.43 "**Cyprus**" means, collectively, the Debtor and CAMC.

1.1.44 "**Cyprus Affiliated Parties**" means, for such time as the Debtor was a subsidiary of CAMC or its predecessors, and solely in their capacity as such: (i) direct or indirect shareholders of CAMC or its predecessors; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Debtor and the Cyprus Corporate Parties; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable.  For the

avoidance of doubt, the Cyprus Affiliated Parties exclude the J&J Corporate Parties, the Rio Tinto Corporate Parties, the Imerys Debtors, and the Imerys Corporate Parties.

1.1.45  "**Cyprus Contributions**" means (i) the Plan Note, (ii) the Plan Note Pledge Agreement, (iii) the Freeport Plan Note Guarantee, and (iv) the Assignment.

1.1.46 "**Cyprus Corporate Parties**" means (a) Freeport, (b) CAMC, (c) the Persons listed on **Schedule I**, each of which is directly or indirectly owned or controlled by Freeport, CAMC, and/or the Debtor, and (d) any future successors or assigns of Freeport, CAMC, the Debtor, and/or the Persons or Entities listed on **Schedule I**, solely in their capacities as such.

1.1.47 "**Cyprus Designated Account**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.48 "**Cyprus Historical Insurance Settlements**" means the following agreements, but solely to the extent of the particular Talc Insurance Policies released in each settlement agreement: (1) the settlement and release agreement by and between CAMC, on the one hand, and The Home Insurance Company, on the other hand, dated August 14, 2002; (2) the settlement and release agreement by and among CAMC, the Debtor, AMAX Inc. and Cyprus Foote Mineral Company, on the one hand, and International Insurance Company, individually and as successor in interest to International Surplus Lines Insurance Company, and North River Insurance Corporation on the other hand, dated December 19, 2000; (3) the settlement and release agreement by and between CAMC, on the one hand, and St. Paul Fire and Marine Insurance Company, on the other hand, dated June 14, 2000; (4) the settlement and release agreement by and among CAMC, on the one hand, and Westport Insurance Corporation (f/k/a Puritan Insurance Company, f/k/a Manhattan Fire and Marine Insurance Company) on the other hand, dated July 19, 2000; (5) the London Market Settlement and Release Agreement; and (6) the Seaton Settlement and Release Agreement.

1.1.49 "**Cyprus Historical Settled Insurers**" means the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Claims pursuant to the Cyprus Historical Insurance Settlements, solely with respect to the policies and claims so released.

1.1.50 "**Cyprus Indemnity Rights**" means (i) all rights belonging to the Debtor and the Cyprus Protected Parties to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, subrogation, and/or breach of contract against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claims channeled to the Talc Personal Injury Trust prior to the Effective Date, and (ii) all of their rights or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, subrogation, and/or breach of contract against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust; *provided, however*, that the assertion of the Cyprus Indemnity Rights against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the

injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Plan or the Imerys Chapter 11 Plan.  For the avoidance of doubt, the Cyprus Indemnity Rights do not include any Debtor J&J Released Claims, which are being settled pursuant to the J&J Settlement.

1.1.51  "**Cyprus Insurance Protocol**" is defined in accordance with Section 4.15 of the Plan.

1.1.52  "**Cyprus Protected Parties**" means the Cyprus Corporate Parties and the Cyprus Affiliated Parties.  With regard to Amoco Corporation or any successor or predecessor thereto that is not otherwise a Protected Party (collectively, "**Amoco**"): (i) with respect to any talc-related claims or liabilities relating to its indirect or direct ownership of the Debtor *prior to July 1, 1985*, including any talc-related claim or liability that could give rise to any claim against CAMC under the Memorandum of Agreement dated June 28, 1985 between Amoco Corporation and Cyprus Minerals Company, Amoco shall be a Cyprus Protected Party, and (ii) with respect to any indemnity or similar obligations that it undertook *after July 1, 1985*, including to any Talc Insurance Company with respect to any Talc Insurance Policy, Amoco shall not be a Cyprus Protected Party.  For the avoidance of doubt, the Cyprus Protected Parties exclude the Imerys Released Parties and the J&J Corporate Parties.

1.1.53  "**Cyprus Released Claims**" is defined in accordance with Section 12.2.1 of the Plan.

1.1.54  "**Cyprus Settlement**" means that certain comprehensive settlement by and among the Debtor, CAMC, Freeport, the Tort Claimants' Committee, the FCR, and the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR, the terms of which are set forth in and implemented by the Plan and the Imerys Chapter 11 Plan.

1.1.55  "**Cyprus Talc Insurance Policy Rights**" means (a) all rights, Claims, benefits, or causes of action, if any, held by the Debtor and the Cyprus Protected Parties with respect to the Talc Insurance Policies and the J&J Policies, including the right to receive proceeds, subject to the J&J Settlement Agreement; and (b) all rights, Claims, or causes of action, if any, held by the Debtor and the Cyprus Protected Parties, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Debtor or the Cyprus Protected Parties under any Talc Insurance Policy and any J&J Policy, subject to the J&J Settlement Agreement.

1.1.56  "**Debtor**" means Cyprus Mines Corporation, the Debtor in this Chapter 11 Case.

1.1.57  "**Debtor J&J Released Claims**" has the meaning ascribed to such term in the J&J Settlement Agreement.

- 7 -

1.1.58 "**Delaware Trustee**" means the Entity appointed in accordance with Section 4.4 to serve as the "Delaware Trustee" in accordance with the terms of the Plan, the Imerys Plan, and the Talc Personal Injury Trust Agreement.

1.1.59 "**Designated Accounts**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.60 "**DIP Claim**" means a right to payment held by CAMC on account of any and all of the Debtor's obligations under the DIP Credit Agreement.

1.1.61 "**DIP Credit Agreement**" means the Amended and Restated Superpriority Debtor-in-Possession Credit Agreement, dated as of June 21, 2023, between the Debtor and CAMC, as amended and supplemented from time to time.

1.1.62 "**DIP Order**" means the *Order (I) Authorizing Debtor in Possession to Enter Into Post-Petition Financing Agreement and Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Superpriority Administrative Claims, and (III) Granting Related Relief* [D.I. 219], as amended, modified, or supplemented from time to time by further order of the Bankruptcy Court.

1.1.63 "**Disallowed**" means any Non-Talc Claim or Equity Interest that (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan, or (b) has been withdrawn, in whole or in part (but solely to the extent of such withdrawal).

1.1.64 "**Disbursing Agent**" means the Reorganized Debtor, or such other Entity or Entities chosen by the Reorganized Debtor to make or facilitate Distributions pursuant to the Plan.  For the avoidance of doubt, the Talc Personal Injury Trust shall not be considered a Disbursing Agent.

1.1.65 "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Section 12.1.2 of the Plan.

1.1.66 "**Disclosure Statement**" means the *Disclosure Statement for the First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code*, dated November 5, 2024, including all exhibits and schedules thereto and references therein that relate to the Plan, approved by order of the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement and supplemental disclosure documents may be amended, modified, or supplemented from time to time with the consent of each of the Plan Proponents.

1.1.67 "**Disputed**" means any Non-Talc Claim or Equity Interest, or any portion thereof, that has not been Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or that is contingent or unliquidated.

1.1.68 "**Distribution(s)**" mean(s) Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.69 "**Distribution Date**" means the date which is as soon as reasonably practicable after the later of (i) the Effective Date, or (ii) in the case of a Non-Talc Claim that is not yet Allowed as of the Effective Date, the date that such Claim becomes Allowed.

1.1.70 "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims, which shall be the Confirmation Date.

1.1.71 "**District Court**" means the United States District Court for the District of Delaware.

1.1.72 "**Document Access Agreement**" means that certain Document Access Agreement substantially in the form attached to the Plan Supplement, as more fully described in Section 10.7.7 of the Plan.

1.1.73 "**Dual Estate Factor**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.74 "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

1.1.75 "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.76 "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.1.77 "**Environmental Claim**" means any Claim by a Governmental Unit against the Debtor arising out of, related to or based upon federal or state environmental laws or regulations, environmental orders, consent decrees and other requirements in connection with (a) sites that are not part of the Estate, including previously owned or operated sites that are no longer owned or operated by the Debtor and third-party sites that have never been owned or operated by the Debtor to which the Debtor or its predecessors are alleged to have sent waste or other materials and (b) the Debtor's owned or operated sites.  For the avoidance of doubt, this definition does not include any Talc Claims.

1.1.78 "**Environmental Obligation**" means any payment obligation of the Reorganized Debtor arising out of, related to, or based upon federal or state environmental laws or regulations, environmental orders, environmental consent decrees, and other contractual arrangements associated with environmental remediation or monitoring, including, without limitation, any Environmental Claim, and legal fees and expenses

- 9 -

incurred in connection with any of the foregoing.  This definition does not encompass any Talc Claims.

1.1.79  "**Equity Interest**" means the stock interest of CAMC in the Debtor or the Reorganized Debtor, as applicable.

1.1.80  "**Estate**" means the estate created in the Debtor's Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.81  "**Estate Causes of Action**"  means any and all of the actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action owned or held, or assertable by or on behalf of the Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR, or by any other creditors, on behalf of the Debtor or its Estate), whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including, without limitation, claims or causes of action:  (i) based on a theory of veil piercing, alter ego, vicarious liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, or any theory seeking to hold an Affiliate of the Debtor or other Protected Party liable for the Debtor's obligations; (ii) to avoid, invalidate or recover any transfer of any kind made by the Debtor, or any obligation of the Debtor, including under Chapter 5 of the Bankruptcy Code or other applicable law; (iii) based on a theory that any Affiliate of the Debtor or other Protected Party conspired with, aided or abetted, or acted in concert with the Debtor in allegedly harming holders of Talc Claims; or (iv) assertable by the Debtor or the Estate as a "generalized" claim under any federal, state, or other applicable law.

1.1.82  "**Executory Contract**" means any executory contract as to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.83  "**FCR**" means Roger Frankel (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who assert Talc Personal Injury Demands, but who are currently unknown.  "FCR" stands for Future Claimants' Representative.

1.1.84  "**Fee Claim**" means any Claim of a (i) Professional for allowance of compensation and reimbursement of costs and expenses and (ii) member of the Tort Claimants' Committee for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Case on or before the Effective Date.

1.1.85  "**Fee Examiner**" means M. Jacob Renick (or any Bankruptcy Court-appointed successor), in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

1.1.86  "**Fee Examiner Order**" means the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals* [D.I. 289].

1.1.87 "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

1.1.88 "**Foreign Claim**" means a Talc Claim solely involving talc or a product containing talc (i) that was purchased entirely outside of the US/Canada, and (ii) as to which the claimant's exposure to any such talc or product occurred entirely outside of the US/Canada. For the avoidance of doubt, talc and products containing talc will be deemed to have been purchased entirely outside of the US/Canada only if (x) all the talc, or all the talc contained in the products, that the claimant used and that the claimant alleges caused his or her injury was mined, milled, processed, and shipped from locations entirely outside of the US/Canada and not distributed into the US/Canada, and (y) the claimant or other retail consumer purchased the product containing such talc entirely outside of the US/Canada. For purposes of this definition, a Canadian Claim is not a Foreign Claim.

1.1.89 "**Freeport**" means Freeport-McMoRan Inc.

1.1.90 "**Freeport Plan Note Guarantee**" means the guarantee agreement, in substantially the form contained in the Plan Supplement, to be executed by Freeport and delivered to the Talc Personal Injury Trust pursuant to which, upon the occurrence of the Effective Date, Freeport will guarantee CAMC's and the Reorganized Debtor's payment obligations under the Plan Note and be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters. For purposes of this definition, "liquidity" means the sum of unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

1.1.91 "**Fund**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.92 "**Fund A**" means the Fund described in Section 2.2(a) of the Trust Distribution Procedures.

1.1.93 "**Fund A Claims**" means Talc Personal Injury Claims that are Ovarian Cancer Claims and Other Gynecological Disease Claims, which will be compensated from Fund A in accordance with the Trust Distribution Procedures. Fund A Claims do not include Foreign Claims.

1.1.94 "**Fund B**" means the Fund described in Section 2.2(b) of the Trust Distribution Procedures.

1.1.95 "**Fund B Claims**" means Talc Personal Injury Claims that are Mesothelioma Claims, Lung Cancer Claims, and Other Non-Gynecological Disease Claims, which will be compensated from Fund B in accordance with the Trust Distribution Procedures. Fund B Claims do not include Foreign Claims.

1.1.96 "**General Bar Date Order**" means the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Submitting Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [D.I. 265].

1.1.97 "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.1.98 "**Home Proceeds**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.99 "**Imerys Affirmation Order**" means an order of the District Court affirming confirmation of the Imerys Chapter 11 Plan and issuing or affirming the issuance of a channeling injunction under section 524(g) and other applicable provisions of the Bankruptcy Code in favor of the Imerys Protected Parties, the Debtor, and the Cyprus Protected Parties.

1.1.100 "**Imerys Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Imerys Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.101 "**Imerys Debtors**" means, collectively, Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada Inc., and, in the event it files a voluntary petition for relief under chapter 11 of the Bankruptcy Code before the date on which the Imerys Chapter 11 Plan is confirmed, Imerys Talc Italy S.p.A.

1.1.102 "**Imerys Chapter 11 Case**" means the procedurally consolidated chapter 11 cases pending for the Imerys Debtors in the Bankruptcy Court under Case No. 19-10289 (LSS).

1.1.103 "**Imerys Chapter 11 Plan**" means the chapter 11 plan of reorganization of the Imerys Debtors, as amended, modified, or supplemented from time to time, filed in the Imerys Chapter 11 Case.

1.1.104 "**Imerys Corporate Parties**" has the meaning ascribed to such term in the Imerys Chapter 11 Plan.

1.1.105 "**Imerys Designated Account**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.106 "**Imerys FCR**" means James L. Patton, Jr. (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who assert Imerys Talc Personal Injury Demands against the Imerys Debtors, but who are currently unknown.

1.1.107      "**Imerys Plan Documents**" means "Plan Documents" as that term is defined in the Imerys Chapter 11 Plan.

1.1.108      "**Imerys Plan Proponents**" means "Plan Proponents" as that term is defined in the Imerys Chapter 11 Plan.

1.1.109      "**Imerys Protected Parties**" means the Imerys Debtors and the Imerys Protected Parties (as defined in the Imerys Chapter 11 Plan).

1.1.110      "**Imerys Released Parties**" means the Imerys Debtors and the Imerys Released Parties (as defined in the Imerys Chapter 11 Plan).

1.1.111      "**Imerys Talc Claim**" means "Talc Claim" as that term is defined in the Imerys Chapter 11 Plan.

1.1.112      "**Imerys Talc Personal Injury Claim**" means "Talc Personal Injury Claim" as that term is defined in the Imerys Chapter 11 Plan.

1.1.113      "**Imerys Tort Claimants' Committee**" means the official committee of tort claimants in the Imerys Chapter 11 Case appointed by the United States Trustee, as such committee is reconstituted from time to time.

1.1.114      "**Impaired**" means a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.115      "**Indirect Talc Claim**" means a Talc Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), insurer, co-defendant of the Debtor, or predecessor of the Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), insurer, co-defendant of the Debtor, or predecessor of the Debtor, whether in the nature of or sounding in contract, tort, warranty, or other theory of law. For the avoidance of doubt, an Indirect Talc Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict. By way of illustration and not limitation, an Indirect Talc Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death. Indirect Talc Claims (that are not Foreign Claims) shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.

1.1.116      "**Initial Payment Percentages**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.117        "**Injunctions**" means the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Insurance Entity Injunction, the Release Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.118        "**Insurance Adversary Proceeding**" means the adversary proceeding styled as *Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company and Cyprus Mines Corporation,* Adv. Pro. No. 19-50115 (LSS) (Bankr. D. Del.).

1.1.119        "**Insurance Entity Injunction**" means the injunction described in Section 12.3.2 of the Plan.

1.1.120        "**Internal Revenue Code**" or "**Tax Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

1.1.121        "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, J&J includes LLT Management LLC (f/k/a LTL Management LLC), Kenvue, Inc., Janssen Pharmaceuticals, Inc., and Johnson & Johnson Holdco (NA) Inc. and excludes the Debtor, the Cyprus Corporate Parties, the Imerys Debtors, the Imerys Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.122        "**J&J Agreements**" means:  (i) that certain Agreement, dated as of January 6, 1989, between the Debtor and Johnson & Johnson, pursuant to which the Debtor purchased from J&J the stock of Windsor Minerals, Inc.; (ii) that certain Talc Supply Agreement, dated as of January 6, 1989, as amended, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., pursuant to which Windsor Minerals, Inc. continued to supply talc to J&J; (iii) that certain Supply Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001, as amended; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; and (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011.

1.1.123        "**J&J Corporate Parties**" has the meaning ascribed to such term in the J&J Settlement Agreement.  For the avoidance of doubt, the J&J Corporate Parties exclude the Debtor, the Cyprus Corporate Parties, the Imerys Debtors, the Imerys Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.124        "**J&J Initial Payment**" means $225,000,000.

- 14 -

1.1.125        "**J&J Insurance Payments**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.126        "**J&J Insurance Recoveries**" has the meaning ascribed to the term "Insurance Recoveries" in the J&J Settlement Agreement.

1.1.127        "**J&J Payment Obligations**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.128        "**J&J Payment Protocol**" means the protocol governing the payment of the J&J Payment Obligations to the Debtor, the Imerys Debtors, and/or the Talc Personal Injury Trust, as applicable, which is set forth in Sections 4 and 5 of the J&J Settlement Agreement.

1.1.129        "**J&J Policies**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.130        "**J&J Related Rights**" means any and all rights and claims the Debtor or any Protected Party has against J&J in respect of Talc Claims under the J&J Agreements, the Plan, the other Plan Documents, the Imerys Chapter 11 Plan, or applicable law, including, without limitation, rights of and claims for contribution, reimbursement, subrogation, indemnification, and/or breach of contract.

1.1.131        "**J&J Settlement**" means that certain settlement set forth in the J&J Settlement Agreement and approved by the Bankruptcy Court pursuant to the J&J Settlement Order.

1.1.132        "**J&J Settlement Agreement**" means the Amended and Restated Settlement Agreement and Release among the Debtor, CAMC, the Imerys Debtors, Imerys S.A., the Tort Claimants' Committee, the FCR, the Imerys Tort Claimants' Committee, and the Imerys FCR, and solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 thereof, Rio Tinto and Zurich, on the one hand, and the J&J Settling Parties, on the other hand, which was approved by the Bankruptcy Court pursuant to the J&J Settlement Order and is attached hereto as **Exhibit C**.

1.1.133        "**J&J Settlement Closing Date**" has the meaning ascribed to the term "Closing Date" in the J&J Settlement Agreement.

1.1.134        "**J&J Settlement Order**" means the *Order (I) Approving the Amended and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [D.I. 2634].

1.1.135        "**J&J Settlement Proceeds**" means the amount of the J&J Payment Obligations and the Home Proceeds that is (i) received by the Cyprus Designated Account prior to the Effective Date, (ii) in the Imerys Designated Account on the Effective Date, and (iii) payable to the Talc Personal Injury Trust on or after the Effective Date pursuant to the terms of the J&J Settlement Agreement.

1.1.136    "**J&J Settling Parties**" means Johnson & Johnson and any successor thereto, Johnson & Johnson Holdco (NA) Inc. (f/k/a J&J Intermediate Holding Corp.) and any successor thereto, Pecos River Talc LLC and any successor thereto, and Red River Talc LLC and any successor thereto.  For the avoidance of doubt, the J&J Settling Parties exclude the Debtor, the Cyprus Corporate Parties, the Imerys Debtors, the Imerys Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.137    "**Judgment**" means a final and binding judicial determination or arbitration award.

1.1.138    "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.1.139    "**London Market Insurers**" has the meaning ascribed to such term in the London Market Settlement and Release Agreement.

1.1.140    "**London Market Settlement and Release Agreement**" means the settlement and release agreement by and between CAMC, on the one hand, and certain Underwriters at Lloyd's, London, and certain London Market Insurance Companies, on the other hand, entered into about May 2001.

1.1.141    "**Lung Cancer Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.142    "**Membership Interest Purchase Agreement**" means the membership interest purchase agreement, in substantially the form contained in the Plan Supplement, to be executed by the Debtor and Byner Cattle Company, pursuant to which Byner Cattle Company will sell and the Reorganized Debtor will purchase 100% of the membership interests in AZ Big Sandy from Byner Cattle Company in consideration of a payment to Byner Cattle Company in the amount of $25,016,584.

1.1.143    "**Merger Agreement**" means the agreement and plan of merger, in substantially the form contained in the Plan Supplement, to be entered into by and between the Debtor and AZ Big Sandy, pursuant to which AZ Big Sandy will merge with and into the Reorganized Debtor on the Effective Date.

1.1.144    "**Mesothelioma Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.145    "**Mesothelioma / Lung Cancer TAC**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.146    "**Non-Talc Cause of Action**" means any and all Estate Causes of Action (other than Talc Personal Injury Trust Causes of Action and Talc Insurance Actions) owned or held, or assertable by or on behalf of the Debtor or its Estate that are not otherwise released pursuant to the Plan.

1.1.147    "**Non-Talc Claim**" means any Claim that is not a Talc Claim.

1.1.148        "**Non-Talc Insurance Policies**" means any insurance policy, other than a Talc Insurance Policy, issued to or that provides or may provide coverage at any time to the Debtor or under which the Debtor has sought or may seek coverage including, without limitation, any such policy for directors' and officers' liability, general liability, workers' compensation, and any excess or umbrella policy, and all agreements, documents, or instruments relating thereto.

1.1.149        "**Other Gynecological Disease Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.150        "**Other Non-Gynecological Disease Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.151        "**Ovarian Cancer Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.152        "**Ovarian Cancer TAC**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.153        "**Payment Percentages**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.154        "**PDC Agreement**" means the letter agreement by and between Phelps Dodge Corporation, on the one hand, and BP Amoco Corporation, on the other hand, entered into on February 28, 2000.

1.1.155        "**PDC Agreement Talc Insurance and Indemnity Rights**" means all rights, Claims, benefits, or causes of action held by the Debtor and the Cyprus Protected Parties with respect to Talc Claims and the PDC Agreement, including the right to receive proceeds paid under any Talc Insurance Policy subject to the PDC Agreement or from BP Amoco Corporation as indemnitor of certain insurance companies.

1.1.156        "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

1.1.157        "**Petition Date**" means February 11, 2021, the date on which the Debtor filed its petition for relief commencing its Chapter 11 Case.

1.1.158        "**Plan**" means this *Fourth Modified First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code* filed by the Debtor, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code and consistent with the Cyprus Settlement.

1.1.159        "**Plan Documents**" means the Plan, the Disclosure Statement, the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing

(including, without limitation and for the avoidance of doubt, the Talc Personal Injury Trust Documents).

1.1.160    "**Plan Note**" means the unsecured, seven-year promissory note, in substantially the form contained in the Plan Supplement, issued by CAMC and the Reorganized Debtor, jointly and severally, for and on behalf of themselves and all other Cyprus Protected Parties, in favor of the Talc Personal Injury Trust with an aggregate outstanding principal amount of $195 million as of the Effective Date, payable as set forth in Section 10.7.2.1.

1.1.161    "**Plan Note Pledge Agreement**" means the Pledge Agreement, in substantially the form contained in the Plan Supplement, to be issued by CAMC in favor of the Talc Personal Injury Trust, pursuant to which the Talc Personal Injury Trust will be granted an Encumbrance entitling the Talc Personal Injury Trust to 51% of the Equity Interests in the Reorganized Debtor in the event of default and exercise of remedies under the Plan Note.

1.1.162    "**Plan Proponents**" means, collectively, the Debtor, CAMC, the Tort Claimants' Committee, and the FCR.

1.1.163    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtor, with terms consistent with the Plan, no later than fourteen (14) days prior to the earlier of (i) the deadline for submission of Ballots (as defined in the Voting Procedures) to vote to accept or reject the Plan, or (ii) the deadline to object to Confirmation of the Plan, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications, or supplements to the Plan Supplement, including the following:  (a) the list of Executory Contracts and Unexpired Leases to be rejected by the Debtor; (b) the Amended Charter Documents; (c) the list of officers and directors of the Reorganized Debtor; (d) the Plan Note; (e) the Plan Note Pledge Agreement; (f) the Freeport Plan Note Guarantee; (g) the CAMC Funding Agreement; (h) the Document Access Agreement; (i) the initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC; (j) the Membership Interest Purchase Agreement; and (k) the Merger Agreement; *provided* that the Plan Documents listed in subsections (d), (e), (f), (h), and (i) shall each be in form and substance reasonably acceptable to each of the Plan Proponents and the Imerys Plan Proponents (but only with respect to any terms or provisions that are material to the rights of the applicable Imerys Plan Proponent or to the treatment of Imerys Talc Personal Injury Claims).  The Plan Supplement, and any amendments or supplements to the foregoing, will be served only on those parties that have requested notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtor; *provided* that (i) the initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC and (ii) any amendments to the identity of the initial Talc Trustees and their compensation, the identity of the initial Delaware Trustee, the initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC, will be filed and served on all parties receiving Ballots.  In addition, copies of all Executory Contract and Unexpired Lease exhibits and

any amendments thereto will be served on the applicable counterparties to such Executory Contracts and Unexpired Leases. A copy of the Plan Supplement and any amendments or supplements thereto will be available for review on the Claims Agent's website free of charge at https://cases.ra.kroll.com/cyprusmines by clicking the link for "Plan & Disclosure Statement."

1.1.164    **"Post-Effective Date FCRs"** has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.165    **"Post-Effective Date Liabilities"** is defined in accordance with Section 4.14 of the Plan.

1.1.166    **"Priority Non-Tax Claim"** means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.1.167    **"Priority Tax Claim"** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.1.168    **"Professional"** means any person retained or to be compensated pursuant to sections 327, 328, 330, 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including, without limitation, any professional retained by the Tort Claimants' Committee and/or the FCR.

1.1.169    **"Proof of Claim"** means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against the Debtor.

1.1.170    **"Protected Party"** means any of the following:  (a) the Debtor; (b) the Reorganized Debtor; (c) the Imerys Protected Parties; (d) the Cyprus Protected Parties; (e) the Settling Talc Insurance Companies; and (f) any Person, except for the Talc Personal Injury Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtor, the Reorganized Debtor, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); *provided*, *however*, each Entity identified under clauses (c) through (e) shall be a "Protected Party" under the Channeling Injunction with respect to a Talc Personal Injury Claim to the extent, and only to the extent, such Entity meets the requirements for protection under section 524(g)(3)(A) or section 524(g)(4)(A)(ii) of the Bankruptcy Code.

1.1.171    **"Providence Washington"** means Providence Washington Insurance Company and Seaton Insurance Company, formerly known as Unigard Security Insurance Company, formerly known as Unigard Mutual Insurance Company.

1.1.172    **"Release Injunction"** is defined in accordance with Section 12.2.3 of the Plan.

1.1.173 "**Released Parties**" means each of: (a) the Debtor; (b) the Reorganized Debtor; (c) the Tort Claimants' Committee; (d) the individual members of the Tort Claimants' Committee (in their capacities as such); (e) the FCR; (f) each of the Protected Parties; (g) the Imerys Tort Claimants' Committee; (h) the individual members of the Imerys Tort Claimants' Committee (in their capacities as such); (i) the Imerys FCR; (j) the Imerys Released Parties; and (k) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (a), (b), (c), (e), (f), (g), and (i), each such Person's Representatives.

1.1.174 "**Releasing Claim Holder**" means, collectively, (a) each holder of a Claim who is sent, or whose counsel is sent on the holder's behalf, a Ballot or a Cyprus Notice of Non-Voting Status (each as defined in the Voting Procedures) and does not timely opt out of, or timely object to, the releases provided for in the Plan, except for those holders of Claims whose solicitation packages or Cyprus Notice of Non-Voting Status (as applicable) were returned to the Debtor or its agent(s) as undeliverable and were not subsequently sent a Ballot or a Cyprus Notice of Non-Voting Status to a corrected address that was not returned as undeliverable, and (b) with respect to each of the foregoing Persons in clause (a), such Person's respective predecessors, successors, and assigns, each in their capacity as such.

1.1.175 "**Reinstated**" means, with respect to any Claim or Equity Interest, that the Claim or Equity Interest shall not be discharged hereunder or channeled to the Talc Personal Injury Trust, and the holder's legal, equitable and contractual rights on account of such Claim or Equity Interest shall remain unaltered by Confirmation, rendering such Claim or Equity Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code.

1.1.176 "**Reorganized Debtor**" means the Debtor as it exists after the Effective Date.

1.1.177 "**Reorganized Imerys Debtors**" means the Imerys Debtors as they exist on and after the effective date of the Imerys Chapter 11 Plan.

1.1.178 "**Representatives**" means with respect to any Person, such Person's (a) successors, permitted assigns, subsidiaries, and controlled affiliates, (b) officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

1.1.179 "**Rio Tinto**" means Rio Tinto America Inc.

1.1.180 "**Rio Tinto Corporate Parties**" has the definition given in the Imerys Chapter 11 Plan.

1.1.181 "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the Debtor as filed in the Chapter 11 Case in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

1.1.182    "**Seaton Settlement and Release Agreement**" means the settlement and release agreement by and between Freeport, on the one hand, and Seaton Insurance Co., f/k/a Unigard Security Insurance Co., f/k/a Unigard Mutual Insurance Co., entered into in 2013.

1.1.184    "**Secured Claim**" means a Claim or any portion thereof:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) Allowed pursuant to the Plan or any Final Order as a secured Claim.

1.1.185    "**Settled Talc Insurance Policy**" means any Talc Insurance Policy that is released pursuant to a Talc Insurance Settlement Agreement.

1.1.186    "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies (a) prior to the Effective Date, any Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated, with the consent of the Debtor, the Tort Claimants' Committee, and the FCR, in the Confirmation Order and/or the Affirmation Order, to be a Settling Talc Insurance Company; and (b) following the Effective Date, each Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust, the Talc Trust Advisory Committees, and the Post-Effective Date FCRs; *provided*, *however*, that any post-Effective Date addition to the list of Protected Parties does not become effective until entry of a Final Order approving the addition.  For the avoidance of doubt, Old Republic Insurance Company is a Settling Talc Insurance Company.

1.1.187    "**Supplemental Settlement Injunction Order**" means the injunction described in Section 12.4 of the Plan.

1.1.188    "**Talc Claim**" means any Claim or any Talc Demand against the Debtor or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries or harms (whether physical, emotional or otherwise and whether or not diagnosable or manifested before Confirmation or the close of the Chapter 11 Case), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products in connection with the alleged pre-Effective Date acts or omissions of the Debtor or any other Entity for whose conduct the Debtor (i) has liability or (ii) is alleged to have liability by reason of the Debtor's direct or indirect ownership or control of, conduct of business, or any transaction with such Entity.  Talc Claims include, without limitation, any such claims or demands directly or indirectly arising out of or relating to: (a) any products previously mined, processed, milled, manufactured, sold and/or distributed by the Debtor

- 21 -

or by any other Entity for whose conduct the Debtor has liability or is alleged to have liability; (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations the Debtor has, or is alleged to have, liability; or (c) any talc in any way connected to the Debtor alleged to contain asbestos or other constituent. Talc Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including in the nature of alter ego, veil piercing, successor or vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, and including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against the Debtor or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. The term "Talc Claim" includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Claims. For the avoidance of doubt, the term "Talc Claim" is intended to encompass any and all pending or future Claims against any Cyprus Protected Party in any way relating to the Debtor's (or any predecessor's) or any current or former subsidiary of the Debtor's manufacture, distribution or other conduct relating in any way to talc or talc-containing products. For the avoidance of doubt, the term "Talc Claim" does not encompass any Claim against a Protected Party (other than the Debtor) that does not arise out of or relate directly or indirectly to such Protected Party's current or former (i) affiliation or corporate relationship with the Debtor (including direct or indirect ownership of the Debtor or predecessor thereof), (ii) control over the Debtor or predecessor thereof, (iii) provision of insurance to or for the benefit of a Debtor, or (iv) conduct of business or transactions involving the Debtor or predecessor thereof, but does encompass any Claim against a Protected Party that is covered by or comes within any of clauses (i) – (iv) of this sentence. Notwithstanding the foregoing, Talc Claims do not include: (a) any claim by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; or (b) any claims or defenses that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such (including any reinsurers or retrocessionaires that are Released Parties) or that any reinsurer or retrocessionaire of a Settling Talc Insurance Company may have against such Settling Talc Insurance Company in its capacity as a reinsured, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of any Settling Talc Insurance Company (or any reinsurer or retrocessionaire) to assert any such claim or defense in any forum; *provided* that no such claim can be asserted against the Talc

Personal Injury Trust unless otherwise provided in the Plan. For the avoidance of doubt, a "Talc Claim" includes any Foreign Claim but does not include any environmental liabilities or obligations arising out of, related to or based upon federal or state environmental laws or regulations, environmental orders, consent decrees and other requirements.

1.1.189    "**Talc Demand**" means a demand for payment, present or future, against the Debtor or any Protected Party that (i) was not a Claim prior to the Effective Date and (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Claim.

1.1.190    "**Talc In-Place Insurance Coverage**" means all of the rights, benefits or insurance coverage under any Talc Insurance Policy or any Talc Insurance Settlement Agreement, including the right to payment or reimbursement of liability, indemnity, or defense costs arising from or related to Talc Claims or Talc Personal Injury Trust Expenses. For the avoidance of doubt, Talc In-Place Insurance Coverage does not include any Talc Insurance Policies that have been settled pursuant to the Cyprus Historical Insurance Settlements.

1.1.191    "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtor under the laws of any jurisdiction, against any Talc Insurance Company with respect to any Talc Claim, arising from or related to: (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay under Talc In-Place Insurance Coverage, whether prior to or after the Petition Date, (b) the refusal of any Talc Insurance Company to compromise and settle any Talc Claim under or pursuant to any Talc Insurance Policy or Talc Insurance Settlement Agreement, (c) the interpretation or enforcement of the terms of any Talc Insurance Policy or Talc Insurance Settlement Agreement with respect to any Talc Claim, (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extracontractual damages, or other wrongful conduct under applicable law, or (e) any other claims under, arising out of or relating to a Talc Insurance Policy, a Talc Insurance Settlement Agreement, or Talc In-Place Insurance Coverage, including but not limited to the California Coverage Action and the Insurance Adversary Proceeding.

1.1.192    "**Talc Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to a Talc Insurance Settlement Agreement, (b) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), and (c) the right to receive the proceeds or benefits of any Talc Insurance Action.

1.1.193    "**Talc Insurance Assets**" means (a) the Talc Insurance Actions, (b) the Talc Insurance Action Recoveries, (c) the Talc Insurance Settlement Agreements, (d) the Talc In-Place Insurance Coverage, (e) the Cyprus Talc Insurance Policy Rights, (f) the PDC Agreement Talc Insurance and Indemnity Rights, and (g) all other rights under or with respect to the Talc Insurance Policies, subject to the J&J Settlement Agreement. For the avoidance of doubt, the Talc Insurance Assets do not include rights under any Settled Talc Insurance Policies except as expressly set forth in the applicable Talc Insurance Settlement Agreement.

1.1.194    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that may have liability under a Talc Insurance Policy.

1.1.195    "**Talc Insurance Policy**" means any liability insurance policy (i) that was issued prior to June 30, 1992; (ii) that is currently or was previously in effect at any time on or before the Effective Date; (iii) as to which there has not been a complete release of coverage for Talc Claims; and (iv) that names the Debtor or any Cyprus Protected Party as an insured (whether as the primary or additional insured, or by virtue of being a parent or subsidiary of the named insured) or that is otherwise alleged to afford the Debtor or any Cyprus Protected Party indemnity or insurance coverage for any Talc Claim or any claims channeled to the Talc Personal Injury Trust. The Talc Insurance Policies include the policies set forth on **Schedule II**. For the avoidance of doubt, the term "Talc Insurance Policy" does not include any J&J Policies.

1.1.196    "**Talc Insurance Settlement Agreement**" means any settlement agreement entered into after the Petition Date by and among (i) any Talc Insurance Company, on the one hand, and (ii) the Debtor, and consented to by the Tort Claimants' Committee and the FCR (or the Talc Personal Injury Trust, the Talc Trust Advisory Committees and the Post-Effective Date FCRs, after the Effective Date) on the other hand, in which a Talc Insurance Policy and/or the Debtor's rights thereunder with respect to Talc Claims are released.

1.1.197    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code. Upon entry of the Confirmation Order in the Chapter 11 Case determining that the Bankruptcy Code authorizes the Assignment by preempting any terms or provisions of the Talc Insurance Policies that any Talc Insurance Company asserts or may assert otherwise prohibits the Assignment, a Talc Insurer Coverage Defense shall not include any defense that the Assignment is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

1.1.198    "**Talc Personal Injury Claim**" means a Talc Claim that is not a Foreign Claim.

1.1.199    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against the Debtor or any Protected Party that (i) was not a Claim prior to the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is to be channeled and resolved pursuant to the terms of the Talc Personal Injury Trust Documents.

1.1.200    "**Talc Personal Injury Trust**" means the Ivory America / Cyprus Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement, the other Plan Documents, and the Imerys Chapter 11 Plan, which is a "qualified settlement

fund" within the meaning of Treasury Regulations issued under Section 468B of the Internal Revenue Code.

1.1.201    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form attached hereto as **Exhibit A**.

1.1.202    "**Talc Personal Injury Trust Assets**" means the following assets and any income, earnings, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust:  (a) the Cyprus Contributions (subject to the terms in Section 10.6.2); (b) the right to receive the J&J Settlement Proceeds; and (c) any other assets contributed to the Talc Personal Injury Trust pursuant to the Imerys Chapter 11 Plan.  The allocation of the Talc Personal Injury Trust Assets among the Funds is set forth in the Trust Distribution Procedures.

1.1.203    "**Talc Personal Injury Trust Causes of Action**" means, any Estate Cause of Action, not otherwise expressly released pursuant to the Plan, attributable to: (a) all defenses to any Talc Personal Injury Claim, including, but not limited to, all defenses under section 502 of the Bankruptcy Code; (b) with respect to any Talc Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (c) any other claims, rights, defenses, or bases for claim reduction with respect to Talc Personal Injury Claims that the Debtor would have had under applicable law if the Chapter 11 Case had not occurred and the holder of such Talc Personal Injury Claim had asserted it by initiating civil litigation against the Debtor; (d) any claim, cause of action, or right of the Debtor under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by the Debtor on account of Talc Personal Injury Claims prior to the Petition Date; and (e) any claim, cause of action, or right of the Debtor to enforce the Cyprus Settlement, the J&J Settlement, and any Talc Insurance Settlement Agreement for the benefit of the Talc Personal Injury Trust.  For the avoidance of doubt, the Talc Personal Injury Trust Causes of Action shall not include (a) any defenses, cross-claims, offsets, or recoupments against any Protected Party or any Talc Insurance Company, (b) any retained causes of action as contemplated by Section 11.1 of the Plan, or (c) any Debtor J&J Released Claim and any J&J Related Rights; *provided, however*, if (i) the J&J Settlement Agreement is terminated, pursuant to Section 8.3 of the J&J Settlement Agreement, after the Effective Date, (ii) the Bankruptcy Court determines, after notice and hearing, that such termination requires that the Parties (as defined in the J&J Settlement Agreement) be returned to the status quo ante immediately preceding the Execution Date (as defined in the J&J Settlement Agreement), and (iii) each such Party is, in fact, returned to the status quo ante immediately preceding the Execution Date in all respects, including, for the avoidance of doubt, repayment in full of all J&J Payment Obligations made theretofore, then the Talc Personal Injury Trust Causes of Action shall include the Debtor J&J Released Claims and the J&J Related Rights.  For the avoidance of doubt, nothing herein shall be interpreted as modifying the J&J Settlement Agreement, including with regard to what remedies may be available or are appropriate thereunder.

- 25 -

1.1.204     "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Document Access Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in the Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.  With respect to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, (i) prior to the Effective Date, the form and substance of such documents shall be acceptable to the Plan Proponents and the Imerys Plan Proponents, and (ii) after the Effective Date, the Plan Proponents and the Imerys Plan Proponents shall have consent rights over modifications to such documents to the extent such modifications will materially impact the scope and the terms of the releases and injunctions included in Article XII of the Plan or in Article XII of the Imerys Chapter 11 Plan.

1.1.205     "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims).  Talc Personal Injury Trust Expenses shall also expressly include (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Talc Personal Injury Trust Assets (including, without limitation, the prosecution of any Talc Personal Injury Trust Causes of Action and Talc Insurance Actions), in each case whether or not any such action results in a recovery for the Talc Personal Injury Trust and (b) the reasonable documented costs and expenses incurred by the Reorganized Debtor in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any, including, without limitation, any costs and expenses incurred by the Reorganized Debtor in being named as a defendant in any Talc Insurance Action.

1.1.206     "**Talc Trust Advisory Committees**" means the Ovarian Cancer TAC and the Mesothelioma / Lung Cancer TAC, in each case, as appointed and serving in accordance with Section 4.5 of the Plan, and having the powers, duties and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.207     "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committees.

1.1.208     "**Talc Trustees**" means the individuals appointed by the Bankruptcy Court to serve as a trustee of the Talc Personal Injury Trust pursuant to the terms of the Plan and the Talc Personal Injury Trust Agreement or who subsequently may be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.209     "**Tort Claimants' Committee**" means the official committee of tort claimants in the Debtor's Chapter 11 Case appointed by the United States Trustee, as such committee is reconstituted from time to time.

1.1.210     "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form attached hereto as **Exhibit B**.

1.1.211    "**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.212    "**Unimpaired**" means a Claim or Equity Interest, or a Class of Claims or Equity Interests, that is not Impaired under the Plan.

1.1.213    "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

1.1.214    "**Unsecured Claim**" means a Claim against the Debtor that is not an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Secured Claim, or a Talc Claim.

1.1.215    "**US/Canada**" means the United States, Canada, and any of the territories and possessions of the United States (including Puerto Rico) and Canada.

1.1.216    "**Voting Procedures**" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against and Equity Interests in the Debtor entitled to vote on the Plan.

1.1.217    "**Voting Procedures Order**" means, the order entered by the Bankruptcy Court, which, among other things, (i) fixes Talc Personal Injury Claims in the amounts designated in the Voting Procedures, solely for voting purposes and not for allowance or distribution purposes, and (ii) approves the Voting Procedures.

1.1.218    "**Zurich**" means Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch.

1.2    <u>Interpretation; Application of Definitions; Rules of Construction; and Computation of Time</u>.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Schedule, or Exhibit references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the Plan.  Unless otherwise stated herein, all references to dollars mean U.S. dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3    <u>Exhibits</u>.  All exhibits and schedules to the Plan, to the extent not annexed hereto and any agreements referred to herein and therein will be available for review following their filing with the Bankruptcy Court on (a) the Court's website at www.deb.uscourts.gov, and (b) the website maintained by the Debtor's Claims Agent at https://cases.ra.kroll.com/cyprusmines.

1.4     Ancillary Documents.  Each of the schedules and exhibits to the Plan (whether annexed hereto or included in the Plan Supplement) are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan, including, without limitation, the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Document Access Agreement, the Amended Charter Documents, and the other Plan Documents.

## ARTICLE II.
## TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS

2.1     Administrative Claims.

2.1.1     Allowed Administrative Claims.  Holders of Allowed Administrative Claims (other than Fee Claims and DIP Claims, which are governed by Sections 2.3 and 2.4 of the Plan, respectively) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

2.1.2     Administrative Claims Bar Date.  Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims, DIP Claims, and Claims against the Debtor arising under section 503(b)(9) of the Bankruptcy Code), must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtor or the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

2.1.3     Disputed Administrative Claims.  If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtor) distribute to the holder of such Administrative Claim, the Cash that such holder would have received on account of such

Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date.

2.2     Allowed Priority Tax Claims.    On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such claim agrees to an alternative treatment.

2.3     Fee Claims.

2.3.1    All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtor, the Tort Claimants' Committee, or the FCR, all Fee Claims of members of the Tort Claimants' Committee for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtor and other parties required to be served by the Compensation Procedures Order by no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; *provided, however*, that, notwithstanding a Professional's filing of such final fee request, a Professional may, subject to Section 11.7.2 herein, continue to request and receive compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered after the Effective Date. For the avoidance of doubt, the deadline for final fee requests set forth in this Section 2.3.1 shall not apply to and shall have no effect on any Fee Claim for services rendered post-Effective Date pursuant to Section 11.7.2 herein. Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed by no later than twenty (20) days after the filing of such Claim. The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with this Section 2.3 of the Plan. The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtor shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

2.3.2    From and after the Effective Date, the Reorganized Debtor may, upon submission of appropriate documentation and in the ordinary course of business, pay the post-Effective Date charges incurred by the Reorganized Debtor for any professional's fees, disbursements, expenses, or related support services without application to or approval from the Bankruptcy Court. On the Effective Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for fees and charges incurred from and after the Effective Date in the ordinary course of business without any notice to or approval from the Bankruptcy Court.

2.4     DIP Claims. Effective on the Effective Date, as part of the Cyprus Settlement and in consideration for the Cyprus Protected Parties being Protected Parties and receiving all of the

protections inuring to the benefit of the Protected Parties under the Plan, each holder of a DIP Claim shall, by virtue of the entry of the Confirmation Order, be deemed to have fully, finally, and forever released, relinquished, forgiven, and discharged the Debtor and the Reorganized Debtor, from each and every DIP Claim, whether known or unknown, now or in the future, in law, equity, or otherwise, which has been, could have been, or may in the future have been brought by or on behalf of any holder of a DIP Claim.  As a result of the foregoing release, the holders of DIP Claims will receive no Distributions under the Plan on account of such DIP Claims.  Effective upon the Effective Date, the DIP Credit Agreement and all related documents shall be deemed automatically cancelled, extinguished, and of no further force or effect, with the Debtor and the Reorganized Debtor having no continuing obligations or duties or responsibilities thereunder.

## ARTICLE III.
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

3.1  <u>Claims and Equity Interests Classified</u>.  For purposes of organization, voting, and all Plan confirmation matters, and except as otherwise provided herein, all Claims (other than Administrative Claims and Priority Tax Claims) against and Equity Interests in the Debtor are classified as set forth in this Article III of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims described in Article II of the Plan have not been classified and are excluded from the following Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Claim that is not an Allowed Claim for distribution purposes.

3.2  <u>Treatment and Classification of Claims and Equity Interests</u>.  For purposes of all Plan confirmation matters, including, without limitation, voting on, Confirmation of, and Distributions under, the Plan, and except as otherwise provided herein, all Claims against (other than Administrative Claims and Priority Tax Claims, which are not classified) and Equity Interests shall be classified and treated in the manner set forth below.

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 4a | Talc Claims – Fund A Claims | Impaired | Entitled to Vote | *See Treatment* |

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 4b | Talc Claims – Fund B Claims | Impaired | Entitled to Vote | *See Treatment* |
| 4c | Talc Claims – Foreign Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | *See Treatment* |
| 5 | Equity Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |

3.2.1    Class 1—Priority Non-Tax Claims.

(a)    Classification:  Class 1 consists of all Priority Non-Tax Claims against the Debtor.

(b)    Treatment:  Except to the extent that the holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, on the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim.

(c)    Voting:  Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan. Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

3.2.2    Class 2—Secured Claims.

(a)    Classification:  Class 2 consists of all Secured Claims against the Debtor.

(b)    Treatment:  All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives on the Distribution Date:  (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code;  (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code;  (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.

(c)    Voting:  Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan.  Each holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

3.2.3    Class 3—Unsecured Claims.

(a)    Classification:  Class 3 consists of all Unsecured Claims against the Debtor.

(b)　　　Treatment:  Except to the extent previously paid during the Chapter 11 Case or the holder of an Allowed Unsecured Claim agrees to a less favorable treatment (including as set forth below with respect to the CAMC Intercompany Note Claim), each Allowed Unsecured Claim shall receive such treatment as may be necessary to render such Claim Unimpaired.

(c)　　　Resolution of CAMC Intercompany Note Claim.  Notwithstanding Section 3.2.3(b) of the Plan, effective on the Effective Date, as part of the Cyprus Settlement and in consideration for the Cyprus Protected Parties being Protected Parties and receiving all of the protections inuring to the benefit of the Protected Parties under the Plan, each holder of a CAMC Intercompany Note Claim shall, by virtue of the entry of the Confirmation Order, be deemed to have fully, finally, and forever released, relinquished, and discharged the Debtor and the Reorganized Debtor, from each and every CAMC Intercompany Note Claim, whether known or unknown, now or in the future, in law, equity, or otherwise, which has been, could have been, or may in the future be brought by or on behalf of any holder of a CAMC Intercompany Note Claim.  As a result of the foregoing release, the holders of the CAMC Intercompany Note Claims will receive no Distributions under the Plan on account of such CAMC Intercompany Note Claims.  Effective upon the Effective Date, the CAMC Intercompany Note and all related documents shall be deemed automatically cancelled, extinguished, and of no further force or effect, with the Debtor and the Reorganized Debtor having no continuing obligations or duties or responsibilities thereunder.

(d)　　　Voting:  Class 3 is Unimpaired and each holder of an Allowed Claim in Class 3 is presumed to accept the Plan.  Each holder of an Allowed Claim in Class 3 is not entitled to vote to accept or reject the Plan.

3.2.4  Class 4—Talc Claims.

(a)　　　Classification:  Class 4a consists of all Fund A Claims.  Class 4b consists of all Fund B Claims.  Class 4c consists of all Foreign Claims against the Debtor.

(b)　　　Treatment of Class 4a and Class 4b:

1.　　　On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to

the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Trust Distribution Procedures.

2.    Fund A Claims shall only be compensated from Fund A.  Fund B Claims shall only be compensated from Fund B.

3.    The Trust Distribution Procedures include provisions that require the Talc Trustees to set the Initial Payment Percentage for each Fund after the Effective Date and permit the Talc Trustees to subsequently modify the Payment Percentage for each Fund separately, with the consent of the applicable Talc Trust Advisory Committee and Post-Effective Date FCR for Fund A Claims and Fund B Claims. The Payment Percentages are subject to the Dual Estate Factor, which will increase recoveries for holders of Talc Personal Injury Claims as provided for in the Trust Distribution Procedures.

(c)    <u>Treatment of Class 4c</u>:  On the Effective Date, Foreign Claims against the Debtor shall be Reinstated.  As a result of their being Reinstated, the Debtor's liability (if any) for a Foreign Claim will rest solely with the Reorganized Debtor.  Foreign Claims will not be channeled to or assumed by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall not be responsible for resolving, and shall bear no costs or expenses related to resolving, a Claim determined to be a Foreign Claim.

(d)    <u>Voting</u>:  Class 4a and Class 4b are Impaired and each holder of a Talc Personal Injury Claim in Class 4a and/or 4b is entitled to vote to accept or reject the Plan.  Class 4c is Unimpaired, and each holder of a Claim in Class 4c is presumed to accept the Plan.  Each holder of a Claim in Class 4c is not entitled to vote to accept or reject the Plan.

3.2.5    <u>Class 5—Equity Interests</u>.

(a)    <u>Classification</u>:  Class 5 consists of all Equity Interests in the Debtor.

(b)    <u>Treatment</u>:  The Equity Interests in the Debtor shall not be altered and the holder shall be entitled to all legal, equitable and contractual rights to which it is entitled.

(c)    <u>Voting</u>:  Class 5 is Unimpaired.  Each holder of an Allowed Class 5 Equity Interest is presumed to accept the Plan.  Each holder of an Allowed Equity Interest in Class 5 is not entitled to vote to accept or reject the Plan.

3.3     Debtor's Rights with Respect to Unimpaired Claims.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE IV.
## THE TALC PERSONAL INJURY TRUST

4.1     Establishment of the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be created in accordance with the Plan Documents and the Imerys Chapter 11 Plan. The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Tax Code.

4.2     Purpose and Trust Distribution Procedures.  The purposes of the Talc Personal Injury Trust shall be to assume all liability and responsibility for all Talc Personal Injury Claims and Imerys Talc Personal Injury Claims and to use the Talc Personal Injury Trust Assets and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims and Imerys Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Talc Personal Injury Claims and Imerys Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims and Imerys Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) and any other applicable provisions of the Bankruptcy Code.

4.3     Initial Talc Trustees.  There shall be two (2) initial Talc Trustees.  The initial Talc Trustees of the Talc Personal Injury Trust are Ellen Pryor and Anne Ferazzi, who shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  All successor Talc Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  For purposes of performing their duties and fulfilling their obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.4     Delaware Trustee.  The initial Delaware Trustee is Wilmington Trust, N.A. and will be appointed as such pursuant to the Confirmation Order.  All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.

4.5     Advising the Talc Personal Injury Trust.

4.5.1     The Talc Trust Advisory Committees.  The Talc Trust Advisory Committees shall be established pursuant to the Talc Personal Injury Trust Agreement. The initial Talc Trust Advisory Committees shall have the functions, duties, and rights provided in the Talc Personal Injury Trust Agreement.  The initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC shall be those persons named in the Plan Supplement.  Each of the Talc Trust Advisory Committee

Members shall serve in accordance with the terms and conditions contained in the Talc Personal Injury Trust Agreement.

4.5.2    <u>Successor Talc Trust Advisory Committee Members</u>.  Successor Talc Trust Advisory Committee Members shall be appointed as provided in, and pursuant to, the terms of the Talc Personal Injury Trust Agreement.

4.5.3    <u>Post-Effective Date FCRs</u>.    From and after the Effective Date, the Post-Effective Date FCRs shall serve in the capacity of future claimants' representatives and as advisors to the Talc Personal Injury Trust, and shall have the functions, duties and rights provided in the Talc Personal Injury Trust Agreement.  Any expenses incurred by the Post-Effective Date FCRs in this capacity shall constitute Talc Personal Injury Trust Expenses.

4.5.4    <u>Successor Post-Effective Date FCRs</u>.  Successor Post-Effective Date FCRs shall be appointed as provided in, and pursuant to, the terms of the Talc Personal Injury Trust Agreement.

4.6    <u>Transfer of Talc Personal Injury Claims to the Talc Personal Injury Trust</u>.

4.6.1    On the Effective Date, and without further action of any Entity, the Talc Personal Injury Trust shall assume the liabilities, obligations, and responsibilities of the Debtor and the other Protected Parties for all Talc Personal Injury Claims, financial or otherwise.  This assumption shall not affect (i) the application of the Discharge Injunction and the Channeling Injunction to the Debtor or any other Protected Party or (ii) any Talc Insurance Company's obligation under any Talc Insurance Policy.  Except to the extent the Talc Personal Injury Trust expressly assumes obligations under the Plan, the Talc Personal Injury Trust shall have no liability or responsibility for any Claims (including Foreign Claims) other than Talc Personal Injury Claims, and no liability or responsibility for any Claims (including Foreign Claims) other than Talc Personal Injury Claims shall be transferred or channeled to the Talc Personal Injury Trust.

4.6.2    Except as specifically provided in the Talc Personal Injury Trust Agreement or the Trust Distribution Procedures, the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions, and the Talc Personal Injury Trust shall thereby become the Estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each Talc Personal Injury Trust Cause of Action and Talc Insurance Action, and the proceeds of the recoveries on any of the Talc Personal Injury Trust Causes of Action or the Talc Insurance Actions shall be deposited in and, when deposited, shall become the property of the Talc Personal Injury Trust, and the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including, but not limited to, the Document Access Agreement) according to their respective terms, including the right to receive the Talc Personal Injury Trust Assets as provided in the Plan; *provided*, *however*, (a) the Talc Personal Injury Trust shall have no other rights against the Reorganized Debtor or the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not

include any of the Talc Insurer Coverage Defenses; (c) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not include any claims fully and finally released, compromised, or settled pursuant to the Plan; (d) the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol; and (e) for the avoidance of doubt, the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions do not include any rights of the Debtor, the Reorganized Debtor, or the other Protected Parties arising under the Channeling Injunction or any of the other injunctions, releases, or the discharge granted under the Plan and the Confirmation Order.

4.7     <u>Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust</u>.

4.7.1    <u>Transfers on the Effective Date</u>.   To the fullest extent permissible under applicable law, on the Effective Date:

4.7.1.1     The Talc Insurance Assets, the Cyprus Indemnity Rights shall, by operation of the Plan and the Confirmation Order, be automatically, and without further act or deed, transferred to, vested in, and assumed by the Talc Personal Injury Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity, subject to the Channeling Injunction and other provisions of the Plan.  For the avoidance of doubt, the Talc Personal Injury Trust shall neither receive, assume, nor accept any assignment of, or rights or obligations under, any Cyprus Historical Insurance Settlement or any other insurance settlement that contains an indemnification, defense, or hold-harmless provisions in favor of the settled insurance party.

4.7.1.2     CAMC and the Reorganized Debtor shall issue and deliver the Plan Note, and CAMC shall issue and deliver the Plan Note Pledge Agreement.

4.7.1.3     Upon the occurrence and during the continuation of an Event of Default (as defined under the Plan Note), the Talc Personal Injury Trust shall have the right to demand in writing to CAMC that CAMC transfer to the Talc Personal Injury Trust ownership of 51% of the voting shares in the Reorganized Debtor.  Within twenty (20) days of CAMC's receipt of any such written demand, CAMC shall transfer to the Talc Personal Injury Trust ownership of 51% of the voting shares in the Reorganized Debtor.  The rights granted under this Section 4.7.1.3 shall remain valid and enforceable until the earlier of the date on which (i) all obligations under the Plan Note have been fully paid or have otherwise been fully discharged and (ii) the Talc Personal Injury Trust exercises any remedy under the Plan Note Pledge Agreement.

4.7.1.4     Freeport shall issue and deliver the Freeport Plan Note Guarantee.

4.7.1.5     The rights of the Debtor under the J&J Settlement Agreement shall be assigned and transferred to the Talc Personal Injury Trust without need for further action by any J&J Settling Party or Person, and the Talc Personal Injury Trust shall be bound by all of the applicable provisions of the J&J

Settlement Agreement. Unless the J&J Settlement Agreement is validly terminated pursuant to the terms thereof, the Debtor, the Reorganized Debtor, and the Cyprus Corporate Parties shall continue to be bound by the J&J Settlement Agreement and shall retain all of the obligations and benefits thereof notwithstanding the Debtor's assignment and transfer of rights under the J&J Settlement Agreement to the Talc Personal Injury Trust.

4.7.1.6    The Plan shall constitute a motion to assign the Debtor's rights under the J&J Settlement Agreement to the Talc Personal Injury Trust on the Effective Date. Through such assignment, the Talc Personal Injury Trust will be assigned the rights to receive: (i) all amounts in the Cyprus Designated Account, and (ii) any other amounts owed to the Debtor by the J&J Settling Parties pursuant to the terms of the J&J Settlement Agreement including any J&J Payment Obligations not yet paid by the J&J Settling Parties.

4.7.2    Transfers After the Effective Date.    To the extent any of the Cyprus Contributions are not transferred to the Talc Personal Injury Trust as of the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall immediately be transferred to the Talc Personal Injury Trust. To the extent that action of the Reorganized Debtor, CAMC or Freeport is required to effectuate such transfer, the Reorganized Debtor, CAMC or Freeport shall transfer, assign, and contribute such remaining Cyprus Contributions to the Talc Personal Injury Trust, to the extent it has authority to do so on its own behalf or on behalf of a Cyprus Corporate Party, as soon as reasonably practicable. In the event the Reorganized Debtor, CAMC or Freeport fails to make any such transfers that it has authority to make on its own behalf or on behalf of a Cyprus Corporate Party, or breaches any obligation contained in this Section 4.7 to take action on its own behalf or on behalf of a Cyprus Corporate Party, the Talc Personal Injury Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.

4.7.3    Talc Insurance Policies.    On the Effective Date, the Talc Personal Injury Trust shall assume all present and future obligations associated with recovering proceeds under the Talc Insurance Policies, subject to applicable law and the J&J Settlement Agreement. Solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement. For the avoidance of doubt, other than as set forth in this provision or otherwise stated in the Plan or the Confirmation Order, the Imerys Chapter 11 Plan, or the Cyprus Settlement, the Talc Personal Injury Trust is not assuming any obligations undertaken by the Debtor, the Imerys Debtors, or any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Talc Insurance Policy. For the avoidance of doubt, the treatment of the Talc Insurance Policies, Talc Insurance Assets, Cyprus Talc Insurance Policy Rights, and J&J Policies shall, in all respects, be subject to the terms of the J&J Settlement Agreement and the J&J Settlement Order.

4.8    Talc Personal Injury Trust Expenses.    The Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust Assets, including

proceeds of applicable Talc Insurance Policies. The Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses. Additionally, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.

4.9    Excess Talc Personal Injury Trust Assets. To the extent there are any Talc Personal Injury Trust Assets remaining at such time as the Talc Personal Injury Trust is dissolved, such excess Talc Personal Injury Trust Assets shall be transferred to a charity or charities for such charitable purposes as the Talc Trustees, in their reasonable discretion, shall determine.

4.10    Institution and Maintenance of Legal and Other Proceedings. Subject to the Talc Personal Injury Trust Agreement, from and after the Effective Date, the Talc Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust that is not released pursuant to the Plan.

4.11    Dissolution of the Talc Personal Injury Trust. The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents. Upon dissolution of the Talc Personal Injury Trust: (a) the Talc Trustees, the Talc Trust Advisory Committee Members, and the Post-Effective Date FCRs shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case, and (b) the Talc Trust Advisory Committees shall be dissolved.

4.12    Funds and Investment Guidelines. All monies held in the Talc Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.13    Indemnification of the Protected Parties for Talc Personal Injury Claims. From and after the Effective Date, the Talc Personal Injury Trust shall, pursuant to the Talc Personal Injury Trust Agreement, indemnify, to the fullest extent permitted by applicable law, the Debtor, the Reorganized Debtor, and the other Protected Parties for reasonable documented out-of-pocket expenses (including, without limitation, attorneys' fees and expenses) incurred after the Effective Date attributable to the defense of any Talc Personal Injury Claim asserted against the Debtor, Reorganized Debtor, or the other Protected Parties; *provided, however*, that the limit of the indemnification will be the amount contributed in Cash by or on behalf of (i) CAMC, with respect to the Debtor and the Cyprus Protected Parties, and (ii) each other Protected Party, with respect to such Party; *provided, further,* that the Talc Personal Injury Trust shall not indemnify any party for any alleged Foreign Claim. For the avoidance of doubt, this Section 4.13 is intended to supplement and not supersede the indemnification obligations of the Talc Personal Injury Trust set forth in Section 4.13 of the Imerys Chapter 11 Plan and is intended to supplement and not supersede the Injunctions provided in this Plan including the Channeling Injunction.

4.14    Post-Effective Date Liabilities. Notwithstanding anything to the contrary in the Plan Documents or the Confirmation Order, neither any claim against nor the liability of any Entity arising out of or relating to the alleged post-Effective Date acts or omissions of such Entity (each,

a "**Post-Effective Date Liability**") shall be a Talc Personal Injury Claim.  No Post-Effective Date Liabilities are affected by the filing of the Chapter 11 Case, Confirmation or effectiveness of the Plan, or any of the transactions effectuated in connection therewith.  To the extent an individual has both a Talc Personal Injury Claim and a claim based on any Post-Effective Date Liability, that individual may seek recovery from the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents and will retain any and all rights under applicable law with respect to such Post-Effective Date Liabilities.

4.15    Forbearance of Claims by Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be bound by the following protocol (the "**Cyprus Insurance Protocol**"):

4.15.1  In the event that (a) the Talc Personal Injury Trust obtains a Judgment providing that the Talc Personal Injury Trust is entitled to a payment from an insurer pursuant to any Talc Insurance Policy or if such an insurer enters into an agreement or settlement to pay, or otherwise pays, an amount to the Talc Personal Injury Trust pursuant to any Talc Insurance Policy, and (b) based on such Judgment or agreement or settlement or payment, such insurer obtains a Judgment against any Cyprus Historical Settled Insurer, or an agreement to pay from any Cyprus Historical Settled Insurer, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against, agreement with, settlement with, or recovery from such insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by any Cyprus Corporate Party to such Cyprus Historical Settled Insurer pursuant to the Cyprus Historical Insurance Settlements.

4.15.2  The Talc Personal Injury Trust shall not seek recovery from any London Market Insurer that was a party to the London Market Settlement and Release Agreement, or any other insurer, with respect to claims and policies released in that agreement.

4.15.3  The Talc Personal Injury Trust shall not seek recovery from Providence Washington, or any other insurer, with respect to the policy released in the Seaton Settlement and Release Agreement.

4.15.4  If the Talc Personal Injury Trust obtains a Judgment that entitles it to receive a payment from any of the Certain Cyprus Historical Settled Insurers, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against the Certain Cyprus Historical Settled Insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by a Cyprus Corporate Party to such Certain Cyprus Historical Settled Insurer.

4.15.5  The Talc Personal Injury Trust shall obtain in any future settlement with any Certain Cyprus Historical Settled Insurer with respect to the Talc Insurance Policies released in any Cyprus Historical Insurance Settlement a release by the Certain Cyprus Historical Settled Insurer of the Debtor and the Cyprus Protected Parties.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

5.1    General Treatment.

5.1.1    Subject to Section 5.7 hereof, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts or Unexpired Leases of the Debtor shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was assumed or rejected previously by the Debtor, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed on or before the Effective Date, or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected by the Debtor pursuant to the Plan Supplement.

5.1.2    Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of Executory Contracts and Unexpired Leases, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall (i) in the case of an Executory Contract or Unexpired Lease that is a Talc Personal Injury Trust Asset, be assigned to the Talc Personal Injury Trust on the date such trust is established or as soon as reasonably practicable thereafter, and shall vest in, and be fully enforceable by the Talc Personal Injury Trust in accordance with its terms, except as such terms may have been modified by such order, or (ii) revest in and be fully enforceable by the Reorganized Debtor, as applicable, in accordance with its terms, except as such terms may have been modified by such order.

5.1.3    Notwithstanding anything to the contrary in the Plan, (i) the Debtor reserves the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases to be rejected by the Debtor identified in the Plan Supplement at any time before the date that is sixteen (16) days prior to the Confirmation Hearing. After the Effective Date, the Reorganized Debtor, or any assignee, as applicable, shall have the right to terminate, amend, or modify any intercompany contracts, leases or other agreements to which they are a party without approval of the Bankruptcy Court.

5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

5.2.1    If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor, the Reorganized Debtor, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtor or counsel for the Reorganized Debtor, as applicable, by the *earlier* of (i) thirty (30) days after service of notice of the Effective Date, and (ii) thirty (30) days after service of notice of entry of a

Final Order rejecting such Executory Contract or Unexpired Lease pursuant to a motion filed by the Debtor, which notice, in each case, will set forth such deadline.

5.2.2   Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time period provided in Section 5.2.1 will be automatically disallowed, forever barred from assertion and shall not be enforceable, without the need for any objection, or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a Class 3 Unsecured Claim against the Debtor and shall be treated in accordance with Article III of the Plan.

5.3   <u>Cure of Defaults for Executory Contracts and Unexpired Leases</u>.

5.3.1   Notwithstanding anything to the contrary contained herein, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Distribution Date.  In the event of a dispute regarding (1) any Cure Amount owed, (2) the ability of the Debtor or any assignee to provide any "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

5.3.2   No later than fourteen (14) days prior to the deadline to object to Confirmation of the Plan, the Debtor shall distribute, or cause to be distributed, notices of proposed assumption and proposed Cure Amounts to the applicable counterparty or counterparties to each such Executory Contract or Unexpired Lease, which notices shall include procedures for objecting to the proposed assumption of such Executory Contract or Unexpired Lease and any Cure Amounts to be paid in connection therewith, and the anticipated procedure for resolution of disputes by the Bankruptcy Court.  Any objection to a proposed assumption (including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code) or related Cure Amount by a counterparty to an Executory Contract or Unexpired Lease must be filed, served and actually received by counsel to the Debtor on the date that is the earlier of (i) fourteen (14) days after the service of the notices of proposed assumption and proposed Cure Amounts to the counterparties, and (ii) three (3) Business Days prior to the Confirmation Hearing.  Any unresolved objections shall be heard at the Confirmation Hearing, unless otherwise agreed by the parties or at such other date and time as may be fixed by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to any proposed assumption and/or Cure Amount will be deemed to have assented to such assumption and/or Cure Amount.  To the extent an Executory Contract or Unexpired Lease with the Debtor is not identified as an Executory Contract or Unexpired Lease to be assumed or rejected by the Debtor, then the Cure Amount for such Executory Contract or Unexpired Lease is $0 and such Executory Contract or Unexpired Lease will be assumed by the Debtor pursuant to the Plan.

- 41 -

5.3.3    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    <u>Modifications, Amendments, Supplements, Restatements or Other Agreement</u>.

5.4.1    Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

5.4.2    Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.5    <u>Reservation of Rights</u>.    Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on (i) the list of the Executory Contracts and Unexpired Leases to be rejected by the Debtor, or (ii) anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor, or any assignee has any liability thereunder.    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, the Reorganized Debtor, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.6    <u>Talc Insurance Policies, Cyprus Historical Insurance Settlements, and Talc Insurance Settlement Agreements</u>.    Notwithstanding Section 5.1 above, all Talc Insurance Policies, Cyprus Historical Insurance Settlements, and Talc Insurance Settlement Agreements entered into by the Debtor prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by the Debtor.    Other than the permissibility of the Assignment, which is to be determined by or in connection with Confirmation of the Plan, the rights and obligations of the parties under the Talc Insurance Policies, the Cyprus Historical Insurance Settlements, and the Talc Insurance Settlement Agreements, including the question of whether any breach has occurred, shall be determined under applicable law.

5.7    <u>Non-Talc Insurance Policies</u>.    The Debtor does not believe that the Non-Talc Insurance Policies (or settlements related thereto) constitute executory contracts.  However, to the extent such Non-Talc Insurance Policies are considered to be executory contracts, then,

notwithstanding anything contained in this Article V to the contrary, the Plan will constitute a motion to assume such Non-Talc Insurance Policies, and authorize the Reorganized Debtor, as applicable, to pay all future obligations, if any, in respect thereof.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, its Estate and all parties in interest.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such Non-Talc Insurance Policy.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the Non-Talc Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed.  Under no circumstances shall the Talc Personal Injury Trust be obligated to pay any indemnity or retrospective premium obligations arising out of Non-Talc Insurance Policies.

**ARTICLE VI.**
**DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS**
**OTHER THAN TALC CLAIMS**

6.1     <u>Distributions</u>.  Distributions on account of Allowed Non-Talc Claims shall be made on or after the Distribution Date as provided in the Plan.  All Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or resolved by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

6.2     <u>Timing and Calculation of Amounts to be Distributed</u>.

6.2.1     Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.2.2     If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this Article VI of the Plan.

6.3     <u>Disbursing Agent</u>.  Except as otherwise provided herein, all Distributions under the Plan shall be made by the Disbursing Agent.  The Reorganized Debtor, or any such other Entity

or Entities designated by the Reorganized Debtor, shall serve as Disbursing Agent for all Non-Talc Claims.

6.4    Rights and Powers of Disbursing Agent.

6.4.1    The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all Distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

6.4.2    Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

6.5    Distributions on Account of Claims Allowed After the Effective Date. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

6.6.1    Delivery of Distributions to Holders of Allowed Non-Talc Claims.  Except as otherwise provided in the Plan, Distributions to holders of Allowed Non-Talc Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2    Full Benefit of Distributions.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment or similar legal

process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan. Neither the Debtor, the Reorganized Debtor, nor the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct or fraud.

6.6.3    <u>Undeliverable Distributions and Unclaimed Property</u>. In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided, however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Debtor or the Reorganized Debtor notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The claim of any holder to such property or interest in property shall be discharged and forever barred.

6.7    <u>Time Bar to Cash Payments</u>. Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof. The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided, however*, that any such request for re-issuance of a check shall be made on or before the twelve (12) month anniversary of the Distribution Date. After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8    <u>Record Date for Holders of Claims</u>. Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. If there is any dispute regarding the identity of the Person entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.9    <u>Compliance with Tax Requirements and Allocations</u>.

6.9.1    In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions

pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

6.9.2   For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.10    <u>Transfers of Claims</u>.  In the event that the holder of any Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the Reorganized Debtor or the Talc Personal Injury Trust (to the extent it pertains to a Talc Personal Injury Claim), in writing of such transfer and file a notice of the transfer with the Bankruptcy Court.  The Reorganized Debtor or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Reorganized Debtor or the Talc Personal Injury Trust, as applicable. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtor or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.11    <u>Interest on Impaired and Disputed Claims</u>.  Except as specifically provided for herein or in the Talc Personal Injury Trust Documents (as related to Talc Personal Injury Claims), interest shall not accrue on Impaired Claims, and no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim.  Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

6.12    <u>Setoffs</u>.  The Debtor and the Reorganized Debtor (or the Talc Personal Injury Trust to the extent it pertains to a Talc Personal Injury Claim) may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts or liabilities of any nature that the Debtor or the Reorganized Debtor (or the Talc Personal Injury Trust (in its own right or as assignee of the Debtor) to the extent it pertains to a Talc Personal Injury Claim) may hold against the holder of such Allowed Claim; *provided*, *however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts or liabilities.

## ARTICLE VII.
## RESOLUTION OF DISPUTED CLAIMS OTHER
## THAN TALC CLAIMS AND ADMINISTRATIVE CLAIMS

7.1    <u>Disputed Claims</u>.  All Disputed Claims against the Debtor, other than Talc Claims and Administrative Claims, shall be subject to the provisions of this Article VII.  All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.  All Administrative Claims shall be determined and, if Allowed, paid in accordance with Article II of the Plan.

7.2    Prosecution of Claims Generally.

7.2.1    Subject to the provisions contained herein, including as set forth in Section 11.7.2 of the Plan, after the Effective Date, only the Reorganized Debtor may object to the allowance of any Non-Talc Claim, except that the United States Trustee, the Tort Claimants' Committee, the FCR, the other Notice Parties (as that term is defined in the Compensation Procedures Order), as applicable, shall also have standing and capacity to object to the Fee Claims of the Professionals.  After the Effective Date, the Reorganized Debtor shall be accorded the power and authority to allow or settle and compromise any Non-Talc Claim, except for Fee Claims, without notice to any other party or approval of or notice to the Bankruptcy Court.  For the avoidance of doubt, no fees incurred from and after the Effective Date resulting from objections to the Fee Claims, other than objections by the Reorganized Debtor, will be funded by the Reorganized Debtor.

7.2.2    Notwithstanding anything to the contrary in this Article VII,

(i)    resolution of Talc Personal Injury Claims shall be handled exclusively by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents,

(ii)    objections to Fee Claims shall be handled in accordance with the Compensation Procedures Order, subject to Section 2.3, and

(iii)    objections to Administrative Claims (excluding Fee Claims and DIP Claims) shall be handled in accordance with Section 2.1 of the Plan.

7.3    Prosecution of Disputed Debtor Claims and Claims Objection Deadline.

7.3.1    The Debtor shall have the right, after the Effective Date, to file objections to the Non-Talc Claims that have not already been Allowed by Final Order, agreement, or the Plan, and litigate to judgment, settle, or withdraw such objections to Disputed Claims. Without limiting the foregoing, the Reorganized Debtor shall have the right to litigate any Disputed Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

7.3.2    Unless otherwise ordered by the Bankruptcy Court, objections to Non-Talc Claims (other than Administrative Claims or late-filed Claims) shall be filed with the Bankruptcy Court and served upon the holders of each such Non-Talc Claim to which objections are made on or before the Claims Objection Bar Date, unless extended by order of the Bankruptcy Court prior to the expiration of such period.  Objections to late-filed Claims against the Debtor shall be filed before the later of (i) six (6) months following the Effective Date, or (ii) ninety (90) days after the Reorganized Debtor receives actual notice of the filing of such Claim.

7.4    Distributions on Account of Disputed Claims.  At such time as determined to be practicable by the Reorganized Debtor, the Disbursing Agent will make Distributions on account of any Disputed Claim that has become Allowed.  Such Distributions will be made pursuant to the applicable provisions of Article VI of the Plan.

7.5    No Distributions Pending Allowance.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.6    Estimation of Claims.  The Debtor (before the Effective Date) or the Reorganized Debtor (on or after the Effective Date) may, at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date) or the Reorganized Debtor (on or after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.
## ACCEPTANCE OR REJECTION OF PLAN

8.1    Classes Entitled to Vote.  Holders of Talc Personal Injury Claims in Classes 4a and 4b shall be entitled to vote to the extent and in the manner provided in the Voting Procedures Order and the Plan.

8.2    Acceptance of Holders of Talc Personal Injury Claims.  Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, each of Class 4a and Class 4b shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in each of Class 4a and Class 4b, respectively, actually voting on the Plan have voted to accept the Plan.

8.3    Acceptance by Unimpaired Classes.  Classes 1, 2, 3, 4c, and 5 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

9.1    Conditions Precedent to the Confirmation of the Plan.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 9.3 of the Plan:

9.1.1    The Bankruptcy Court shall have entered an order, acceptable in form and substance to each of the Plan Proponents, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

9.1.2    Each of Class 4a and Class 4b shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

9.1.3    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall be consistent with (i) section 524(g) and other provisions of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan and shall be in form and substance acceptable to the Plan Proponents.

9.1.4    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to each of the Plan Proponents. These findings and determinations, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article XII shall be effective, binding and enforceable, and shall among other things conclude:

(i)    Good Faith Compliance.    The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud.

(ii)    Voting.    Each of Class 4a and Class 4b has voted in requisite numbers and amounts in favor of the Plan as required by each of sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(iii)    Injunctions.    The Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order are to be implemented in connection with the Talc Personal Injury Trust and do not enjoin or otherwise affect any claims or demands that any holder of a Talc Personal Injury Claim may have, whether presently or in the future, against J&J.

(iv)    Named Defendants.    As of the Petition Date, the Debtor has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos in talc or talc-containing products.

(v)    Assumption of Certain Liabilities.    Upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Protected Parties with respect to Talc Personal Injury Claims and have exclusive authority as of the Effective Date to satisfy or defend such Talc Personal Injury Claims.

(vi)    Funding of Talc Personal Injury Trust.    The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets, including the Plan Note.    The Talc Personal Injury Trust would be entitled to own, by the exercise of rights granted under the Plan Note Pledge Agreement or Section 4.7.1.3 of the Plan

and the Confirmation Order, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.

(vii)   Use of Talc Personal Injury Trust Assets.   The Talc Personal Injury Trust will use its assets and income to resolve Talc Personal Injury Claims.

(viii)   Likelihood of Talc Personal Injury Demands.   The Debtor is likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(ix)   Talc Personal Injury Demands Indeterminate.   The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(x)   Likelihood of Threat to Plan's Purpose.   Pursuit of Talc Personal Injury Claims, including Talc Personal Injury Demands, outside of the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to treat the Talc Personal Injury Claims and Talc Personal Injury Demands equitably.

(xi)   Injunctions Conspicuous.   The terms of the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement.

(xii)   Appropriate Trust Mechanisms.   Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims.

(xiii)   Future Claimants' Representative.   The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands of the kind that are addressed in the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, and transferred to and assumed by the Talc Personal Injury Trust.

(xiv)   Fair and Equitable Inclusion.   The inclusion of the Debtor or any other Protected Party within the protection afforded by the Channeling Injunction

- 50 -

and the Insurance Entity Injunction, as applicable, is fair and equitable with respect to the Persons that might subsequently assert Talc Personal Injury Demands against the Debtor or such other Protected Party in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of the Debtor or such other Protected Party.

(xv)  Sections 105(a) and 524(g) Compliance.  The Plan complies with sections 105(a) and 524(g), to the extent applicable, and all other applicable provisions of the Bankruptcy Code.

(xvi)  Injunctions Essential.  The Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts.

(xvii)  Insurance Assignment Authorized.  The Assignment of the Talc Insurance Assets is authorized, valid, permissible, and enforceable under sections 524(g), 541(c)(1)(a), 1123(a)(5)(B), and 1129(a)(1) of the Bankruptcy Code, notwithstanding any terms of the Talc Insurance Policies or provisions of applicable law that prohibit (or that may be argued to prohibit) the delegation, Assignment, or other transfer of the Talc Insurance Assets to the Talc Personal Injury Trust.  From and after the Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.7 of the Plan, no Talc Insurance Company may assert under any Talc Insurance Policy or Talc Insurance Settlement Agreement, (i) any defense that any Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust is prohibited by any Talc Insurance Policy or Talc Insurance Settlement Agreement, or by applicable non-bankruptcy law.  Except for the foregoing, for the avoidance of doubt, the Cyprus Talc Insurance Policy Rights that are assigned to the Talc Personal Injury Trust pursuant to Section 4.7 of the Plan include and remain subject to the terms and conditions of the applicable Talc Insurance Policies, including any Talc Insurer Coverage Defenses available under applicable law.

(xviii)  The J&J Settlement.  The assignment of the Debtor's rights under the J&J Settlement Agreement to the Talc Personal Injury Trust on the Effective Date is authorized, including the assignment of the Debtor's rights to receive: (i) all amounts in the Cyprus Designated Account and (ii) any other amounts owed to the Debtor by the J&J Settling Parties pursuant to the terms of the J&J Settlement Agreement including any J&J Payment Obligations not yet paid by the J&J Settling Parties.

(xix)  Assignment of Cyprus Indemnity Rights Authorized.  The Assignment of the Cyprus Indemnity Rights is authorized and permissible notwithstanding any agreements or provisions of applicable law that may be argued to prohibit the Assignment.  The Bankruptcy Code authorizes the Assignment of the Cyprus Indemnity Rights to the Talc Personal Injury Trust pursuant to Section

4.7 of the Plan, and from and after the Assignment of the Cyprus Indemnity Rights to the Talc Personal Injury Trust, no applicable party may assert (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the Assignment of the Cyprus Indemnity Rights to the Talc Personal Injury Trust pursuant to Section 4.7 of the Plan, or any other action contemplated by Section 4.7 of the Plan, is prohibited by any agreement or by applicable non-bankruptcy law.

(xx)    Cyprus Settlement.  The Cyprus Settlement (i) represents a sound exercise of the Debtor's business judgment, (ii) is in the best interest of the Debtor and the Estate, (iii) is fair, reasonable, and equitable, and the consideration exchanged under the Cyprus Settlement constitutes a fair and reasonable settlement of the settling parties' disputes, and (iv) is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxi)    The Supplemental Settlement Injunction Order.  The Supplemental Settlement Injunction Order is fair, equitable, in the best interests of the Debtor's Estate, and shall be entered in connection with the Cyprus Settlement.

(xxii)    Adequate Notice.  Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to: (a) all known creditors and holders of Equity Interests, including all known holders of Talc Claims; (b) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Tort Claimants' Committee and the FCR); (c) all parties to Unexpired Leases and Executory Contracts with the Debtor; (d) all taxing authorities listed on the Schedules or in the Claims Register; (e) the Department of the Treasury by service upon the District Director of the Internal Revenue Service of the United States; (f) state attorneys general and state departments of revenue for states in which the Debtor has conducted business; and (g) holders of interests in the Talc Insurance Policies being sold free and clear of such interests under the Plan that have been identified by the Settling Talc Insurance Companies (as applicable) to the Debtor, in each case, (x) in accordance with the solicitation procedures governing such service and (y) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b).  In addition, notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been sufficiently publicized.  Such transmittal, service, and publication were adequate and sufficient to bind, among other parties, each holder of a Talc Personal Injury Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(xxiii)  Due Process.  Each holder of a Talc Claim and each party represented by the Tort Claimants' Committee or the FCR has been afforded due process based on the notice referenced in clause (xxi) above, the appointment of the Tort Claimants' Committee and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

9.1.5   The J&J Settlement Agreement shall not have been terminated and is otherwise in effect, except pursuant to Section 8.3 of the J&J Settlement Agreement as a result of a material breach by J&J, as determined in accordance with Section 8.3 of the J&J Settlement Agreement.

9.1.6   The Confirmation Order shall provide that, upon the occurrence and during the continuation of an Event of Default (as defined in the Plan Note), in addition to the remedies available to the Talc Personal Injury Trust under the Plan Note Pledge Agreement, within twenty (20) days of CAMC's receipt of a written demand from the Talc Personal Injury Trust consistent with Section 4.7.1.3 of the Plan, CAMC shall transfer ownership of 51% of the voting shares in the Reorganized Debtor to the Talc Personal Injury Trust; provided, however, that such rights remain valid and enforceable until the earlier of the date on which (i) all obligations under the Plan Note have been fully paid or have otherwise been fully discharged and (ii) the Talc Personal Injury Trust exercises any remedy under the Plan Note Pledge Agreement.

9.2   <u>Conditions Precedent to the Effective Date of the Plan</u>.   Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to Section 9.3:

9.2.1   <u>Confirmation Order and Affirmation Order</u>.   The Confirmation Order shall have been submitted to the District Court for affirmation, and the Affirmation Order, in form and substance acceptable to each of the Plan Proponents, shall have been entered by the District Court, and the Confirmation Order and the Affirmation Order shall have become Final Orders.

9.2.2   <u>Imerys Confirmation Order and Imerys Affirmation Order</u>.   The Imerys Chapter 11 Plan, in form and substance consistent with the Cyprus Settlement, shall have been confirmed by entry of the Imerys Confirmation Order by the Bankruptcy Court, which shall have been affirmed by entry of the Imerys Affirmation Order by the District Court, and the Imerys Confirmation Order and the Imerys Affirmation Order shall have become Final Orders.

9.2.3   <u>Talc Personal Injury Trust</u>.   The Talc Personal Injury Trust Assets shall, simultaneously with the occurrence of the Effective Date, or as otherwise provided herein or in the Imerys Chapter 11 Plan (only as related to the assets contributed pursuant to the Imerys Chapter 11 Plan), be transferred to, vested in, and assumed by the Talc Personal Injury Trust in accordance with Article IV of the Plan.

9.2.4   <u>Plan Documents</u>.   The Talc Personal Injury Trust Agreement (and related documents), the Plan Note, the Plan Note Pledge Agreement, the Freeport Plan Note Guarantee, the CAMC Funding Agreement, the Document Access Agreement, the Membership Interest Purchase Agreement, the Merger Agreement, and any applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

9.2.5    United States Trustee's Fees.  The fees of the United States Trustee then owing by the Debtor shall have been paid in full.

9.2.6    Officer's Certificate.  An authorized representative of CAMC shall have delivered an officer's certificate to the Tort Claimants' Committee and FCR certifying that, to the best of CAMC's knowledge, the Debtor and the Cyprus Corporate Parties do not have insurance policies issued prior to June 30, 1992 that may provide coverage for Talc Personal Injury Claims other than the Talc Insurance Policies listed on an exhibit to such officer's certificate.

9.2.7    J&J Settlement Agreement.  The J&J Settlement Agreement shall not have been terminated and is otherwise in effect, except pursuant to Section 8.3 of the J&J Settlement Agreement as a result of a material breach by J&J, as determined in accordance with Section 8.3 of the J&J Settlement Agreement.

9.3    Waiver of Conditions Precedent.  To the greatest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified by the Debtor, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents; *provided, however*, that the conditions precedent in Sections 9.1.6, 9.2.1, and 9.2.2 cannot be waived or modified other than the condition that the Confirmation Order, the Affirmation Order, the Imerys Confirmation Order, and the Imerys Affirmation Order shall have become Final Orders; *provided, further*, that the conditions precedent in Sections 9.1.5 and 9.2.7 may only be waived by J&J in its sole discretion.  Any waiver or modification of a condition precedent permitted under this Section 9.3 may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

9.4    Notice of Effective Date.  The Debtor shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within five (5) Business Days thereafter, which notice shall confirm that the foregoing conditions have been satisfied or waived.

9.5    Concurrent Effectiveness of the Plan and the Imerys Chapter 11 Plan.  Subject to satisfaction of the conditions precedent in this Article IX and Article IX of the Imerys Chapter 11 Plan, unless otherwise waived in accordance with Section 9.3 of the Plan or Section 9.3 of the Imerys Chapter 11 Plan, the Effective Date of the Plan and the effective date of the Imerys Chapter 11 Plan shall occur concurrently.

## ARTICLE X.
## MEANS FOR IMPLEMENTATION OF THE PLAN

10.1    General.  On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

10.2    Operations of the Debtor Between Confirmation and the Effective Date.  The Debtor shall continue to operate as Debtor and Debtor-in-Possession during the period from the Confirmation Date through and until the Effective Date.

10.3    Effective Date Corporate Transactions.  On the Effective Date, the Debtor shall (i) consummate the purchase of 100% of the membership interests of AZ Big Sandy from Byner Cattle Company pursuant to the terms of the Membership Interest Purchase Agreement, (ii) consummate the merger of AZ Big Sandy with and into the Reorganized Debtor pursuant to the terms of the Merger Agreement such that the Reorganized Debtor is the surviving company, and (iii) grant CAMC an exclusive and irrevocable option, which shall be exercisable by CAMC at any time upon written notice to the Reorganized Debtor, to purchase all of the water rights and real property appurtenant thereto that the Reorganized Debtor acquired through the aforementioned merger with AZ Big Sandy for a purchase price equal to Cash in the amount of $13,507,375.67.

10.4    Charter and Bylaws.  From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the Amended Charter Documents.  The Amended Charter Documents shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.

10.5    Corporate Action.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtor, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtor.

10.6    Post-Effective Date Governance, Continued Existence of the Reorganized Debtor.

10.6.1  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Reorganized Debtor's Estate (other than property constituting Talc Personal Injury Trust Assets), including but not limited to, all Estate Causes of Action and any property acquired by the Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or Estate Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.6.2  On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the Debtor that constitute Talc Personal Injury Trust Assets shall vest in the Talc Personal Injury Trust pursuant to the terms of the Plan.  The Talc Personal Injury Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

10.6.3  On the Effective Date, the officers and directors of the Reorganized Debtor shall consist of the individuals that will be identified in the Plan Supplement.

10.7    Cyprus Settlement.

10.7.1    Compromise and Settlement of Claims.

10.7.1.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Cyprus Contributions and other benefits provided pursuant to the Cyprus Settlement, the provisions of the Plan effect a compromise and settlement of all Cyprus Released Claims against the Cyprus Protected Parties and the Imerys Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Cyprus Settlement and to release all of the Cyprus Released Claims, including, without limitation, the Estate Causes of Action, against each of the Cyprus Protected Parties and the Imerys Released Parties.  The Plan also effectuates a release of the Released Parties from all Claims, including Estate Causes of Action, on behalf of the Debtor, the Reorganized Debtor, and the Estate.

10.7.1.2    The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan, constitute a good faith compromise and settlement among the Debtor, CAMC, Freeport, the Tort Claimants' Committee, the FCR, the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR.  The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Cyprus Settlement and the good faith compromise and settlement of all of the Claims and controversies among the parties to the Cyprus Settlement described in the Plan, including without limitation all Estate Causes of Action against any Cyprus Protected Party, pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Cyprus Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Cyprus Settlement is: (i) fair, equitable, reasonable, and in the best interests of the Debtor and its Estate; (ii) fair and equitable with respect to the holders of Talc Personal Injury Claims, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Debtor and the Cyprus Protected Parties; and (iii) fair and equitable with respect to the Persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Debtor and the Cyprus Protected Parties.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Cyprus Settlement and the Bankruptcy Court's finding that the Cyprus Settlement is in the best interests of the Debtor and the Estate, and is fair, equitable, and reasonable.

10.7.1.3    Upon the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust and the execution of the CAMC Funding Agreement, the Plan shall be deemed to be substantially consummated, notwithstanding any contingent obligations arising from the foregoing.

10.7.1.4    The Plan (including its incorporation of the Cyprus Settlement), the Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies among the parties to the Cyprus Settlement based upon the unique circumstances of this Chapter 11 Case and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding except as necessary, and as admissible in such context to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.    The Plan, the Cyprus Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding, in which none of the Debtor, the Reorganized Debtor, the Cyprus Protected Parties, the Imerys Debtors, the Reorganized Imerys Debtors, or the Talc Personal Injury Trust is a party.    For the avoidance of doubt, this Section 10.7.1.4 in no way limits or affects the applicability of Section 10.11 of the Imerys Chapter 11 Plan.

10.7.2  <u>Cyprus Contributions.</u>  Subject to the terms of the Cyprus Settlement and subject to the occurrence of the Effective Date, the Cyprus Protected Parties will make the Cyprus Contributions to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims and Imerys Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement.

10.7.2.1    <u>Plan Note</u>.  Pursuant to the Plan Note, CAMC and the Reorganized Debtor, jointly and severally, will pay on behalf of themselves and the Cyprus Protected Parties, a total of $195 million to the Talc Personal Injury Trust via wire transfers in seven installments.  The first three payments shall each consist of $32.5 million and shall total $97.5 million.  The next four payments shall each consist of $24.375 million and shall total $97.5 million.  Each payment shall be made no later than as set forth in the following schedule:

- Within thirty (30) days after the Effective Date: $32.5 million (the "**<u>First Installment</u>**");

- 1 year anniversary of the First Installment: $32.5 million;

- 2 year anniversary of the First Installment: $32.5 million;

- 3 year anniversary of the First Installment: $24.375 million;

- 4 year anniversary of the First Installment: $24.375 million;

- 5 year anniversary of the First Installment: $24.375 million; and

- 6 year anniversary of the First Installment: $24.375 million.

10.7.3  Dissolution of Releases and Injunctions.    The releases and Injunctions contained in the Plan and the Confirmation Order with respect to the Cyprus Protected Parties shall dissolve immediately should any of the payments under the Plan Note (or, solely pursuant to the Freeport Plan Note Guarantee, any payments from Freeport) not be received by the Talc Personal Injury Trust within thirty (30) days of a true and accurate written notice from the Talc Personal Injury Trust to CAMC and Freeport that such payment was due and not made by the deadlines set forth above.

10.7.4  Dismissal of Actions, Stays of Proceedings, and Release of Claims.  Upon occurrence of the Effective Date, (a) the Debtor and the Cyprus Protected Parties shall release, dismiss and withdraw all claims against the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim or Imerys Talc Claim, including without limitation all indemnity claims, and (b) the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR shall release, dismiss and withdraw all claims against the Debtor, the Tort Claimants' Committee, the FCR, and the Cyprus Protected Parties directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim or Imerys Talc Claim, including without limitation all indemnity claims.  For the avoidance of doubt, the foregoing dismissals and withdrawals shall be without prejudice to re-filing, and all releases shall be void and all released claims may be reinstated, if and only if the Imerys Affirmation Order or the Affirmation Order is successfully challenged on appeal by Final Order.  In no event shall any party be deemed to have released any other party for breach of agreements adopted pursuant to the Cyprus Settlement.

10.7.5  Allocation of the Cyprus Contributions.  The Cyprus Contributions will be allocated among the Funds as set forth in the Trust Distribution Procedures.  For the avoidance of doubt, nothing in the Plan Documents shall be interpreted as an admission, or adjudication on the merits of any disputed issue related to the Talc Insurance Policies, including, but not limited to, the disputed rights at issue in the Insurance Adversary Proceeding.

10.7.6  CAMC Funding Agreement.  Upon the occurrence of the Effective Date, the Debtor and CAMC shall execute the CAMC Funding Agreement in substantially the form contained in the Plan Supplement.

10.7.7  Document Access Agreement.  Parties including, but not limited to, the Debtor, CAMC, and the Talc Personal Injury Trust shall enter into the Document Access Agreement on the Effective Date, in substantially the form attached to the Plan Supplement, that provides for, among other things, the Debtor, CAMC, and any other party to the Document Access Agreement (excluding the Talc Personal Injury Trust) to retain and make available certain documents regarding talc and talc liabilities for potential use by the Talc Personal Injury Trust and/or in lawsuits or claims against non-Protected Parties and to assist and cooperate as may be reasonably necessary for the pursuit of, among other things, lawsuits or claims against non-Protected Parties and the Cyprus Talc Insurance Policy Rights, including with respect to the California Coverage Action.

10.8    Form of Certain Documents.

10.8.1  The Plan shall be in form and substance reasonably acceptable to each of the Plan Proponents and the Imerys Plan Proponents.

10.8.2  The Affirmation Order and the Confirmation Order shall be in form and substance acceptable to each of the Plan Proponents and the Imerys Plan Proponents.

10.9    Resolution of Talc Personal Injury Claims.  Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures.

10.10   Sources of Consideration for Plan Distributions.

10.10.1        Non-Talc Claims.  Cash consideration necessary for payments or Distributions on account of the Allowed Administrative Claims shall be obtained from the Cash on hand of the Debtor on the Effective Date, including Cash available to be borrowed by the Debtor under the DIP Credit Agreement.  Cash consideration necessary for payments or Distributions on account of Allowed Non-Talc Claims, including, without limitation, Allowed Administrative Claims not paid in full pursuant to the foregoing sentence, shall be obtained from the Cash on hand of the Debtor or from post-Effective Date funding from CAMC pursuant to (and subject to the terms of) the CAMC Funding Agreement.

10.10.2        Talc Personal Injury Claims.  All Cash consideration necessary for payments or distributions on account of Talc Personal Injury Claims shall be obtained from the Talc Personal Injury Trust Assets and proceeds therefrom.

10.10.3        Funding by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan, the Imerys Chapter 11 Plan, and/or the Talc Personal Injury Trust Documents, as applicable.

10.11   Modification of the Plan.  To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure; *provided* that no such amendment or modification of the Plan that adversely affects the rights or obligations of the Imerys Protected Parties shall be permitted hereunder without the prior written consent of the Imerys Debtors or the Reorganized Imerys Debtors, as applicable.  For the avoidance of doubt, CAMC's consent shall be necessary to make any amendment or modification to the Plan that:  (a) modifies, alters or otherwise changes the terms, language or scope of the Channeling Injunction or of any releases in favor of any Cyprus Protected Party; or (b) otherwise relates to or has any effect on CAMC or any other Cyprus Protected Party.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of

- 59 -

implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as: (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material and are consistent with the Bankruptcy Code; (c) the Tort Claimants' Committee and the FCR or, following the Effective Date, the Talc Trust Advisory Committees and the Post-Effective Date FCRs consent; (d) CAMC consents; and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court. On and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents, other than the Plan, will be as provided in such Plan Documents. Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to this Section 10.11.

10.12    Revocation or Withdrawal of the Plan.    The Debtor reserves the right to, with the consent of each of the other Plan Proponents, revoke and withdraw the Plan prior to entry of the Confirmation Order.  If the Debtor, with the consent of each of the other Plan Proponents, revokes or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, or any other Entity (including the Plan Proponents) or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving the Debtor.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

10.13    Certain Technical Modifications.    Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications are consistent with the Bankruptcy Code and do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Equity Interests under the Plan.

## ARTICLE XI.
## EFFECT OF CONFIRMATION

11.1    Preservation of Certain Estate Causes of Action.

11.1.1 In accordance with section 1123(b) of the Bankruptcy Code, and except where such Estate Causes of Action have been expressly released, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Talc Causes of Action, whether arising before or after the Petition Date.  The Reorganized Debtor's right to commence, prosecute or settle such Non-Talc Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue the Non-Talc Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.

11.1.2 No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Non-Talc Cause of Action against them as any indication that the Reorganized Debtor will not pursue the Non-Talc Causes of Action.  The Reorganized Debtor expressly reserves all rights to prosecute any and all

Non-Talc Causes of Action, except as otherwise expressly provided in the Plan. Unless any of the Non-Talc Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all such Non-Talc Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Non-Talc Causes of Action upon, after, or as a consequence of the Confirmation of the Plan.

11.1.3 Upon the Effective Date, the Reorganized Debtor shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtor, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. On or after the Effective Date, the Reorganized Debtor may pursue, settle or withdraw, without Bankruptcy Court approval, such claims, rights, or causes of action (other than the Talc Personal Injury Trust Causes of Action, and the Talc Insurance Actions) as it determines in accordance with its best interests.

11.2 <u>Preservation of Talc Personal Injury Trust Causes of Action</u>. On the Effective Date, all Talc Personal Injury Trust Causes of Action shall be transferred to and vested in the Talc Personal Injury Trust. The Talc Personal Injury Trust shall retain and enforce, as the appointed Estate representative in accordance with section 1123(b) of the Bankruptcy Code, all Talc Personal Injury Trust Causes of Action, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code. The transfer of the Talc Personal Injury Trust Causes of Action to the Talc Personal Injury Trust, insofar as they relate to the ability to defend against or reduce the amount of Talc Personal Injury Claims, shall be considered the transfer of a non-exclusive right enabling the Talc Personal Injury Trust to defend itself against asserted Talc Personal Injury Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including without limitation, the Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of a Talc Personal Injury Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Talc Personal Injury Trust Causes of Action not been assigned to the Talc Personal Injury Trust.

11.3 <u>Talc Insurance Actions</u>. Any Talc Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved or prosecuted by the Debtor until the Effective Date for the benefit of the Talc Personal Injury Trust subject to the consent of the FCR and the Tort Claimants' Committee, which shall not be unreasonably withheld. As of the Effective Date, such Talc Insurance Actions along with the rights and obligations of the Debtor, the Reorganized Debtor, and any other Protected Party, as applicable, shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, and the Talc Personal Injury Trust shall retain and enforce as the appointed Estate representative in accordance with section 1123(b)(3)(B)of the Bankruptcy Code all such Talc Insurance Actions; *provided*, *however*, nothing herein shall permit the Talc Personal Injury Trust to assert a claim against a Settling Talc Insurance Company that is released under the terms of a Talc Insurance Settlement Agreement (as applicable) or the Plan. Such Talc Insurance Actions shall be free and clear of all Liens, security interests, and other Claims or causes of action, except for Talc Insurer Coverage Defenses. Upon vesting in the Talc Personal Injury Trust, the prosecution of the Talc Insurance Actions shall be governed by the Talc Personal Injury Trust Documents.

11.4    <u>Insurance Provisions</u>.

11.4.1  The provisions of this Section 11.4 shall apply to all Entities (including, without limitation, all Talc Insurance Companies).

11.4.1.1    Except as provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan Documents or the Confirmation Order shall modify, amend, abridge, or supplement, or be interpreted as modifying, amending, abridging, or supplementing, (i) the terms and conditions of any Talc Insurance Policy issued by a non-Settling Talc Insurance Company, (ii) rights or obligations under such Talc Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, or (iii) the Talc Insurer Coverage Defenses.  The rights and obligations, if any, under any Talc Insurance Policy, or relating to or arising out of the Plan, the Plan Documents, or the Confirmation Order, shall be determined pursuant to applicable law; *provided, however*, that the permissibility and effect of the Assignment as set forth in Section 4.7 of the Plan shall be binding on the Talc Insurance Companies.

11.4.1.2    No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article XII of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction and the Insurance Entity Injunction.

11.4.1.3    Nothing in this Section 11.4 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

11.4.1.4    No provision of the Plan shall be interpreted to assign or transfer the rights of any Cyprus Protected Party, or to resolve disputes between Cyprus and the Imerys Debtors regarding ownership or control of rights to insurance or indemnity rights, absent occurrence of the Effective Date.

11.4.1.5    Nothing in the Plan Documents or the Confirmation Order shall relieve or discharge any Talc Insurance Company (other than a Settling Talc Insurance Company) from their obligations under the applicable Talc Insurance Policies.  Except for Section 4.7 of the Plan and the permissibility and effect of the Assignment provisions set out above, notwithstanding anything to the contrary in the Plan Documents or the Confirmation Order: (i) the Cyprus Talc Insurance Policy Rights transferred pursuant to the Plan remain subject to the terms and conditions of the applicable Talc Insurance Policies, including any Talc Insurer Coverage Defenses available under applicable law; (ii) the Talc Personal Injury Trust's rights under any Talc Insurance Policies issued by non-Settling Talc Insurance Companies and the merits of any Talc Insurer Coverage Defenses, including the effect of any failure to satisfy any conditions precedent under such

policies (other than, in the case of the Talc Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the Assignment or transfer of such rights), shall be determined in accordance with the Talc Insurance Policies and applicable law, in subsequent litigation, with all rights with respect thereto preserved; (iii) nothing in the Plan Documents or the Confirmation Order shall constitute or be deemed to be a finding as to whether or not any non-Settling Talc Insurance Company is obligated to provide coverage for, or pay, the amount determined under the Trust Distributions Procedures for any Talc Personal Injury Claim or any other amount; and (iv) nothing in the Plan or the Confirmation Order shall operate to require any Talc Insurance Company or third-party administrator to pay under any Talc Insurance Policy the liability of any Person or Entity that was not insured thereunder before the Effective Date for any liability that arose before the Effective Date.

11.5    Institution and Maintenance of Legal and Other Proceedings.

11.5.1  As of the Effective Date, and subject to Section 4.6.2 of the Plan, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Talc Personal Injury Trust, including without limitation, the Cyprus Talc Insurance Policy Rights, the Cyprus Indemnity Rights, Talc Personal Injury Claims, and Talc Personal Injury Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all such actions in the name of either of the Debtor or the Reorganized Debtor, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust.  Furthermore, without limiting the foregoing, the Talc Personal Injury Trust shall be empowered to maintain, administer, preserve, or pursue the Talc In-Place Insurance Coverage and the Talc Insurance Actions.  Notwithstanding anything to the contrary herein, the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol.

11.5.2  Without limiting Section 11.5.1 of this Plan, the Talc Personal Injury Trust shall satisfy, to the extent required under the relevant policies and applicable law, any self-insured retentions and/or any retrospective premiums arising out of any Talc Claims under the Talc Insurance Policies.  In the event that a Talc Insurance Company pays such self-insured retention and is entitled to reimbursement from the Talc Personal Injury Trust under applicable law, such non-Settling Talc Insurance Company shall receive that reimbursement in the form of a set-off solely against any claim for coverage by the Talc Personal Injury Trust against that non-Settling Talc Insurance Company with respect to the relevant Talc Claim.

- 63 -

11.6    Terms of Injunctions and Automatic Stay.

11.6.1 All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case or any associated adversary proceeding, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtor, with the consent of each of the other Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

11.6.2 Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

11.7    The FCR and the Tort Claimants' Committee.

11.7.1 The FCR and the Tort Claimants' Committee shall continue in their official capacities until the Effective Date, upon which the Tort Claimants' Committee and FCR shall automatically terminate except as provided otherwise in the Plan.  Upon such termination, the FCR, the Tort Claimants' Committee, the members of the Tort Claimants' Committee, and all Professionals and agents of the foregoing shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code.  The Debtor shall pay the reasonable fees and expenses incurred by the FCR and the Tort Claimants' Committee through the date of termination in accordance with the Compensation Procedures Order, the DIP Order, the DIP Credit Agreement, and the terms of the Plan, including Section 2.3 of the Plan.

11.7.2 Notwithstanding the foregoing Section 11.7.1 of the Plan, the Tort Claimants' Committee and the FCR may, each at their own option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any: (a) appeal of any order entered in the Chapter 11 Case, including without limitation the Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Tort Claimants' Committee or FCR, as applicable, was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order, in which the Tort Claimants' Committee or FCR, as applicable, is a participant as of the Effective Date.  To the extent that the Tort Claimants' Committee or FCR determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, the Tort Claimants' Committee or FCR, as applicable, shall terminate upon the termination of all:  (a) appeals of any orders entered in the Chapter 11 Case, including without limitation the Confirmation Order; (b) hearings on a Professional Fee Claim; (c) adversary proceedings pending on the Effective Date to which the Tort Claimants' Committee or FCR, as applicable, was a participant; and (d) motions or other

- 64 -

actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order, in which the Tort Claimants' Committee or FCR, as applicable, is a participant as of the Effective Date. After the Effective Date, the Post-Effective Date FCRs shall have the powers and duties conferred upon the Post-Effective Date FCRs in the Talc Personal Injury Trust Documents.

11.7.3 Nothing in this Section 11.7 of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Administrative Claims.

11.8   <u>Lack of Precedential Value</u>.   The asset allocations, claim values, and claim qualification criteria applicable to holders of Talc Personal Injury Claims provided for in the Plan and the Plan Documents are based on the unique facts and circumstances of the Chapter 11 Case and the Imerys Chapter 11 Case. The asset allocations, claim values, and claim qualification criteria shall have no precedential effect with respect to the allocation, claim values, or claim qualification criteria that are appropriate with respect to other tort claims against other Persons.

11.9   <u>Expungement of Talc Claims from the Claims Register</u>.   On the Effective Date, all Talc Claims filed against the Debtor in the Chapter 11 Case shall be expunged from the Claims Register. Talc Claims will be addressed outside of the bankruptcy claims resolution process consistent with Section 3.2.4(b) and (c) of the Plan, as applicable.

11.10   <u>Provisions Related to the J&J Settlement</u>.

11.10.1      Nothing in the Plan or the Trust Distribution Procedures shall be binding on or used to impact, prejudice, or affect the J&J Corporate Parties (including, without limitation, LLT Management LLC (f/k/a LTL Management LLC), Johnson & Johnson, Red River Talc LLC and Pecos River Talc LLC) in the tort system or in a bankruptcy case.

11.10.2      Unless and until the J&J Settlement Agreement is terminated, the Debtor, the Imerys Debtors, the Reorganized Debtor, the Reorganized Imerys Debtors, the Debtor Corporate Parties, the Talc Personal Injury Trust, the Debtor Releasing Parties, the Non-Debtor Releasing Parties and any other person that seeks to assert claims through any of the foregoing, or to otherwise recover from any Cyprus Talc Insurance Policies, are enjoined from commencing, prosecuting, accepting payment on account of (other than the J&J Payment Obligations), or otherwise pursuing insurance coverage for, J&J Talc Claims, including recovering any defense costs or for contribution; *provided, however*, for the avoidance of doubt, in accordance with Section 6.3 of the J&J Settlement Agreement, nothing in the J&J Settlement Order or the J&J Settlement Agreement shall enjoin or otherwise bar Rio Tinto, the Rio Tinto Captive Insurers and Zurich from seeking insurance coverage (including, without limitation, for defense costs or indemnity, whether for amounts to be paid under the Rio Tinto/Zurich Settlement or otherwise) from their insurers, reinsurers and retrocessionaires; and, *provided, further*, nothing in the J&J Settlement Order shall alter the rights and protections afforded Rio Tinto, the Rio Tinto Captive Insurers and Zurich as set forth in Sections 6.3.2 and 6.3.3 of the J&J Settlement Agreement. Unless and until the J&J Settlement Agreement is terminated, any settling

insurer, any other party to the Plan Settlement Agreements, including Rio Tinto, the Rio Tinto Captive Insurers, and Zurich, and any person or entity claiming under or through any of the foregoing, including any reinsurers or retrocessionaires, shall not assert, or be able to assert, any subrogation rights against any J&J Corporate Party with respect to any payments made, to be made, or contemplated to be made pursuant to any Plan Settlement Agreement or otherwise on account of any Talc Personal Injury Claim (as defined in the J&J Settlement Agreement), but instead Rio Tinto, the Rio Tinto Captive Insurers and Zurich shall be able to assert such rights against, and shall have all such rights attach to, the Imerys Share of Settlement Proceeds until the Rio Tinto/Zurich Settlement is consummated. Notwithstanding the above, subject to the other terms of the J&J Settlement Agreement, the J&J Settling Parties, on behalf of the Debtor Releasing Parties and Non-Debtor Releasing Parties, may pursue insurance coverage for J&J Talc Claims from only J&J Policies, except those policies under which the J&J Settling Parties entered into talc-related settlements prior to the Execution Date.[2]

## ARTICLE XII.
## RELEASES, INJUNCTION AND EXCULPATION

### 12.1    Discharge and Injunctions.

12.1.1    Discharge of Claims Against the Debtor.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall afford the Debtor a discharge to the fullest extent permitted by sections 524 and 1141(d)(1) of the Bankruptcy Code.

12.1.2    **Discharge Injunction.  Except as specifically provided in the Plan or the Confirmation Order, from and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts or liabilities, or rights: (i) commencing or continuing any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order (the "Discharge Injunction"). The foregoing injunction shall extend to the successors of the Debtor (including, without limitation, the Reorganized Debtor) and their respective properties and**

---

[2]  Capitalized terms used but not defined in this Section 11.10.2 and otherwise not defined in the Plan have the meanings ascribed to them in the J&J Settlement Agreement.

interests in property. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.

12.2    **Releases.**

12.2.1  **Releases by Debtor and the Estate.**

(a)     **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtor, the Reorganized Debtor and the Estate from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, the Reorganized Debtor or the Estate (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtor, the Reorganized Debtor or the Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), its Estate, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between the Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission (other than the rights and obligations under the Plan Documents and the contracts, instruments, releases and other agreements or documents delivered or to be delivered under any of the foregoing). The Debtor and the Reorganized Debtor shall be bound by the releases set forth in this Section 12.2.1 of the Plan.**

(b)      **The Cyprus Settlement is intended to serve as a complete and permanent resolution of all Estate Causes of Action that could be asserted by the Debtor's Estate and all Estate Causes of Action (as defined in the Imerys Chapter 11 Plan) that could be asserted by the Imerys Debtors' estates against any of the Cyprus Protected Parties. Accordingly, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtor, and the Reorganized Debtor, on their own behalf and as representatives of the Estate, and the Tort Claimants' Committee and FCR, solely on their own behalf, and any Settling Talc Insurance Company (regardless of when it enters into any settlement with the Debtor, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust), each solely on its own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each of the Cyprus Protected Parties and the Imerys Released Parties of and from (i) all Estate Causes of Action and (ii) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtor, the Estate, the Reorganized Debtor, the Tort Claimants' Committee, the FCR, solely on his own behalf, or any Settling Talc Insurance Company have, had, may have, or may claim to have against any of the Cyprus Protected Parties or the Imerys Released Parties directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim (sub-clauses (i) and (ii) collectively, the "Cyprus Released Claims").**

12.2.2  **Releases by Holders of Claims.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate (including any Estate Causes of Action and Talc Personal Injury Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or**

- 68 -

their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the Estate, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between the Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission (other than the rights and obligations under the Plan Documents and the contracts, instruments, releases and other agreements or documents delivered or to be delivered under any of the foregoing), except to the extent that such act or omission of a Released Party is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act.  The releases set forth in this Section 12.2.2 of the Plan are in addition to, and not in lieu of, the Acceptance and Release that every claimant must complete, execute and deliver to the Talc Personal Injury Trust as a condition precedent to its receipt of any payment or distribution from the Talc Personal Injury Trust.  Notwithstanding anything to the contrary in the Plan, the Plan Documents, or the Confirmation Order, the releases and injunctions set forth in this Section 12.2.2 (and otherwise in this Article XII) shall not constitute a release of nor shall enjoin any claims or defenses that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such or that any reinsurer or retrocessionaire of a Settling Talc Insurance Company may have against such Settling Talc Insurance Company in its capacity as a reinsured, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of any Settling Talc Insurance Company (or reinsurer or retrocessionaire) to assert any such claim or defense in any forum; *provided* that no such claim can be asserted against the Talc Personal Injury Trust unless otherwise provided in the Plan.

12.2.3  **Injunction Related to Releases**.  Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan (the "**Release Injunction**").

12.3  **The Channeling Injunction and the Insurance Entity Injunction**.  In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

- 69 -

12.3.1 **Channeling Injunction.**

(a) **Terms. To preserve and promote the settlements contemplated by and provided for in the Plan, including the Cyprus Settlement, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 105(a) and 524(g) of the Bankruptcy Code, the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be to the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, and such holder (regardless of whether such holder is a Releasing Claim Holder) shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to:**

(i) **commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;**

(ii) **enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;**

(iii) **creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any Protected Party or any property or interests in property of any Protected Party;**

(iv) **asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, contribution, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and**

(v) **taking any act in any manner, and in any place whatsoever, with regard to any matter that is within the scope of the**

matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)     Reservations.  Notwithstanding anything to the contrary in Section 12.3.1(a) of the Plan, this Channeling Injunction shall not impair:

(i)     the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust (or otherwise in accordance with the Trust Distribution Procedures);

(ii)     the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)     the rights of Persons to assert any Claim, debt, obligation or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust (or otherwise in accordance with the Trust Distribution Procedures); or

(iv)     the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents.

(c)     Modifications.  There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)     Non-Limitation of Channeling Injunction.  Except as set forth in Section 12.3.1(b) of the Plan, nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan, the Cyprus Settlement, or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(e)     Bankruptcy Rule 3016 Compliance.  The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(f)     Enforcement of the Channeling Injunction.  Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction, including the Bankruptcy Court.

(g)     Contribution Claims.  If a non-Settling Talc Insurance Company asserts that it has rights, whether legal, equitable, contractual, or

otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss or defense costs on behalf of the Debtor or any Protected Party in connection with any Talc Personal Injury Claim (collectively, "<u>Contribution Claims</u>") against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.

12.3.2   <u>Insurance Entity Injunction</u>.

(a)   **Purpose.  In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction;** *provided, however*, **that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance Settlement Agreement.**

(b)   **Terms Regarding Claims Against Talc Insurance Companies. Subject to the provisions of Sections 12.3.1 and 12.3.2 of the Plan, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Talc Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expense) against any Talc Insurance Company based upon, attributable to, arising out of, or in any way connected with any such Talc Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:**

(i)   **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;** *provided, however*, **that to the extent any Talc Insurance**

Company asserts a claim against J&J, nothing in the Plan shall affect J&J's ability to assert any defense or counterclaim;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand or cause of action;

*provided, however*, that (a) the injunction set forth in this Section 12.3.2(b) shall not impair in any way any actions brought by the Talc Personal Injury Trust against any Talc Insurance Company (other than a Settling Talc Insurance Company); and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this Section 12.3.2(b) with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Reservations.  Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

(ii)    the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

> > (iii)    the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;
>
> > (iv)    the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Talc Insurance Company based on or arising from the Talc Insurance Policies or Talc Insurance Settlement Agreements; and
>
> > (v)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement.
>
> (d)    Notwithstanding anything to the contrary above, nothing in the Plan will preclude J&J from pursuing any rights it has under any J&J Policy.

12.4    **Supplemental Settlement Injunction Order.  In order to preserve and promote the Cyprus Settlement, which is incorporated herein, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date.**

> (a)    **Terms.    All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Cyprus Released Claims directly or indirectly against the Cyprus Protected Parties (or any of them) or the Imerys Released Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Cyprus Released Claims.**
>
> (b)    **Any Cyprus Protected Party or Imerys Released Party may enforce the Supplemental Settlement Injunction Order as a defense to any Claim brought against such Cyprus Protected Party or such Imerys Released Party that is enjoined under the Plan as to such Cyprus Protected Party or Imerys Released Party and may seek to enforce such injunction in a court of competent jurisdiction.**

12.5    Reservation of Rights.    Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge and the Injunctions set forth in this Article XII shall not be deemed or construed to satisfy, discharge, release or enjoin claims by (a) the Reorganized Debtor or any other Entity, as the case may be, against the Talc Personal Injury Trust for payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures or for the payment of Talc Personal Injury Trust Expenses or (b) the Talc Personal Injury Trust or the Reorganized Debtor, as the case may be, against any Talc Insurance Company that has not performed under a Talc Insurance Policy or a Talc Insurance Settlement Agreement.  Nothing in this Section 12.5 is intended or shall be construed to limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

12.6    Disallowed Claims.    On and after the Effective Date, the Debtor and the Reorganized Debtor shall have no liability or obligation on a Disallowed Claim, and any order disallowing a Claim which is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute a Final Order:  (a) in relation to the Debtor disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) in relation to the Debtor disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

**12.7    Exculpation.  None of  (a) the Debtor, (b) the Tort Claimants' Committee, (c) the members of the Tort Claimants' Committee in their capacities as such, (d) the FCR, and (e) the Representatives of any of the foregoing, and in the case of (b)-(e), solely in their capacities as such and solely with respect to conduct while acting as a fiduciary of the Debtor's Estate, shall have or incur any liability to any Person or Entity for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtor (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith, or willful misconduct);** *provided, however*, **that this exculpation shall not apply to Talc Insurer Coverage Defenses; provided further that for the purposes of this Section 12.7, any former officer or director of the Debtor that was an officer or director at any time during the Chapter 11 Case but is no longer an officer or director shall be considered a Representative of the Debtor.  In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, and the administration of each of them.**

12.8    No Successor Liability.  Except as otherwise expressly provided in the Plan, the Reorganized Debtor does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Entity or Person, or otherwise have any responsibility for any liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, on or after the Effective Date.  Neither any Plan Proponent, the Reorganized Debtor, nor the Talc Personal Injury Trust, the Talc Trust Advisory Committees, or the Post-Effective Date FCRs is, or shall be deemed to be, a successor to the Debtor by reason of any theory of law or equity (except as otherwise provided in Article IV of the Plan), and none shall have any successor or transferee liability of any kind or character; *provided, however*, the Reorganized Debtor and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

12.9    Prepetition Indemnification and Reimbursement Obligations.  The respective obligations of the Debtor to indemnify and reimburse Persons who are or were directors, officers

or employees of the Debtor on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of incorporation, codes of regulation, bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, (i) shall survive Confirmation of the Plan and remain unaffected thereby, (ii) are assumed by the Reorganized Debtor, and (iii) shall not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date the Reorganized Debtor shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

12.10   Survival of Environmental Claims and Liabilities.   Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order shall discharge, release, exculpate, impair, or otherwise preclude:  (i) any liability to a Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; or (ii) any liability of the Debtor, the Reorganized Debtor or any non-debtor as to any Environmental Claim.  Such liabilities described in (i) and (ii) shall pass through this Chapter 11 Case unaffected as if this Chapter 11 Case had not been commenced and continue to be treated as they were prior to the Petition Date consistent with applicable law, including, without limitation, any liabilities associated with the Administrative Order for Remedial Action and any related orders in the matter of Cannelton Industries, Inc.  Nothing in the Plan or the Confirmation Order shall release, nullify, preclude, or enjoin the enforcement of any police or regulatory power of a Governmental Unit.

12.11   Survival of Foreign Claims.

12.11.1     Notwithstanding anything contained in the Plan or the other Plan Documents to the contrary, (a) nothing in the Plan or the other Plan Documents shall discharge, release, exculpate, impair, or otherwise preclude any Foreign Claim against the Debtor, and (b) Foreign Claims against the Debtor, if any, shall be Reinstated and liquidated, determined, or otherwise resolved consistent with applicable law in an appropriate non-bankruptcy forum, subject to any applicable legal or equitable rights or defenses under applicable non-bankruptcy law; *provided, however*, that nothing in the foregoing shall limit, derogate from, or otherwise affect the releases by the Debtor and the Estate contained in Section 12.2.1 of the Plan or the Injunctions intended to preserve and protect such releases contained in Sections 12.2.3 and 12.4 of the Plan

12.11.2     Foreign Claims, if any, shall not be channeled to or assumed by the Talc Personal Injury Trust, and liability, if any, of the Debtor for a Foreign Claim will be the responsibility of the Reorganized Debtor.  No Foreign Claim will be subject to the Claims allowance process set forth in the Plan or receive any distributions under the Trust Distribution Procedures from the Talc Personal Injury Trust, and the Talc Personal Injury Trust shall bear no cost or expenses arising from resolution of a Claim that is determined to be a Foreign Claim.

12.11.3     Solely with respect to Foreign Claims asserted or to be asserted against the Debtor or the Reorganized Debtor, the automatic stay imposed by section 362 of the Bankruptcy Code will be terminated as of the date that is 30 days after the Effective Date and, pursuant to section 108(c) of the Bankruptcy Code, the applicable statute of limitations with respect to any such Foreign Claim, that did not expire prior to the Petition Date will cease to be tolled as of that date.

12.11.4     For the avoidance of doubt, nothing in this Section 12.11 shall be deemed to modify, limit, or otherwise override Section 13.3(k) of the Plan.

# ARTICLE XIII.
# JURISDICTION OF BANKRUPTCY COURT

13.1     <u>Jurisdiction</u>.  Until the Chapter 11 Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan or the Talc Personal Injury Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtor, and to adjudicate and enforce the Talc Insurance Actions, the Talc Personal Injury Trust Causes of Action, and all other causes of action which may exist on behalf of the Debtor.  Nothing contained herein shall prevent the Reorganized Debtor or the Talc Personal Injury Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action (other than Estate Causes of Action released pursuant to Section 12.2.1 of the Plan), Talc Insurance Action, Talc Personal Injury Trust Cause of Action, or other cause of action which the Debtor has or may have and which may not have been enforced or prosecuted by the Debtor, which actions or other causes of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (i) the Bankruptcy Court in fact has jurisdiction with respect to any Talc Insurance Action, (ii) any such jurisdiction is exclusive with respect to any Talc Insurance Action, or (iii) abstention or dismissal of any Talc Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Talc Insurance Action(s).  Any court other than the Bankruptcy Court that has jurisdiction over a Talc Insurance Action shall have the right to exercise such jurisdiction.

13.2     <u>General Retention</u>.  Following Confirmation of the Plan, the administration of the Chapter 11 Case will continue until the Chapter 11 Case is closed by a Final Order of the Bankruptcy Court.

13.3     <u>Specific Purposes</u>.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the following specific purposes after Confirmation of the Plan:

(a)     to modify the Plan after Confirmation, pursuant to the provisions of the Plan, the Bankruptcy Code and the Bankruptcy Rules;

(b)     to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust

Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan and pursuant to the provisions of the Plan Documents;

(c)     to assure the performance by the Disbursing Agent of its obligations to make Distributions under the Plan;

(d)     to enforce and interpret the terms and conditions of the Plan, the Plan Documents and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights and powers of the Reorganized Debtor and the Talc Personal Injury Trust, and (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise;

(e)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including without limitation contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Case;

(f)     to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(g)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtor, the Reorganized Debtor, the other Plan Proponents, or the Talc Personal Injury Trust, and their respective current and former officers, directors, stockholders, employees, members, attorneys, accountants, financial advisors, representatives and agents;

(h)     to determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the allowance of any Claims resulting therefrom;

(i)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     to determine the allowance and/or disallowance of any Non-Talc Claims, including Administrative Claims, against or Equity Interests in the Debtor or its Estate, including, without limitation, any objections to any such Claims and/or Equity Interests, and the compromise and settlement of any Non-Talc Claim, including Administrative Claims, against or Equity Interest in the Debtor or its Estate;

(k)     to determine if a Claim is a Foreign Claim, *provided however*, that if such Claim is determined to be a Foreign Claim by Final Order, the Bankruptcy Court shall not adjudicate the merits of such Foreign Claim or make any other determination with respect to such Foreign Claim;

(l)     to hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

(m)    to determine all questions and disputes regarding title to the assets of the Debtor or its Estate, or the Talc Personal Injury Trust;

(n)    to issue such orders as may be necessary for the addition of any Settling Talc Insurance Company as a Protected Party;

(o)    to determine all questions and disputes regarding, and to enforce, the Cyprus Settlement;

(p)    to hear and determine the Talc Insurance Actions, any Talc Personal Injury Trust Cause of Action and any similar claims, causes of action or rights of the Talc Personal Injury Trust to construe and take any action to enforce any Talc Insurance Policy or Talc Insurance Settlement Agreement, and to issue such orders as may be necessary for the execution, consummation and implementation of any Talc Insurance Policy or Talc Insurance Settlement Agreement, and to determine all questions and issues arising thereunder;

(q)    to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(r)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose;

(s)    to enter in aid of implementation of the Plan such orders as are necessary, including but not limited to the implementation and enforcement of the releases and the Injunctions described herein; and

(t)    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policies, *provided however*, (i) such orders shall not impair the Talc Insurer Coverage Defenses or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtor's Chapter 11 Case, (ii) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Talc Insurance Policies, and (iii) all interested parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this Section 13.3 shall not be deemed to be a retention of exclusive jurisdiction with respect to any matter described in this Section 13.3; rather, any court other than the Bankruptcy Court which has jurisdiction over any matter described in this Section 13.3 shall have the right to exercise such jurisdiction.  To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court."  Nothing

contained in this Section shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

13.4    <u>District Court Jurisdiction</u>.  The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Affirmation Order to hear and determine any motion to extend the Channeling Injunction to a Talc Insurance Company, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

13.5    <u>Reservation of Rights</u>.  Nothing contained in the Plan will (i) constitute a waiver of any claim, right or cause of action that a Debtor, the Reorganized Debtor, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Talc Insurance Company; or (ii) limit the assertion, applicability or effect of any Talc Insurer Coverage Defense.

13.6    <u>Compromises of Controversies</u>.  From and after the Effective Date, the Reorganized Debtor and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

13.7    <u>Talc Personal Injury Claims</u>.  Notwithstanding anything in this Article XIII to the contrary, the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures shall govern the resolution of Talc Personal Injury Claims, including the forum in which such Talc Personal Injury Claims shall be determined.

**ARTICLE XIV.**
**MISCELLANEOUS PROVISIONS**

14.1    <u>Closing of Chapter 11 Case</u>.  The Reorganized Debtor shall, promptly after the full administration of each Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

14.2    <u>Timing of Distributions or Actions</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

14.3    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

14.4    <u>Entire Agreement</u>.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions,

warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

14.5     <u>Headings</u>.  Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

14.6     <u>Severability</u>.  If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor (with the consent of each of the Plan Proponents), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable pursuant to its terms.

14.7     <u>Notices</u>.  All notices, requests and demands required or permitted to be provided to the Debtor, the Reorganized Debtor, or the Plan Proponents under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be addressed as follows and mailed by registered or certified mail, return receipt requested, and shall be deemed to have been duly given or made when actually delivered, with a copy also furnished via email:

**THE DEBTOR:**
CYPRUS MINES CORPORATION
Attention:  Corporate Secretary
333 N. Central Ave.
Phoenix, AZ 85004
Mhughes2@fmi.com

**COUNSEL FOR THE DEBTOR:**

REED SMITH LLP
Kurt F. Gwynne, Esq.
1201 Market Street - Suite 1500
Wilmington, DE  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
Email:  kgwynne@reedsmith.com

REED SMITH LLP
Paul M. Singer, Esq.
Luke A. Sizemore, Esq.
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3006
Email:  psinger@reedsmith.com
         lsizemore@reedsmith.com

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

A.M. SACCULLO LEGAL, LLC
Mark T. Hurford, Esq.
27 Crimson King Drive
Bear, DE 19701
Telephone: (302) 836-8877
Facsimile: (302) 836-8787
Email: mark@saccullolegal.com

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay, Esq.
Todd E. Phillips, Esq.
1200 New Hampshire Avenue NW, 8th Floor
Washington, DC 20036
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
        tphillips@capdale.com

ANDERSON KILL P.C.
Robert M. Horkovich, Esq.
7 Times Square, 15th Floor
New York, NY 10036
Telephone: (212) 278-1322
Facsimile: (212) 278-1733
Email: rhorkovich@andersonkill.com

**THE FCR:**

Roger Frankel
c/o Frankel Wyron LLP
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
Telephone: (202) 367-9128
Email: rfrankel@frankelwryon.com

**COUNSEL FOR THE FCR:**

FRANKEL WYRON LLP
Richard H. Wyron
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
Telephone: (202) 367-9127
Email: rwyron@frankelwyron.com

TOGUT, SEGAL & SEGAL LLP
Albert Togut, Esq.
Frank A. Oswald, Esq.
One Penn Plaza, Suite 3335
New York, NY 10119
Telephone: (212) 594-5000
Email: altogut@teamtogut.com
        frankoswald@teamtogut.com

HERBERT SMITH FREEHILLS KRAMER
(US) LLP
Brian F. Shaughnessy
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9125
Email: bshaughnessy@hsfkramer.com

**COUNSEL FOR CAMC:**

WACHTELL, LIPTON, ROSEN & KATZ
Emil A. Kleinhaus, Esq.
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1332
Facsimile:  (212) 403-2332
Email:  eakleinhaus@wlrk.com

MORRIS NICHOLS ARSHT & TUNNELL LLP
Robert J. Dehney, Esq.
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:  rdehney@mnat.com

**THE IMERYS DEBTORS:**

IMERYS TALC AMERICA, INC.,
Attention: Ryan Van Meter, Esq.
100 Mansell Court East, Suite 300
Roswell, Georgia 3007
Telephone:  (770) 645-3739
Facsimile:  (770) 645-3475
Email:  ryan.vanmeter@imerys.com

**COUNSEL FOR THE IMERYS DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
           merchant@rlf.com
           steele@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone:  (424) 653-5500
Facsimile:  (424) 653-5501
E-mail:  jeff.bjork@lw.com
           kim.posin@lw.com
           helena.tseregounis@lw.com
           shawn.hansen@lw.com

**COUNSEL FOR THE IMERYS TORT CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
           mfink@rc.com

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**COUNSEL FOR THE IMERYS FCR:**
YOUNG CONAWAY STARGATT &
TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
          eharron@ycst.com
          szieg@ycst.com

**COUNSEL FOR IMERYS, S.A.:**
HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
          erin.diers@hugheshubbard.com

14.8    <u>Notice to Other Entities</u>.    After the occurrence of the Effective Date, the Reorganized Debtor has authority to send a notice to entities providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; provided, that neither of:  (i) the United States Trustee or (ii) counsel of record to CAMC need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtor is authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to:  (i) the United States Trustee; (ii) counsel of record to CAMC.; and (iii) those entities that have filed such renewed requests.

14.9    <u>Plan Supplement</u>.  Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Claims Agent (https://cases.ra.kroll.com/cyprusmines) and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

14.10    <u>Inconsistencies</u>.    To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent

with the Confirmation Order on the Plan, the provisions of such Confirmation Order shall be controlling.

14.11    Withholding of Taxes.  The Disbursing Agent, the Talc Personal Injury Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

14.12    Transfer Taxes.  Pursuant to section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax or other similar tax shall be imposed or assessed by any taxing authority on account of (i) the transfer of any assets or property pursuant to the Plan; (ii) the making or delivery of an instrument of transfer under the Plan; or (iii) the termination or extinguishment of any Equity Interests.  The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

14.13    Binding Effect.  The rights, duties and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.  For the avoidance of doubt, the estates, executors and heirs of holders of Talc Claims (whether such Claims are currently existing or arise in the future) shall be deemed successors of such holders, and the terms of the Plan shall inure to the benefit of and be binding on such holders' estates, executors and heirs, as applicable.

14.14    Payment of Statutory Fees.  All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  The Reorganized Debtor shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Case, and shall comply with all applicable statutory reporting requirements.

14.15    Effective Date Actions Simultaneous.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

14.16    Consent to Jurisdiction.  Upon default under the Plan, the Reorganized Debtor, the Talc Personal Injury Trust, the Talc Trustees, the Tort Claimants' Committee, the FCR, and the Cyprus Protected Parties, respectively, consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default.

14.17    Further Assurances.  Each of the Protected Parties (but only to the extent that each such Protected Party has the ability to bind one or more Protected Parties under applicable state law), the Talc Personal Injury Trust, all Entities receiving Distributions under the Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the

Plan as may be reasonably necessary to effectuate the provisions and intent of the Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

[*Remainder of page left intentionally blank*]

Dated:  January 20, 2026
Wilmington, Delaware

**CYPRUS MINES CORPORATION**

*/s/*_____
Name:
Title:

**TORT CLAIMANTS' COMMITTEE**

*/s/*_____
Name:
Title:

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/*_____
Name:

**CYPRUS AMAX MINERALS COMPANY**

*/s/*_____
Name:
Title:

**THE DEBTOR:**
CYPRUS MINES CORPORATION
Attention:  Corporate Secretary
333 N. Central Ave.
Phoenix, AZ 85004

**COUNSEL FOR THE DEBTOR:**

REED SMITH LLP
Kurt F. Gwynne, Esq.
1201 Market Street - Suite 1500
Wilmington, DE  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575

REED SMITH LLP
Paul M. Singer, Esq.
Luke A. Sizemore, Esq.
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3006

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

A.M. SACCULLO LEGAL, LLC
Mark T. Hurford, Esq.
27 Crimson King Drive
Bear, DE 19701
Telephone:  (302) 836-8877
Facsimile:  (302) 836-8787

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay, Esq.
Todd E. Phillips, Esq.
1200 New Hampshire Avenue NW, 8th Floor
Washington, DC 20036
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

ANDERSON KILL P.C.
Robert M. Horkovich, Esq.
7 Times Square, 15th Floor
New York, NY 10036
Telephone:  (212) 278-1322
Facsimile:  (212) 278-1733

**THE FCR:**
Roger Frankel
c/o Frankel Wyron LLP
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
Telephone:  (202) 367-9128

**COUNSEL FOR THE FCR:**

FRANKEL WYRON LLP
Richard H. Wyron
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
Telephone:  (202) 367-9127

TOGUT, SEGAL & SEGAL LLP
Albert Togut, Esq.
Frank A. Oswald, Esq.
One Penn Plaza, Suite 3335
New York, NY 10119
Telephone:  (212) 594-5000

HERBERT SMITH FREEHILLS KRAMER
(US) LLP

Brian F. Shaughnessy
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9125

**COUNSEL FOR CAMC**
WACHTELL, LIPTON, ROSEN & KATZ
Emil A. Kleinhaus, Esq.
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1332
Facsimile:  (212) 403-2332

MORRIS NICHOLS ARSHT & TUNNELL
LLP
Robert J. Dehney, Esq.
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989