## **EXHIBIT B**

**Trust Distribution Procedures**

**IVORY AMERICA/CYPRUS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Page**

## IVORY AMERICA/CYPRUS PERSONAL INJURY TDP

SECTION I INTRODUCTION .................................................................................. 1

    1.1    Purpose ...................................................................................... 1

    1.2    Interpretation ............................................................................. 2

    1.3    Definitions ................................................................................. 2

SECTION II OVERVIEW ...................................................................................... 27

    2.1    Trust Purpose ........................................................................... 27

    2.2    Funds ....................................................................................... 28

    2.3    Treatment of Ovarian Cancer I-IV Claims .............................. 29

    2.4    Treatment of Mesothelioma Claims and Lung Cancer Claims ...... 29

    2.5    Claim Treatment Summary ...................................................... 30

    2.6    Necessity of Filing a Trust Claim Form .................................. 30

    2.7    Application of the Payment Percentages .................................. 30

    2.8    Determination of the Maximum Annual Payments ................. 31

    2.9    Indirect Talc Personal Injury Claims ...................................... 33

SECTION III TDP ADMINISTRATION .................................................................. 33

    3.1    TACs and Post-Effective Date FCRs ...................................... 33

    3.2    Consent and Consultation Procedures ..................................... 34

SECTION IV PAYMENT PERCENTAGE; PERIODIC ESTIMATES; DUAL ESTATE
    FACTOR .................................................................................. 34

    4.1    Uncertainty of Debtors' Talc Liabilities ................................. 34

    4.2    Computation of Payment Percentages ..................................... 35

    4.3    Applicability of the Payment Percentages ............................... 36

    4.4    Dual Estate Factor – Calculation and Applicability ................ 37

SECTION V RESOLUTION OF TALC PERSONAL INJURY CLAIMS ..................... 38

    5.1    Ordering, Processing and Payment of Claims ......................... 38

    5.2    Resolution of Unliquidated Talc Personal Injury Claims ........ 42

    5.3    Categorizing Claims as Exigent .............................................. 56

    5.4    Indirect Talc Personal Injury Claims ...................................... 57

i

# TABLE OF CONTENTS
(continued)

|  | 5.5 | Evidentiary Requirements | 60 |
|---|---|---|---|
|  | 5.6 | Claims Audit Program | 66 |
|  | 5.7 | Arbitration | 67 |
|  | 5.8 | Litigation | 69 |
| SECTION VI | | CLAIMS MATERIALS | 70 |
|  | 6.1 | Claims Materials | 70 |
|  | 6.2 | Withdrawal or Deferral of Claims | 71 |
|  | 6.3 | Filing Requirements and Fees | 71 |
|  | 6.4 | English Language | 72 |
|  | 6.5 | Confidentiality of Talc Personal Injury Claimants' Submissions | 72 |
| SECTION VII | | GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | 74 |
|  | 7.1 | Claims Processing | 74 |
|  | 7.2 | Acceptance and Release | 75 |
|  | 7.3 | Claims Disputes | 76 |
|  | 7.4 | Costs Considered | 76 |
|  | 7.5 | Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity | 77 |
|  | 7.6 | Punitive Damages | 77 |
|  | 7.7 | Sequencing Adjustments | 78 |
|  | 7.8 | Payment of Judgments for Money Damages | 79 |
|  | 7.9 | Third-Party Services | 80 |
| SECTION VIII | | MISCELLANEOUS | 80 |
|  | 8.1 | Amendments | 80 |
|  | 8.2 | Severability | 81 |
|  | 8.3 | Governing Law | 81 |
|  | 8.4 | Administration with Other Comparable Trusts | 82 |
|  | 8.5 | Lack of Precedential Value | 82 |

ii

**TABLE OF CONTENTS**
(continued)

**Page**

iii

US-DOCS\159191443
RLF1 33768894v.1

## <u>EXHIBITS TO IVORY AMERICA/CYPRUS PERSONAL INJURY TDP</u>

Exhibit A        Acceptance and Release

Exhibit B        Protected Party Notice Information

iii

**<u>IVORY AMERICA/CYPRUS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES</u>[1]**

The Ivory America/Cyprus Personal Injury Trust Distribution Procedures ("**TDP**") contained herein provide the means for resolving all Talc Personal Injury Claims under the Plans for which the Protected Parties have or are alleged to have legal responsibility for or on account of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada Inc., and/or Cyprus Mines Corporation as provided in and required by the Plans and the Ivory America/Cyprus Personal Injury Trust Agreement (the "**Trust Agreement**").

The Plans and the Trust Agreement establish the Ivory America/Cyprus Personal Injury Trust (the "**Trust**"). The trustees as set forth in the Plans and the Trust Agreement ("**Trustees**") shall implement and administer these TDP in accordance with the Trust Agreement.

## SECTION I

## <u>INTRODUCTION</u>

1.1     **Purpose**. These TDP have been adopted pursuant to the Trust Agreement. These TDP are intended to provide reasonable assurance that the Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar claims in substantially the same manner.

---

[1] Capitalized terms used but not defined in these TDP have the meanings ascribed to them in Article I of the Imerys Plan (defined herein) or Article I of the Cyprus Plan (defined herein), as context requires or as indicated herein. To the extent that a term is defined in these TDP and the Plans (as defined herein), the definition contained in these TDP controls.

1

1.2     **Interpretation**.  Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim.  To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest as of the Effective Date.

1.3     **Definitions**.  The following capitalized terms used in these TDP shall have the meanings set forth below:

1.  **"Acceptance and Release"** shall have the meaning set forth in Section 7.2 of these TDP.

2.  **"ADR Procedures"** shall mean the binding arbitration procedures that have or will be instituted by the Trust, with the consent of the TACs and Post-Effective Date FCRs, for resolving disputes as set forth in Section 5.7 of these TDP.

3.  **"Affiliate"** shall mean, with respect to any specified entity: (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity.  As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

4.  **"Auditor"** shall have the meaning set forth in Section 5.6 of these TDP.

5.  **"Average Value"** shall have the meaning set forth in Section 5.2(b)(iii) of these TDP.

6.  **"Bankruptcy Code"** shall mean, as applicable, "Bankruptcy Code" as that term is defined in the Cyprus Plan and/or "Bankruptcy Code" as that term is defined in the Imerys Plan.

2

7. **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware which has jurisdiction over the Chapter 11 Cases.

8. **"Basic Claim Submission"** shall mean the submission of the following information to the Trust: the: (i) holder's name, (ii) holder's address; (iii) holder's social security number (if the holder has one); (iv) name of the injured party, if different from the holder; (v) holder's Disease; and (vi) counsel serving as the holder's Representative (if any) and such counsel's address, along with the filing fee required pursuant to Section 6.3 hereof.

9. **"Bilateral Asbestos-Related Nonmalignant Disease"** shall have the meaning set forth in footnote 6 of these TDP.

10. **"BRCA Reduction"** shall mean (a) a 30% reduction in the liquidated value assigned to the claim of an Ovarian Cancer Claimant who is positive for the BRCA 1 or BRCA 2 mutation; or (b) a 15% reduction in the liquidated value assigned to the claim of an Ovarian Cancer Claimant who has not undergone BRCA testing but has a family history of a first-degree relative (parent, sibling, or child) having epithelial ovarian cancer or breast cancer.

11. **"CAMC"** shall mean Cyprus Amax Minerals Company, a Delaware corporation, and the immediate parent of the Cyprus Debtor.

12. **"Canadian Claims"** shall mean Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

13. **"Chapter 11 Cases"** shall mean, collectively, the Imerys Chapter 11 Cases and the Cyprus Chapter 11 Case.

14. **"Claims Audit Program"** shall have the meaning set forth in Section 5.6 of these TDP.

3

15.   **"Claims Bar Date"** shall mean (A) (i) October 15, 2019, for Non-Talc Claims (as defined in the Imerys Plan) (subject to the exceptions contained in the General Bar Date Order (as defined in the Imerys Plan)) and (ii) January 9, 2020, for Indirect Talc Personal Injury Claims against the Imerys Debtors, (B) July 2, 2021, for certain claims against the Cyprus Debtor (subject to and with the exceptions contained in the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Cyprus Docket No. 265]) or (C) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for submitting certain Claims.

16.   **"Claims Materials"** shall have the meaning set forth in Section 6.1 of these TDP.

17.   **"Claims Processor"** shall have the meaning set forth in Section 5.6 of these TDP.

18.   **"Claimant's Jurisdiction"** shall mean either (a) the jurisdiction in which the Talc Personal Injury Claim was filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date or, (b) if the Talc Personal Injury Claim was not filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced Debtor Exposure; or (iii) any other jurisdiction in the United States or Canada where the claimant has or could have filed a Claim against any of the Debtors or any of their Affiliates or any other defendant in the tort system.

4

19. **"Clear Cell EOC Reduction"** shall mean a 15% reduction in the liquidated value assigned to a claim for an Ovarian Cancer Claimant involving clear cell epithelial ovarian cancer.

20. **"Complete Claim Submission"** shall mean the complete submission of all required materials by a holder of a Talc Personal Injury Claim to the Trust, along with the filing fee required pursuant to Section 6.3 hereof to the extent not already paid.

21. **"Confirmation Orders"** shall mean, together, the Imerys Confirmation Order and the Cyprus Confirmation Order.

22. **"Cosmetic Talc"** shall mean talc that contains at least 90% talc mineral and/or was used in pharmaceutical, cosmetic and/or hygiene products.

23. **"Cross-Trust Audit Program"** shall mean an audit program designed to compare claims filed with the Trust against claims filed with all other trusts administered by the Claims Processor that participate in the Cross-Trust Audit Program but shall include no fewer than four other trusts.

24. **"Cyprus"** shall mean, collectively, Cyprus Mines Corporation and CAMC.

25. **"Cyprus Affiliated Parties"** shall mean, for such time as the Cyprus Debtor was a subsidiary of CAMC or its predecessors, and solely in their capacity as such: (i) direct or indirect shareholders of CAMC or its predecessors; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Cyprus Debtor and the Cyprus Corporate Parties; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable.  For the avoidance of doubt, the Cyprus Affiliated Parties

5

exclude the J&J Corporate Parties, the Rio Tinto Corporate Parties (as defined in the Imerys Plan), the Imerys Corporate Parties (as defined in the Imerys Plan), and the Imerys Debtors.

26. **"Cyprus Chapter 11 Case"** shall mean the Cyprus Debtor's chapter 11 case captioned as *In re Cyprus Mines Corporation*, Case No. 21-10398 (LSS) (Bankr. D. Del.).

27. **"Cyprus Chapter 11 Case Protected Party"** shall mean a "Protected Party" as that term is defined in the Cyprus Plan.

28. **"Cyprus Confirmation Order"** shall mean the order entered by the Bankruptcy Court confirming the Cyprus Plan pursuant to section 1129 of the Bankruptcy Code.

29. **"Cyprus Contributions"** shall have the meaning ascribed to such term in the Cyprus Plan, provided, however, for purposes of these TDP, the term "Cyprus Contributions" shall exclude the Cyprus Talc Insurance Policy Proceeds.

30. **"Cyprus Corporate Parties"** shall mean (a) Freeport, (b) CAMC, (c) the Persons listed on Schedule I to the Cyprus Plan, each of which is directly or indirectly owned or controlled by Freeport, CAMC, and/or the Cyprus Debtor, and (d) any future successors or assigns of Freeport, CAMC, the Cyprus Debtor, and/or the Persons or Entities listed on Schedule I to the Cyprus Plan, solely in their capacities as such.

31. **"Cyprus Debtor"** shall mean Cyprus Mines Corporation.

32. **"Cyprus Designated Account"** shall have the meaning ascribed to such term in the Plans.

33. **"Cyprus Effective Date"** shall mean the date on which the Cyprus Plan becomes effective.

**34.** **"Cyprus FCR"** shall mean Roger Frankel, Esquire, in his capacity as the legal representative for any and all persons who may assert Cyprus Talc Personal Injury Claims in the future, but who are currently unknown.

**35.** **"Cyprus Indirect Talc Personal Injury Claim"** shall mean an "Indirect Talc Claim" as defined in the Cyprus Plan, provided, however, that such term shall not include Foreign Claims for purposes of these TDP.

**36.** **"Cyprus Industrial Talc"** shall mean Cyprus Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

**37.** **"Cyprus Parties"** shall mean, collectively, Cyprus and Freeport.

**38.** **"Cyprus Petition Date"** shall mean February 11, 2021.

**39.** **"Cyprus Plan"** shall mean the *Third Modified First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code*, as the same may be amended, supplemented, or modified from time to time consistent with the Cyprus Settlement.

**40.** **"Cyprus Protected Parties"** means the Cyprus Corporate Parties and the Cyprus Affiliated Parties.  With regard to Amoco Corporation or any successor or predecessor thereto that is not otherwise a Protected Party (collectively, "**Amoco**"): (i) with respect to any talc-related claims or liabilities relating to its indirect or direct ownership of the Cyprus Debtor prior to July 1, 1985, including any talc-related claim or liability that could give rise to any claim against CAMC under the Memorandum of Agreement dated June 28, 1985 between Amoco Corporation and Cyprus Minerals Company, Amoco shall be a Cyprus Protected Party, and (ii) with respect to any indemnity or similar obligations that it undertook after July 1, 1985, including to any Talc

US-DOCS\159191443
RLF1 33768894v.1

Insurance Company with respect to any Cyprus Talc Insurance Policy, Amoco shall not be a Cyprus Protected Party.  For the avoidance of doubt, the Cyprus Protected Parties exclude the Imerys Released Parties (as defined in the Cyprus Plan), the Rio Tinto Protected Parties (as defined in the Imerys Plan), the Zurich Protected Parties (as defined in the Imerys Plan), the XL Protected Parties (as defined in the Imerys Plan) and the J&J Corporate Parties.

41.  **"Cyprus Reorganized Debtor"** shall mean the Cyprus Debtor as it exists after the Cyprus Effective Date.

42.  **"Cyprus Settlement"** shall mean that certain comprehensive settlement by and among the Cyprus Parties, the Imerys Debtors, the Tort Claimants' Committee in the Imerys Chapter 11 Cases, the Tort Claimants' Committee in the Cyprus Chapter 11 Case, the Imerys FCR, and the Cyprus FCR, the terms of which are set forth in and implemented by the Imerys Plan and the Cyprus Plan.

43.  **"Cyprus Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by Cyprus Mines Corporation or any of its predecessors or affiliates including but not limited to United Sierra Corporation, Cyprus Industrial Minerals Corporation, CMC-Sierra Corporation or Cyprus Georesearch Company.

44.  **"Cyprus Talc Insurance Policy"** shall mean "Talc Insurance Policy" as that term is defined in the Cyprus Plan.

45.  **"Cyprus Talc Insurance Policy Proceeds"** shall mean the proceeds from (i) the Cyprus Talc Insurance Policies and (ii) any settlement agreement or similar agreement that amends, modifies, replaces, or governs the rights and obligations of, and the coverage afforded to, any or all of the Debtors under any Cyprus Talc Insurance Policy.  For the avoidance of doubt, the Cyprus Talc Insurance Policy Proceeds do not include the J&J Payment Obligations.

8

46. **"Cyprus Talc Personal Injury Claim"** shall mean "Talc Personal Injury Claim" as that term is defined in the Cyprus Plan.

47. **"Cyprus Talc Personal Injury Demand"** shall mean "Talc Personal Injury Demand" as that term is defined in the Cyprus Plan.

48. **"Debtors"** shall mean, collectively, the Imerys Debtors and the Cyprus Debtor.

49. **"Debtor Exposure"** shall mean credible evidence (a) of exposure to talc or a product containing talc mined, processed, milled, manufactured, sold and/or distributed by one or more of the Debtors, or for which one or more of the Debtors otherwise have legal responsibility, or (b) of conduct for which one or more of the Debtors have legal responsibility that exposed the claimant to such product.

50. **"Direct Claimant"** shall mean the holder of a Direct Talc Personal Injury Claim to whom the Trust has an obligation under the Plans and these TDP.

51. **"Direct Talc Personal Injury Claim"** shall mean a Talc Personal Injury Claim that is not an Indirect Talc Personal Injury Claim.

52. **"Disease"** shall mean Ovarian Cancer I-IV, Mesothelioma Cosmetic A, Mesothelioma Cosmetic B, Mesothelioma Industrial A, Mesothelioma Industrial B or Lung Cancer.

53. **"Dual Estate Factor" or "DEF"** shall have the meaning set forth in Section 4.4 of these TDP.

54. **"Effective Date"** means the first Business Day upon which all of the conditions precedent to the occurrence of both the Effective Date of the Imerys Plan (as defined therein) and the Effective Date of the Cyprus Plan (as defined therein) have been satisfied or waived pursuant to the Plans (as applicable).

US-DOCS\159191443
RLF1 33768894v.1

55. **"Exigent Claim"** shall mean an Exigent Health Claim or an Exigent Hardship Claim.

56. **"Exigent Hardship Claim"** shall mean a Direct Talc Personal Injury Claim that is compensable hereunder, for which the Trust, in its sole discretion, determines that (i) the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) there is a causal connection between the claimant's dire financial condition, and the claimant's talc-related Disease.

57. **"Exigent Health Claim"** shall mean a Direct Talc Personal Injury Claim filed by a claimant who is living when the Direct Talc Personal Injury Claim is filed and that is compensable hereunder, and as to which the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states that (a) there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) the claimant's terminal condition is caused, in whole or in part, by the relevant talc-related Disease.

58. **"Expedited Review Process"** shall mean the claims-resolution method by which Talc Personal Injury Claims for Ovarian Cancer, Mesothelioma, or Lung Cancer are evaluated to determine whether they are entitled to receive the applicable Scheduled Values as described in Section 5.2(a) hereof.

59. **"FIFO"** shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which all Talc Personal Injury Claims shall be valued and paid by the Trust.

60. **"FIFO Processing Queue"** shall mean the FIFO line-up on which the Trust reviews Complete Claim Submissions in a Fund (each Fund shall have its own FIFO line-up).

61. **"FIFO Payment Queue"** shall have the meaning assigned set forth in Section 5.1(b) of these TDP.

62. **"Final Order"** shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

63. **"Foreclosed Jurisdiction"** shall mean a jurisdiction which describes a claim for compensatory damages under these TDP as a claim for "exemplary" or "punitive" damages thereby foreclosing a claimant from a remedy or compensation under these TDP if the law for that jurisdiction were to be applied hereunder.

64. **"Foreign Claim"** shall mean a Talc Claim (as defined in the Cyprus Plan or the Imerys Plan, as applicable) solely involving talc or a product containing talc (i) that was purchased entirely outside of the US/Canada, and (ii) as to which the claimant's exposure to any such talc or product occurred entirely outside of the US/Canada.  For the avoidance of doubt, talc and products containing talc will be deemed to have been purchased entirely outside of the US/Canada only if (x) all the talc, or all the talc contained in the products, that the claimant used and that the claimant alleges caused his or her injury was mined, milled, processed, and shipped from locations entirely

11

outside of the US/Canada and not distributed into the US/Canada, and (y) the claimant or other retail consumer purchased the product containing such talc entirely outside of the US/Canada.  For purposes of this definition, a Canadian Claim is not a Foreign Claim.

65. **"Freeport"** shall mean Freeport-McMoRan Inc.

66. **"FCR"** shall mean the Cyprus FCR and/or the Imerys FCR, as applicable.

67. **"Fund"** shall have the meaning set forth in Section 2.2 of these TDP.

68. **"Home Proceeds"** shall have the meaning ascribed to such term in the Plans.

69. **"Imerys Affiliated Parties"** shall mean, in each case during the times the Imerys Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Imerys Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Persons' respective heirs, executors, estates, and nominees, as applicable.  For the avoidance of doubt, the Imerys Affiliated Parties exclude the J&J Corporate Parties, the Rio Tinto Corporate Parties (as defined in the Imerys Plan), the Cyprus Corporate Parties, and the Cyprus Debtor.

70. **"Imerys Chapter 11 Cases"** shall mean the Imerys Debtors' chapter 11 cases captioned and jointly administered as *In re Imerys Talc America, Inc., et al.,* Case No. 19-10289 (LSS) (Bankr. D. Del.).

71. **"Imerys Chapter 11 Cases Protected Party"** shall mean a "Protected Party" as that term is defined in the Imerys Plan.

12

72. **"Imerys Confirmation Order"** shall mean the order entered by the Bankruptcy Court confirming the Imerys Plan pursuant to section 1129 of the Bankruptcy Code.

73. **"Imerys Corporate Parties"** shall mean Imerys S.A. and all Persons listed on Schedule I to the Imerys Plan, each of which are or were Affiliates of Imerys S.A. during the time that the Imerys Debtors were owned or controlled by Imerys S.A., and the successors and assigns of such Persons, solely in their capacity as such.  Schedule I to the Imerys Plan contains an exclusive list and does not include, among others, the J&J Corporate Parties, the Rio Tinto Corporate Parties (as defined in the Imerys Plan), the Cyprus Corporate Parties or the Cyprus Debtor.

74. **"Imerys-Cyprus Talc Personal Injury Claim"** shall mean any Talc Personal Injury Claim resulting from Debtor Exposure occurring (at least in part) before January 1, 1993.

75. **"Imerys Debtors"** shall mean Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc., individually, collectively or in any combination.

76. **"Imerys Designated Account"** shall have the meaning ascribed to such term in the Plans.

77. **"Imerys FCR"** shall mean James L. Patton, Jr., Esquire, in his capacity as the legal representative for any and all persons who may assert Imerys Talc Personal Injury Claims in the future, but who are currently unknown.

78. "**Imerys Indirect Talc Personal Injury Claim**" shall mean an "Indirect Talc Claim" as defined in the Imerys Plan, provided, however, that such term shall not include Foreign Claims for purposes of these TDP.

79. **"Imerys Industrial Talc"** shall mean Imerys Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

13

80. **"Imerys Petition Date"** shall mean February 13, 2019.

81. **"Imerys Plan"** shall mean the *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as the same may be amended, supplemented, or modified from time to time.

82. **"Imerys Plan Proponents"** shall mean the Imerys Debtors, the Tort Claimants' Committee in the Imerys Chapter 11 Cases, the Imerys FCR, and Imerys S.A., on behalf of itself and all Persons listed on <u>Schedule II</u> of the Imerys Plan, each of which Imerys S.A. has direct or indirect ownership or other control.

83. **"Imerys Released Parties"** shall have the meaning ascribed to such term in the Imerys Plan.

84. **"Imerys Reorganized Debtors"** shall mean the Imerys Debtors on and after the Effective Date.

85. **"Imerys Settlement"** shall mean that certain comprehensive settlement by and among the Imerys Plan Proponents, the terms of which are set forth and implemented in the Imerys Plan.

86. **"Imerys Settlement Funds"** shall mean (i) $75 million, plus (ii) the Sale Proceeds, less (iii) $376,630.14, representing Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents.

87. **"Imerys Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by the Imerys Debtors and any of their predecessors including but not limited to (i) Imerys Talc Vermont, Inc f/k/a Windsor Minerals, Inc., and Cyprus Windsor Minerals Corp.; (ii) Imerys Talc America, Inc, f/k/a Cyprus Talc Corporation and Luzenac America, Inc.; and (iii) Imerys Talc Canada Inc. f/k/a Luzenac, Inc. Notwithstanding anything contained herein, no

14

J&J Corporate Party shall be treated as or considered a predecessor to any of the Imerys Debtors, the Imerys Corporate Parties, the Rio Tinto Corporate Parties (as defined in the Imerys Plan), the Cyprus Debtor, or the Cyprus Corporate Parties.

88. **"Imerys Talc Insurance Policy"** shall mean "Talc Insurance Policy" as that term is defined in the Imerys Plan.

89. **"Imerys Talc Personal Injury Claims"** shall mean "Talc Personal Injury Claim" as that term is defined in the Imerys Plan.

90. **"Imerys Talc Personal Injury Demand"** shall mean "Talc Personal Injury Demand" as that term is defined in the Imerys Plan.

91. **"Indirect Claimant"** shall mean the holder of an Indirect Talc Personal Injury Claim.

92. **"Indirect Talc Personal Injury Claim"** shall mean, as applicable, a Cyprus Indirect Talc Personal Injury Claim and/or an Imerys Indirect Talc Personal Injury Claim.  For the avoidance of doubt, Indirect Talc Personal Injury Claims do not include Foreign Claims.

93. **"Individual Review Process"** shall mean the claims-resolution method in which a Talc Personal Injury Claim is individually evaluated as described in Section 5.2(b).

94. **"Industrial Talc"** shall mean Cyprus Industrial Talc or Imerys Industrial Talc (as applicable).

95. **"Initial Claims Filing Date"** shall mean the date on which the Trust first begins to accept claims.

96. **"Initial Payment Percentages"** shall mean the initial payment percentages set by the Trust for each Fund following the Effective Date.

97. **"J&J"** shall mean Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, J&J includes LTL Management LLC, Kenvue, Inc., Janssen Pharmaceuticals, Inc., and Johnson & Johnson Holdco (NA) Inc.  For the avoidance of doubt, J&J excludes the Cyprus Debtor and its Affiliates, the Imerys Debtors, Imerys S.A. and its Affiliates, and the Rio Tinto Corporate Parties (as defined in the Imerys Plan).

98. **"J&J Corporate Parties"** shall have the meaning ascribed to such term in the J&J Settlement Agreement.  For the avoidance of doubt, the J&J Corporate Parties exclude the Cyprus Debtor and its Affiliates, the Imerys Debtors, Imerys S.A. and its Affiliates, and the Rio Tinto Corporate Parties (as defined in the Imerys Plan).

99. **"J&J Initial Payment"** shall have the meaning ascribed to such term in the Plans.

100. **"J&J Insurance Payments"** shall have the meaning ascribed to such term in the J&J Settlement Agreement.

101. **"J&J Payment Obligations"** shall have the meaning ascribed to such term in the J&J Settlement Agreement.

102. **"J&J Payment Protocol"** shall mean the protocol governing the distribution of the J&J Payment Obligations to the Debtors and/or the Trust, as applicable, which is set forth in <u>Sections 4</u> and <u>5</u> of the J&J Settlement Agreement.

US-DOCS\159191443
RLF1 33768894v.1

103. **"J&J Settlement"** shall mean that certain settlement set forth in the J&J Settlement Agreement and approved by the Bankruptcy Court pursuant to the J&J Settlement Order.

104. **"J&J Settlement Agreement"** shall mean the Amended and Restated Settlement Agreement and Release among the Debtors, Imerys S.A., CAMC, the Tort Claimants' Committee in the Imerys Chapter 11 Cases, the Tort Claimants' Committee in the Cyprus Chapter 11 Case, the Imerys FCR, and the Cyprus FCR, and solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 thereof, Rio Tinto and Zurich (as defined in the Imerys Plan), on the one hand, and the J&J Settling Parties, on the other hand, which is attached as an exhibit to the Plans.

105. **"J&J Settlement Order"** shall mean the *Order (I) Approving the Amended and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [Imerys Docket No. 6715; Cyprus Docket No. 2634].

106. **"J&J Settlement Proceeds"** shall mean the amount of the J&J Payment Obligations and the Home Proceeds that is (i) received by the Cyprus Designated Account prior to the Effective Date, (ii) in the Imerys Designated Account on the Effective Date, and (iii) payable to the Talc Personal Injury Trust on or after the Effective Date pursuant to the terms of the J&J Settlement Agreement.

107. **"J&J Settling Parties"** shall mean Johnson & Johnson and any successor thereto, Johnson & Johnson Holdco (NA) Inc. (f/k/a J&J Intermediate Holding Corp.) and any successor thereto, Pecos River Talc LLC and any successor thereto, and Red River Talc LLC and any successor thereto. For the avoidance of doubt, the J&J Settling Parties exclude the Cyprus

17

Debtor and its Affiliates, the Imerys Debtors, Imerys S.A. and its Affiliates, and the Rio Tinto Corporate Parties (as defined in the Imerys Plan).

108. **"Lung Cancer"** shall mean a primary lung cancer (i.e., a lung cancer that originates in the lungs and is unrelated to any previous cancer as opposed to a lung cancer that has spread to the lungs from another part of the body).

109. **"Lung Cancer Claim"** shall mean a Talc Personal Injury Claim for Lung Cancer.

110. **"Lung Cancer Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Lung Cancer Claim.

111. **"Maximum Annual Payments"** shall have the meaning set forth in Section 2.8 of these TDP.

112. **"Maximum Value"** shall have the meaning set forth in Section 5.2(b)(iii) of these TDP.

113. **"Medical Doctor"** shall mean an individual with a medical doctorate or a doctor of osteopathy.

114. **"Medical/Exposure Criteria"** shall mean the presumptive medical and exposure requirements for each Disease under the Expedited Review Process or the Individual Review Process.

115. **"Mesothelioma"** shall mean a type of cancer caused by exposure to asbestos that develops from the thin layer of tissue that covers many of the internal organs known as the mesothelium, including that found in the lining of the lungs and chest wall, abdomen, heart, and testes.

116. **"Mesothelioma Claim"** shall mean a Talc Personal Injury Claim for Mesothelioma Cosmetic A, Mesothelioma Cosmetic B, Mesothelioma Industrial A, or Mesothelioma Industrial B.

117. **"Mesothelioma Cosmetic A"** shall have the meaning ascribed to such term in the definition of Regular or Routine Exposure to Cosmetic Talc.

118. **"Mesothelioma Cosmetic B"** shall have the meaning ascribed to such term in the definition of Regular or Routine Exposure to Cosmetic Talc.

119. **"Mesothelioma Industrial A"** shall have the meaning ascribed to such term in the definition of Regular or Routine Exposure to Industrial Talc.

120. **"Mesothelioma Industrial B"** shall have the meaning ascribed to such term in the definition of Regular or Routine Exposure to Industrial Talc.

121. **"Mesothelioma __ Claim"** shall mean in reference to Mesothelioma Cosmetic A, Mesothelioma Cosmetic B, Mesothelioma Industrial A, or Mesothelioma Industrial B, a Talc Personal Injury Claim for Mesothelioma Cosmetic A, Mesothelioma Cosmetic B, Mesothelioma Industrial A, or Mesothelioma Industrial B, respectively.

122. **"Mesothelioma __ Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Mesothelioma Claim.

123. **"Mesothelioma / Lung Cancer TAC"** shall mean the TAC that represents the interests of holders of present Mesothelioma Claims, Lung Cancer Claims, and Other Non-Gynecological Disease Claims.

124. **"Other Disease Claim"** shall mean any Talc Personal Injury Claim that is not an Ovarian Cancer Claim, a Mesothelioma Claim, or a Lung Cancer Claim.  For the avoidance of

US-DOCS\159191443
RLF1 33768894v.1

doubt, Other Disease Claims include Other Non-Gynecological Disease Claims and Other Gynecological Disease Claims.

125. **"Other Gynecological Disease Claim"** shall have the meaning set forth in Section 5.2(b)(vi) of these TDP.

126. **"Other Non-Gynecological Disease Claim"** shall have the meaning set forth in Section 5.2(b)(vi) of these TDP.

127. **"Ovarian Cancer"** shall mean epithelial ovarian cancer (serous, endometrioid, undifferentiated, clear cell and borderline), fallopian tube cancer, or primary peritoneal cancer.  For the avoidance of doubt, Ovarian Cancer includes Ovarian Cancer I through IV.

128. **"Ovarian Cancer IV"** shall mean: (a) a diagnosis of Stage IV Ovarian Cancer of a person with serous, endometrioid, clear cell or undifferentiated Ovarian Cancer, or (b) recurrence of or death from serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

129. **"Ovarian Cancer III"** shall mean a diagnosis of Stage III Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

130. **"Ovarian Cancer II"** shall mean a diagnosis of Stage II Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

131. **"Ovarian Cancer I"** shall mean (i) a diagnosis of Stage I Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer, and (ii) all borderline serous and endometrioid Ovarian Cancers.

132. **"Ovarian Cancer __ Claim"** shall mean in reference to Ovarian Cancer I through IV, a Talc Personal Injury Claim for Ovarian Cancer I through IV, respectively.

133. **"Ovarian Cancer __ Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Ovarian Cancer Claim.

134. **"Ovarian Cancer I-IV Claim"** shall mean all Talc Personal Injury Claims for Ovarian Cancer I, Ovarian Cancer II, Ovarian Cancer III and Ovarian Cancer IV.

135. **"Ovarian Cancer Claim"** shall mean a Talc Personal Injury Claim for Ovarian Cancer.

136. **"Ovarian Cancer TAC"** shall mean the TAC that represents the interests of holders of present Ovarian Cancer Claims and Other Gynecological Disease Claims.

137. **"Payment Percentage"** shall have the meaning set forth in Section 4.1 of these TDP as calculated as set forth in Section 4.2 of these TDP.

138. **"Personal Use Exposure"** shall mean, in connection with Ovarian Cancer, the Regular or Routine Application of body powder containing Cyprus Talc and/or Imerys Talc to the genital area for at least three years following puberty (which period does not have to be continuous) and prior to any hysterectomy or tubal ligation.  For the avoidance of doubt, inhalation and dermal contact (i.e. through migration of talcum powder through the genital tract) are the primary routes of exposure.

139. **"Petition Date"** shall mean, as applicable, the Cyprus Petition Date or the Imerys Petition Date.

140. **"Plan Documents"** shall mean the "Plan Documents" as defined in the Imerys Plan and the "Plan Documents" as defined in the Cyprus Plan.

141. **"Plans"** shall mean, together, the Imerys Plan and the Cyprus Plan.

142. **"Post-Effective Date FCRs"** shall mean (i) the Post-Effective Date Ovarian Cancer FCR and (ii) the Post-Effective Date Mesothelioma / Lung Cancer FCR.

21

143. **"Post-Effective Date Mesothelioma / Lung Cancer FCR"** shall mean a future claimants representative appointed at the hearing(s) with respect to confirmation of the Plans (or any successor appointed pursuant to the Trust Agreement), each in their capacity as a legal representative for any and all persons who may, in the future, assert a Talc Personal Injury Claim associated with a Mesothelioma Claim, a Lung Cancer Claim, or an Other Non-Gynecological Disease Claim.

144. **"Post-Effective Date Ovarian Cancer FCR"** shall mean a future claimants representative to be appointed at the hearing(s) with respect to confirmation of the Plans (or any successor appointed pursuant to the Trust Agreement), each in their capacity as a legal representative for any and all persons who may, in the future, assert a Talc Personal Injury Claim associated with an Ovarian Cancer Claim or an Other Gynecological Disease Claim.

145. **"Protected Parties"** shall mean the Cyprus Chapter 11 Case Protected Parties and the Imerys Chapter 11 Cases Protected Parties. For the avoidance of doubt, no J&J Corporate Party is a Protected Party.

146. **"Product Identification Form"** shall mean, in connection with a Trust Claim Form, those questions, forms, or other materials requiring a claimant to identify, to the best of their knowledge at the time of submission of the Trust Claim Form, the names of all products containing Cyprus Talc and/or Imerys Talc to which they were exposed that form the basis of their Talc Personal Injury Claim.

147. **"Regular or Routine Application"** shall mean, in connection with Ovarian Cancer, multiple (2 or more) applications of Cyprus Talc and/or Imerys Talc to the genital area weekly.

US-DOCS\159191443
RLF1 33768894v.1

148. **"Regular or Routine Exposure"** shall mean, as applicable, Regular or Routine Exposure to Cosmetic Talc or Regular or Routine Exposure to Industrial Talc.

149. **"Regular or Routine Exposure to Cosmetic Talc"** shall mean as follows: (i) for holders of Talc Personal Injury Claims asserting Mesothelioma, regular Cyprus Talc and/or Imerys Talc exposure through cosmetic products for a period of at least 3 years and no other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Mesothelioma Cosmetic A"** claim); (ii) for holders of Talc Personal Injury Claims asserting Mesothelioma, regular Cyprus Talc and/or Imerys Talc exposure through cosmetic products for a period of at least 3 years and other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Mesothelioma Cosmetic B"** claim); and (iii) for holders of Talc Personal Injury Claims asserting Lung Cancer, regular Cyprus Talc and/or Imerys Talc exposure through cosmetic products for a period of at least 15 years and no other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Lung Cancer Cosmetic Talc"** claim).

150. **"Regular or Routine Exposure to Industrial Talc"** shall mean as follows: (i) for holders of Talc Personal Injury Claims asserting Mesothelioma, regular Cyprus Talc and/or Imerys Talc exposure in an industrial setting for a period of at least 1 year and no other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Mesothelioma Industrial A"** claim); (ii) for holders of Talc Personal Injury Claims asserting Mesothelioma, regular Cyprus Talc and/or Imerys Talc exposure in an industrial setting for a period of at least 1 year and other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Mesothelioma Industrial B"** claim); and (iii) for holders of Talc Personal Injury Claims asserting Lung Cancer, regular Cyprus Talc and/or Imerys Talc exposure in

23

an industrial setting for a period of at least 10 years and no other significant occupational or industrial exposure (whether direct or bystander) to asbestos (each, a **"Lung Cancer Industrial Talc"** claim).

151. **"Reorganized Debtors"** shall mean, together, the Imerys Reorganized Debtors and the Cyprus Reorganized Debtor.

152. **"Representative"** shall mean an individual or entity acting under legal authority on behalf of a holder of a Talc Personal Injury Claim, which includes counsel. For the avoidance of doubt, a representation of authority by counsel shall be sufficient evidence of authority.

153. "**Reviewable Claim Submission**" shall mean submission of a Talc Personal Injury Claim with information required by the applicable Trust Claim Form, the filing fee required pursuant to Section 6.3 hereof to the extent not already paid, and any other information to be considered by the Trust to review the claim and determine if it is a Complete Claim Submission or if additional materials must be submitted in order for the claim to be considered a Complete Claim Submission.

154. **"Rio Tinto"** shall mean Rio Tinto America Inc.

155. **"Scheduled Value"** shall mean the specific value set forth in Section 5.2(a)(iii) of these TDP to be assigned to claims that elect the Expedited Review Process and satisfy the applicable Medical/Exposure Criteria.

156. **"Secondary Mesothelioma Claim"** shall have the meaning set forth in Section 5.2(b)(v) of these TDP.

157. **"Secondary Mesothelioma Claimant"** shall mean a Talc Personal Injury Claimant asserting a Secondary Mesothelioma Claim.

24

158. **"Settled and Unpaid Talc Personal Injury Claim"** shall mean a Talc Personal Injury Claim that was settled and resolved prior to the Imerys Petition Date if related to the Imerys Debtors or the Cyprus Petition Date if related to the Cyprus Debtor, but for which payment was not received prior to the applicable Petition Date.

159. **"TACs"** shall mean the Ovarian Cancer TAC and the Mesothelioma / Lung Cancer TAC.

160. **"Talc Insurance Company"** shall mean any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that may have liability under a Talc Insurance Policy.

161. **"Talc Insurance Policies"** shall mean the Imerys Talc Insurance Policies and the Cyprus Talc Insurance Policies (as applicable).

162. **"Talc Personal Injury Claim"** shall mean an Imerys Talc Personal Injury Claim and/or a Cyprus Talc Personal Injury Claim (as applicable).  For the avoidance of doubt, (i) Talc Personal Injury Claims include Talc Personal Injury Demands, and (ii) Talc Personal Injury Claims do not include Foreign Claims.

163. **"Talc Personal Injury Claimant"** shall mean the holder of a Talc Personal Injury Claim.

164. **"Talc Personal Injury Demand"** shall mean an Imerys Talc Personal Injury Demand and/or a Cyprus Talc Personal Injury Demand (as applicable).

165. **"Trust Assets"** shall mean the following assets and any income, earnings, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) the right to receive the Cyprus Contributions pursuant to the

25

Cyprus Settlement; (d) the right to receive the XL Contribution pursuant to the XL Settlement; (e) all Cash held by the Imerys Debtors as of the Effective Date, not including the Cash used to fund the Reserves (as defined in the Imerys Plan); (f) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (g) the Talc Personal Injury Trust Causes of Action and any and all proceeds thereof; (h) the Talc Insurance Assets and all Claims thereunder; (i) the Debtor Stock (as defined in the Imerys Plan); (j) all Cash remaining in the Reserves (as defined in the Imerys Plan), if any, to be distributed to the Trust in accordance with the Imerys Plan; (k) any and all other funds, proceeds, or other consideration otherwise contributed to the Trust pursuant to the Imerys Plan and/or the Imerys Confirmation Order or other order of the Bankruptcy Court; and (l) the right to receive the J&J Settlement Proceeds.  For the avoidance of doubt, the Purchased Properties, which will be owned and operated by Reorganized ITV on and after the Effective Date, shall not constitute "Trust Assets," provided, however, that any proceeds derived from operation of the Purchased Properties (except Cash required to fund the Reserves) and realized from the liquidation of the Purchased Properties in accordance with Section 10.14.2 of the Imerys Plan shall constitute "Trust Assets."

**166. "Trust Claim Form"** shall mean the form(s), including the Product Identification Form, issued by the Trust for submitting a claim, which form(s) shall be subject to the consent of the applicable TAC and Post-Effective Date FCR.

**167. "Trust Fund"** shall mean the Trust Assets but not including the Cyprus Contributions, the Cyprus Talc Insurance Policy Proceeds, or the J&J Settlement Proceeds.

**168. "US/Canada"** shall mean the United States, Canada, and any of the territories and possessions of the United States (including Puerto Rico) and Canada.

## SECTION II

## <u>OVERVIEW</u>

**2.1**     **Trust Purpose**.  The purpose of the Trust is to assume the liability for Talc Personal Injury Claims pursuant to the terms of the Plans, and to use the Trust Assets to resolve and, if appropriate, promptly pay Talc Personal Injury Claims in such a way that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner and otherwise comply with the requirements of a trust established pursuant to section 524(g) of the Bankruptcy Code.  To this end, these TDP set forth procedures for processing, resolving, and paying (as appropriate) Ovarian Cancer Claims, Mesothelioma Claims, and Lung Cancer Claims through the Expedited Review Process set forth in Section 5.2(a) or the Individual Review Process in Section 5.2(b).  The Trust has established Medical/Exposure Criteria in recognition of the unique and widespread consumer and commercial nature of the use of (i) Imerys Talc and Imerys Talc containing products and (ii) Cyprus Talc and Cyprus Talc containing products.  The Trust Assets, including the proceeds of any assigned insurance rights, indemnities, and other causes of action shall be used to resolve and satisfy Talc Personal Injury Claims pursuant to these TDP.  The amounts that Talc Personal Injury Claimants may ultimately receive on account of their resolved Talc Personal Injury Claims will depend on, among other things, the Trust's ability to liquidate and recover the proceeds of assigned insurance rights, indemnities, and other causes of action.  The amount of any initial payments or payment percentages (and the DEF, where applicable) established under these TDP or the Trust Agreement are not the equivalent of (i) any Talc Personal Injury Claimant's allowed claim amount or (ii) the right to payment that the holder of an allowed Talc Personal Injury Claim has against the Debtors and/or Protected Parties, as assumed by the Trust, or any other alleged tortfeasor, including J&J.

US-DOCS\159191443
RLF1 33889894v.1

2.2    **Funds.**  The Trust Fund, the Cyprus Contributions, the Cyprus Talc Insurance Policy Proceeds, and the J&J Settlement Proceeds shall be allocated into Fund A and Fund B (each, a "**Fund**").  Each Fund operates separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment Percentage or Maximum Annual Payment, shall not affect or require changes to the other Fund. Each Fund shall be subject to the terms set forth herein for such Fund, and each Fund shall be operated for the exclusive benefit of the respective beneficiaries of such Fund.  Administrative expenses attributable to the operation of one Fund (including the processing of claims asserted against such Fund) shall be allocated to that Fund separately.  Common administrative expenses incurred by the Trust that cannot be attributed to the operation of a single Fund shall be allocated equitably between Fund A and Fund B by the Trustees based on the facts and circumstances with respect to the expenses.

(a)    **Fund A**:  Ovarian Cancer I, II, III and IV Claimants shall only be compensated from Fund A.  Fund A shall consist of a separate sub-account within the Trust equal to the following contribution plus any earnings and income from same: (i) 60% of the total Trust Fund, (ii) 45% of the Cyprus Contributions, (iii) 52.5% of the Cyprus Talc Insurance Policy Proceeds, and (iv) 52.5% of the J&J Settlement Proceeds.  These allocations may not be modified or amended in any respect.  For the avoidance of doubt, Fund A will not compensate Foreign Claims.

(b)    **Fund B**:  Mesothelioma Claimants, Secondary Mesothelioma Claimants, and Lung Cancer Claimants shall only be compensated from Fund B.  Fund B shall consist of a separate sub-account within the Trust equal to the following contributions plus any earnings and income from same:  (i) 40% of the total Trust Fund, (ii) 55% of the Cyprus Contributions,

28

(iii) 47.5% of the Cyprus Talc Insurance Policy Proceeds, and (iv) 47.5% of the J&J Settlement Proceeds. These allocations may not be modified or amended in any respect. For the avoidance of doubt, Fund B will not compensate Foreign Claims.

**2.3** **Treatment of Ovarian Cancer I-IV Claims**. Ovarian Cancer I-IV Claimants who meet the Medical/Exposure Criteria may elect to seek recovery from Fund A through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage (as modified by the DEF (if applicable)). Ovarian Cancer I-IV Claimants who do not meet the Medical/Exposure Criteria must undergo the Trust's Individual Review Process described in Section 5.2(b) below.

**2.4** **Treatment of Mesothelioma Claims and Lung Cancer Claims**.

**(a)** Mesothelioma Cosmetic A Claimants, Mesothelioma Cosmetic B Claimants, Mesothelioma Industrial A Claimants, Mesothelioma Industrial B Claimants, and Lung Cancer Claimants who meet the Medical/Exposure Criteria may elect to seek recovery from Fund B through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage (as modified by the DEF (if applicable)).

**(b)** Mesothelioma Cosmetic A Claimants, Mesothelioma Cosmetic B Claimants, Mesothelioma Industrial A Claimants, Mesothelioma Industrial B Claimants, and Lung Cancer Claimants without Regular or Routine Exposure and Secondary Mesothelioma Claimants who elect to seek recovery from Fund B through the Individual Review Process, shall be subject to the review and valuation procedures set forth herein (including the terms set forth in Sections

5.2(b)(iv) and (v)) and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage (as modified by the DEF (if applicable)).

2.5     **Claim Treatment Summary.**  The following chart summarizes the information contained in Sections 2.3 to 2.4 above:

| Category | Treatment |
| --- | --- |
| Mesothelioma Claims and Lung Cancer Claims with Regular or Routine Exposure | May be processed for resolution by the Trust under Expedited Review or Individual Review as set forth herein and if compensable shall be paid from Fund B. |
| Mesothelioma Claims and Lung Cancer Claims without Regular or Routine Exposure and Secondary Mesothelioma Claims | Must be processed for resolution by the Trust under Individual Review, as set forth herein and if compensable shall be paid by Fund B. |
| Ovarian Cancer I through IV | May be processed for resolution by the Trust under Expedited Review or Individual Review as set forth herein and if compensable shall be paid from Fund A. |

2.6     **Necessity of Filing a Trust Claim Form.**  All holders of Talc Personal Injury Claims must file a Trust Claim Form with the Trust.

2.7     **Application of the Payment Percentages.**  The assets of Fund A and Fund B over their lives are estimated to be substantially less than the aggregate liquidated values of the Talc Personal Injury Claims anticipated to be asserted against them.  After the liquidated value of a Talc Personal Injury Claim payable from a Fund is determined pursuant to the procedures set forth herein for Expedited Review or Individual Review, the holder of such claim shall ultimately receive a pro-rata share of the value of their claim based on a Payment Percentage.  The Initial Payment Percentage for each Fund shall be established after the Effective Date by the Trustees, subject to the consent of the Ovarian Cancer TAC and the Ovarian Cancer Post-Effective Date FCR with respect to Fund A and the consent of the Mesothelioma / Lung Cancer TAC and the Post-Effective Date Mesothelioma / Lung Cancer FCR with respect to Fund B.

30

Any adjustments to Payment Percentages and any supplemental payments to be made with respect to paid claims are governed by Section IV below. Because there is uncertainty in the prediction of both the total amount of each Fund's talc-related liabilities and the amount of the Trust Assets, no guarantee can be made of the Payment Percentage that will be applicable to any Talc Personal Injury Claim.

**2.8** **Determination of the Maximum Annual Payments**. The Trust shall model the cash flow, principal, and income year-by-year to be paid over the entire life of each Fund to ensure that each Fund shall be available to treat all present and future holders of Talc Personal Injury Claims as similarly as possible. In each year, based upon the model of cash flow for each Fund, the Trust shall be empowered to make payments to Talc Personal Injury Claimants up to the Maximum Annual Payment for each Fund considering the Payment Percentage provisions set forth in Sections 4.2 and 4.3 below, subject to application of the DEF. The Maximum Annual Payment for each Fund shall be determined annually by the Trustees based on the cash flow analysis prepared by the Trust's forecasting expert upon which the then current Payment Percentage is based. If, for any year, the Trustees wish to utilize a Maximum Annual Payment for Fund A and/or Fund B that is not equal to the projected claims payment amount for such year set forth in the Trust's forecasting expert's cash flow analysis, the Trustees must obtain the consent of the applicable TAC and the applicable Post-Effective Date FCR to such Maximum Annual Payment. The Trust's payments to all Talc Personal Injury Claimants from a given Fund shall not exceed the applicable Fund's Maximum Annual Payment so determined for that year plus any amount rolled over from prior years. Should the Maximum Annual Payment for a particular Fund not be reached in any year, the portion of the Maximum Annual Payment for such Fund that is not exhausted in that year shall be added to the Maximum Annual Payment for the applicable Fund

31

for the following year and any subsequent year until exhausted or until a Payment Percentage review with respect to such Fund occurs that results in a new cash flow model. Should the Maximum Annual Payment for a particular Fund be reached in any year before all claimants in such Fund's FIFO Payment Queue have been paid, such claimants shall be paid in the following year in the order they appear in such Fund's FIFO Payment Queue. The Payment Percentage and the Maximum Annual Payment amounts for each Fund are based on projections over the lifetime of the Fund. If such long-term projections are revised, that may result in a new model of the Fund's anticipated cash flow and a new calculation of a Maximum Annual Payment for such Fund.

Year-to-year variations in a particular Fund's flow of claims or asset values, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Trust may need to distribute less in that year than would otherwise be permitted based on the original Maximum Annual Payment for such Fund derived from long-term projections. Accordingly, the original Maximum Annual Payment for a Fund in a given year may be temporarily decreased if the present value of the assets of the Fund as measured on a specified date during the year is less than the present value of the assets of the Fund projected for that date by the cash flow model described in the foregoing paragraph. The Trust shall make such a comparison whenever the Trustees become aware of any information that suggests that such a comparison should be made. If the Trust determines that as of the date in question, the present value of a Fund's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Fund based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for

US-DOCS\159191443
RLF1 33768894v.1

that year, which will become the Temporary Maximum Annual Payment (additional reductions in a Fund's Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year a Fund's Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Fund's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Trust's distribution to all applicable Talc Personal Injury Claimants from each Fund for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment for such Fund determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for a Fund for such year is not in effect, the original Maximum Annual Payment for such Fund for the following year shall be reduced proportionately.

2.9     **Indirect Talc Personal Injury Claims**. As set forth in Section 5.4 below, Indirect Talc Personal Injury Claims, if any, shall be subject to all the same limitations and provisions relating to categorization, evaluation and payment of these TDP as all other Talc Personal Injury Claims, including the applicable Payment Percentage (as modified by the DEF (if applicable)).

**SECTION III**

**TDP ADMINISTRATION**

3.1     **TACs and Post-Effective Date FCRs**. Pursuant to the Plans and the Trust Agreement, the Trust and these TDP shall be administered by the Trustees in consultation with the applicable TACs, which represent the interests of holders of present Talc Personal Injury Claims, and the applicable Post-Effective Date FCRs, who represent the interests of holders of Talc

33

Personal Injury Claims that shall be asserted in the future.  Pursuant to the Trust Agreement, and these TDP, the Trustees shall obtain the consent of the TACs and the Post-Effective Date FCRs with respect to any amendment, change or modification to these TDP pursuant to Sections 4.1, 4.2, 5.2 and 8.1, and on such other matters as are required herein or in the Trust Agreement; provided that any amendments or modifications to these TDP that (i) affect only Mesothelioma and/or Lung Cancer Claims shall require consent solely by the Mesothelioma / Lung Cancer TAC and the Post-Effective Date Mesothelioma / Lung Cancer FCR, or (ii) affect only Ovarian Cancer Claims shall require consent solely by the Ovarian Cancer TAC and the Post-Effective Date Ovarian Cancer FCR.  On all other matters, the Trust shall be administered by the Trustees in consultation with the TACs and the Post-Effective Date FCRs.

3.2    **Consent and Consultation Procedures**.  In those circumstances in which consultation or consent of a TAC and a Post-Effective Date FCR is required, the Trustees shall provide written notice to the applicable TAC and the applicable Post-Effective Date FCR of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Section 7.1(a) or the Consent Process described in Section 7.1(b), as applicable, of the Trust Agreement.

## SECTION IV

## PAYMENT PERCENTAGE; PERIODIC ESTIMATES; DUAL ESTATE FACTOR

4.1    **Uncertainty of Debtors' Talc Liabilities**.  There is inherent uncertainty regarding the aggregate value of the Debtors' total talc-related liabilities.  The Trustees must determine from time to time the percentage of the fully liquidated value that holders of present and future Talc Personal Injury Claims are likely to receive from the applicable Fund as reflected by the applicable payment percentage (each, a "**Payment Percentage**") to provide reasonable

34

assurance that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner.  Each Fund shall have its own Payment Percentage.

4.2 **Computation of Payment Percentages**.  The Initial Payment Percentage for each Fund will be set after the Effective Date by the Trustees, with the consent of the Ovarian Cancer TAC and the Ovarian Cancer Post-Effective Date FCR with respect to Fund A and with the consent of the Mesothelioma / Lung Cancer TAC and the Post-Effective Date Mesothelioma / Lung Cancer FCR with respect to Fund B.  The Initial Payment Percentages shall apply to all Talc Personal Injury Claims to be paid by the Trust, unless and until the Trustees, with the consent of the applicable TAC and the applicable Post-Effective Date FCR, determine that a Fund's Payment Percentage must be changed to assure that such Fund shall be in a financial position to pay present and future holders of similar Talc Personal Injury Claims payable from such Fund in substantially the same manner.  For the avoidance of doubt, only the Ovarian Cancer TAC and the Post-Effective Date Ovarian Cancer FCR shall have consent rights with respect to the Payment Percentage for Fund A and only the Mesothelioma / Lung Cancer TAC and the Post-Effective Date Mesothelioma / Lung Cancer FCR shall have consent rights with respect to the Payment Percentage for Fund B.

At least thirty (30) days prior to proposing in writing to a TAC and a Post-Effective Date FCR a change in a Fund's Payment Percentage, the Trustees shall issue a written notice to claimants or claimants' counsel who have filed claims with such Fund indicating that the Trustees are reconsidering the Payment Percentage.

No less frequently than once every twelve (12) months, commencing on the fifth anniversary of the Initial Claims Filing Date, the Trustees shall compare the liability forecasts for each Fund on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of such Fund to date.  If the results of the comparison call into question

35

the ability of a Fund to continue to rely upon the current liability forecast, the Trustees shall undertake a reconsideration of such Fund's Payment Percentage.  The Trustees may also reconsider the then-applicable Payment Percentages sooner or at shorter intervals if the Trustees deem such reconsideration appropriate or if requested by the applicable TAC or the applicable Post-Effective Date FCR.

The Trustees must base their determination of a Fund's Payment Percentage on current estimates of the number, types, and values of present and future Talc Personal Injury Claims that will be payable by such Fund, the value remaining in such Fund, all anticipated administrative and legal expenses of such Fund, and any other material matters that are reasonably likely to affect the sufficiency of funds available for such Fund to pay a comparable percentage of the full liquidated values of their claims to present and future holders of Talc Personal Injury Claims payable by such Fund.

4.3	**Applicability of the Payment Percentages.**  The Trust shall apply the applicable Payment Percentages to all payments made to Talc Personal Injury Claimants.  The payment to a claimant shall reflect the applicable Payment Percentage in effect at the time the claimant's properly completed Acceptance and Release is received by the Trust subject to the provisions of Section 5.1(b) with respect to deceased or incompetent claimants.

If the Trustees increase the Payment Percentage applicable to any Fund, subject to the consent of the applicable TAC and the applicable Post-Effective Date FCR, the Trustees shall make supplemental payments to all claimants who previously liquidated their claims and received payments from such Fund based on the lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the applicable newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect

36

to the claim (but excluding any such amounts attributable to any sequencing adjustment paid pursuant to Section 7.7 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250 after application of the Payment Percentage at that time, and the amount of the suspended payment to the holder of any Talc Personal Injury Claim shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they collectively would have been less than $250. However, the Trustees' obligation shall resume, and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the cumulative aggregate exceeds $250.

### 4.4      Dual Estate Factor – Calculation and Applicability.

In order to compensate holders of Imerys-Cyprus Talc Personal Injury Claims – *i.e.*, claimants who have a claim against both the Imerys Debtors and the Cyprus Debtor – the applicable Payment Percentage for any Imerys-Cyprus Talc Personal Injury Claim will be multiplied by 1.45 (the "**Dual Estate Factor**" or the "**DEF**").  The DEF addresses the difference in rights between holders of Imerys Talc Personal Injury Claims and Imerys-Cyprus Talc Personal Injury Claims by providing additional compensation to the latter.

The DEF shall apply to all Imerys-Cyprus Talc Personal Injury Claims to be paid by the Trust.  In order to qualify for the DEF, a claimant alleging an Imerys-Cyprus Talc Personal Injury Claim is required to satisfy the exposure requirements set forth in Section 5.5(e) of these TDP.

This Section 4.4 of these TDP may not be modified or amended in any respect.

US-DOCS\159191443
RLF1 33768894v.1

## SECTION V

## RESOLUTION OF TALC PERSONAL INJURY CLAIMS

5.1        **Ordering, Processing and Payment of Claims**.

(a)    **Ordering of Claims.**

(i)        **Establishment of FIFO Processing Queues**.  Each Fund shall have a separate FIFO Processing Queue.  The Trust shall order all Trust Claim Forms to be reviewed for processing purposes on a FIFO basis in the order each Reviewable Claim Submission is received, except as otherwise provided herein.   For all Talc Personal Injury Claims in respect of which a Reviewable Claim Submission is filed on or before the date six (6) months after the Initial Claims Filing Date, a claimant's position in the applicable FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date that the specific claim was filed against the Debtors in the tort system; (ii) the date prior to the Petition Date that the claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with the Debtors; (iii) the date subsequent to the Petition Date but prior to the date that the Trust first makes available the Trust Claim Form and other claims materials required to file a claim with the Trust that the claim was filed against another defendant in the tort system; and (iv) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Imerys Plan or the Cyprus Plan pursuant to voting procedures approved by the Bankruptcy Court, as applicable.

For all Talc Personal Injury Claims in respect of which a Reviewable Claim Submission is filed after the date six (6) months after the Initial Claims Filing Date, a claimant's position in the applicable FIFO Processing Queue shall be determined by (i) the date of receipt of the claimant's Reviewable Claim Submission; or (ii) the date that the claim was filed against one or more Debtors in the tort system.  If any Reviewable Claim Submissions are filed on the same date, a claimant's

38

position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the date of the diagnosis of the Disease with the earlier diagnosis having priority over the later diagnosis.  If any Reviewable Claim Submissions are filed and diagnosed on the same date, a claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

(ii)    **Effect of Statutes of Limitations and Repose.**  To be considered timely filed, all unliquidated Talc Personal Injury Claims filed against the Trust must meet either: (i) in the case of claims first filed in the tort system against the Debtors prior to the Petition Date, the applicable federal, state, or foreign statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) in the case of claims not filed against the Debtors in the tort system prior to the Petition Date, the applicable federal, state or foreign statute of limitations and repose that was in effect at the time of the filing of a Basic Claim Submission with the Trust.  However, the running of the applicable statute of limitations or repose shall be tolled as of the earliest of: (a) the actual filing of a claim against one or more Debtors prior to the Petition Date (as applicable) in the tort system; (b) the date specified by agreement or otherwise between the applicable Debtor on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of tolling prior to the Petition Date (as applicable) by an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or (c) the Petition Date (as applicable).  For the avoidance of doubt, in order for a tolling agreement to be considered effective hereunder, it must be a valid, enforceable written agreement between the specific claimant and the relevant Debtor, and in order for the filing of a claim against a Debtor prior to the applicable Petition Date in the tort system to be a tolling event, the subject lawsuit

39

must not have been dismissed as of the Petition Date.  The Claims Materials shall detail the evidence the claimant must submit with respect to any tolling event.

If a Talc Personal Injury Claim meets any of the tolling provisions described in the preceding paragraph and the claim was not barred by the applicable federal, state or foreign statute of limitations or repose at the time of the relevant tolling event, it shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the Initial Claims Filing Date.  In addition, any Talc Personal Injury Claim that is first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state, or foreign statute of limitations or repose, shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever is later.  However, the processing of any Talc Personal Injury Claim by the Trust may be deferred at the election of the claimant pursuant to Section 6.2 below.

(b)    **Payment of Claims**.  Subject to the completion, execution and delivery of an Acceptance and Release in accordance with Section 7.2 below, the holders of Talc Personal Injury Claims that have been liquidated in accordance with the terms hereof shall be paid from the applicable Fund in FIFO order based on the date their liquidation became final, all such payments being subject to the applicable Payment Percentage and the DEF in accordance with Sections 4.3 and 4.4, the applicable Maximum Annual Payment, and any sequencing adjustment provided for in Section 7.7 below, except as otherwise provided herein (the "**FIFO Payment Queue**").  For the avoidance of doubt, each Fund shall have its own FIFO Payment Queue.

Where a claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to

submission of the Acceptance and Release, an offer made by the Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or in that probate process for approval.  If the offer is ultimately approved by the court or through the probate process and a properly completed Acceptance and Release is submitted to the Trust, the Trust shall pay the claim in the amount so offered, multiplied by the greater of (a) the applicable Payment Percentage in effect at the time the offer was first made, or (b) the applicable Payment Percentage in effect at the time the Trust received the properly completed Acceptance and Release, in each case subject to application of the DEF (if applicable).

If any claims are liquidated on the same date, the claimant's position in the applicable FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's talc-related Disease with the earlier diagnosis having priority over the later diagnosis.  If any claims are liquidated on the same date and the respective claimants' talc-related Diseases were diagnosed on the same date, the position of those claimants in the applicable FIFO Payment Queue shall be determined by the Trust based on the claimants' dates of births, with older claimants given priority over younger claimants.

(c) **Settled and Unpaid Talc Personal Injury Claims.**  The holder of a Settled and Unpaid Talc Personal Injury Claim may: (i) resubmit such claim for qualification and valuation under the Trust pursuant to the procedures set forth in these TDP; or (ii) agree to accept the settled amount of their claim up to the Maximum Value multiplied by the Initial Payment Percentage of the applicable Fund.  Further, in order to receive payment with respect to the settled amount of a Settled and Unpaid Talc Personal Injury Claim, the holder of such Settled and Unpaid Talc Personal Injury Claim must submit all documentation necessary to demonstrate to the Trust

41

that the claim was liquidated, which documentation shall include (A) a copy of the settlement agreement and (B) the name, social security number, and date of birth of the claimant, and the name and address of the claimant's lawyer; provided, however, that if a Settled and Unpaid Talc Personal Injury Claim is listed on the schedule of such claims that the Debtors provide to the Trust and the claimant confirms the information provided by the Debtors, the claimant shall not be required to provide any additional documentation.

5.2    **Resolution of Unliquidated Talc Personal Injury Claims**.  Within sixty (60) days after the establishment of the Trust, the Trustees, with the consent of the applicable TAC and the applicable Post-Effective Date FCR shall adopt procedures for reviewing and liquidating all unliquidated Ovarian Cancer I-IV Claims, Mesothelioma Claims, and Lung Cancer Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking compensation from the Trust in respect of unliquidated Talc Personal Injury Claims must first file a Complete Claim Submission, in accordance with the provisions of Sections 6.1 and 6.2 below.

Each Trust Claim Form for claimants seeking to recover from the Trust shall require, in addition to a Basic Claim Submission: (i) Debtor Exposure; (ii) election to proceed through the Expedited Review Process or the Individual Review Process; and (iii) such other and further information and supporting documentation necessary for the Trust to determine if the subject Talc Personal Injury Claim qualifies for payment pursuant to the provisions of these TDP.  Claimants filing Mesothelioma Industrial A Claims, Mesothelioma Cosmetic A Claims, Lung Cancer Claims, or Other Disease Claims must provide information regarding their other occupational and industrial exposure (whether direct or bystander) to asbestos.

US-DOCS\159191443
RLF1 33768894v.1

(a)    **Expedited Review Process.**

(i)    **In General.**  The Expedited Review Process is designed to provide qualifying claimants (a) an expeditious, efficient, and inexpensive method for liquidating applicable, compensable Talc Personal Injury Claims where the claim, after meeting the applicable Medical/Exposure Criteria, can easily be verified by the Trust; and (b) a fixed and certain liquidated claim value.  If, after completing its review, the Trust does not offer the claimant Scheduled Value, the claimant may request that the claim be reviewed pursuant to the Individual Review Process in accordance with Section 5.2(b) below or proceed to ADR in accordance with Section 5.7.  If the claimant elects to have the claim reviewed pursuant to the Individual Review Process, the claimant may submit additional evidence to be considered by the Trust.

(ii)    **Claims Processing Under the Expedited Review Process.**  All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Expedited Review Process shall file the appropriate Trust Claim Form.  Following receipt of a Complete Claim Submission, the Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for any claim category eligible for the Expedited Review Process and shall advise the claimant whether the submitted Trust Claim Form is compensable or deficient.  If the Trust determines that a claim meets the Medical/Exposure Criteria for a claim category eligible for the Expedited Review Process, the Trust shall tender to the claimant an offer of payment equal to the Scheduled Value for such Disease set forth in Section 5.2(a)(iii) below, subject to the applicable Payment Percentage in accordance with Section 4.3 and, if applicable, the DEF.  Offers tendered to Ovarian Cancer I-IV Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, before application of the Payment Percentage and the DEF (if applicable).  The Trust's offer shall be delivered together with the form of Acceptance and Release.

43

Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO Payment Queue, and the Trust shall make payment on the claim subject to the limitations, if any, of the applicable Maximum Annual Payment.

      **(iii)**      **Ovarian Cancer I-IV Claims, Mesothelioma Claims, and Lung Cancer Claims: Scheduled Value and Medical/Exposure Criteria.** The Scheduled Values and Medical/Exposure Criteria set forth below shall apply to all applicable claims for Ovarian Cancer I through IV, Mesothelioma, and Lung Cancer filed with the Trust on or before the date three (3) months following the Initial Claims Filing Date for which the claimant elects the Expedited Review Process and shall continue to apply unless and until changed in accordance with these TDP. On or after such date, the Trustees, with the consent of the applicable TAC and the applicable Post-Effective Date FCR, may add to, change or eliminate Scheduled Values and/or Medical/Exposure Criteria for Ovarian Cancer I-IV Claims, Mesothelioma Claims, and Lung Cancer Claims except that in no event shall the Scheduled Value for any disease level listed in the chart below be reduced to an amount less than the Scheduled Value identified below. Any such change shall apply to Talc Personal Injury Claims filed after the date of the change. Commencing on January 1, 2026, the Trust shall modify these valuations annually for inflation based on the CPI-U published by the United States Department of Labor, Bureau of Labor Statistics; provided, however, that the annual CPI-U adjustment may not exceed three percent (3%). Any such inflation adjustment shall apply to Talc Personal Injury Claims paid after the date of the adjustment.

US-DOCS\159191443
RLF1 33768894v.1

**Expedited Review Medical/Exposure Criteria &
Scheduled Values of Claims Eligible for Expedited Review**

| Disease | Medical/Exposure Criteria | Scheduled Value |
|---|---|---|
| *Ovarian Cancer* | | |
| **Ovarian Cancer IV** | (i) Diagnosis of Ovarian Cancer IV by a pathology report; (ii) Debtor Exposure; and (iii) Personal Use Exposure. | $400,000 |
| **Ovarian Cancer III** | (i) Diagnosis of Ovarian Cancer III by a pathology report; (ii) Debtor Exposure; and (iii) Personal Use Exposure. | $260,000 |
| **Ovarian Cancer II** | (i) Diagnosis of Ovarian Cancer II by a pathology report; (ii) Debtor Exposure; and (iii) Personal Use Exposure. | $140,000 |
| **Ovarian Cancer I** | (i) Diagnosis of Ovarian Cancer I by a pathology report; (ii) Debtor Exposure; and (iii) Personal Use Exposure. | $60,000 |
| *Mesothelioma* | | |
| **Mesothelioma Industrial A** | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular or Routine Exposure to Industrial Talc (for Mesothelioma Industrial A). | $400,000 |
| **Mesothelioma Industrial B** | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular or Routine Exposure to Industrial Talc (for Mesothelioma Industrial B). | $40,000 |

US-DOCS\159191443
RLF1 33768894v.1

| Disease | Medical/Exposure Criteria | Scheduled Value |
|---|---|---|
| **Mesothelioma Cosmetic A** | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular or Routine Exposure to Cosmetic Talc (for Mesothelioma Cosmetic A). | $400,000 |
| **Mesothelioma Cosmetic B** | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular or Routine Exposure to Cosmetic Talc (for Mesothelioma Cosmetic B). | $20,000 |
| *Lung Cancer* | | |
| **Lung Cancer Industrial Talc** | (i) Diagnosis of Lung Cancer; (ii) evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease; (iii) Debtor Exposure; and (iv) Regular or Routine Exposure to Industrial Talc. | $20,000 |
| **Lung Cancer Cosmetic Talc** | (i) Diagnosis of Lung Cancer; (ii) evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease; (iii) Debtor Exposure; and (iv) Regular or Routine Exposure to Cosmetic Talc. | $10,000 |

  **(b)** **Individual Review Process.**

    **(i)** **In General.** Subject to the provisions set forth below, a claimant may elect to have his or her Talc Personal Injury Claim reviewed under the Individual Review Process to determine (A) for Ovarian Cancer I-IV Claims, Mesothelioma Claims, and Lung Cancer Claims that meet the relevant Medical and Exposure Criteria, whether the value of the claim differs from the Scheduled Value provided (*see* Section 5.2(b)(ii)) below; and (B) for Ovarian Cancer

Claims that do not meet the Medical/Exposure Criteria, Mesothelioma Claims and Lung Cancer Claims without Regular or Routine Exposure, Secondary Mesothelioma Claims, and Other Disease Claims, whether the claim is compensable hereunder and the value of such claim (*see* Sections 5.2(b)(iii), (iv), (v), and (vi) below, respectively). A Talc Personal Injury Claim liquidated in the Individual Review Process may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process. Until such time as the Trust has made an offer on a claim pursuant to the Individual Review Process, the claimant may change his or her election to proceed with the Individual Review Process and have the claim liquidated pursuant to the Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the applicable FIFO Processing Queue. If, after completing its review, the Trust does not extend an offer, the claimant may provide additional evidence and request that the claim be re-reviewed or proceed to ADR in accordance with Section 5.7.

(ii)     **Ovarian Cancer I-IV Claims, Mesothelioma Claims, and Lung Cancer Claims that meet the Medical/Exposure Criteria.** Ovarian Cancer I-IV Claimants, Mesothelioma Claimants, and Lung Cancer Claimants that meet the Medical/Exposure Criteria set forth in Section 5.2(a)(iii) and believe they would be entitled to greater than the applicable Scheduled Value were their claim resolved in the tort system, shall be eligible to seek the Individual Review Process to determine the value of their claims. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim (subject to the applicable Payment Percentage (as modified by the DEF (if applicable))) which may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process. Because the detailed examination and valuation process pursuant to the

Individual Review Process requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid on the basis of the liquidated value of their Talc Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review Process.  The liquidated values of Ovarian Cancer I-IV Claims, Mesothelioma Claims, or Lung Cancer Claims that undergo the Individual Review Process in accordance with the factors set forth in Section 5.2(b)(vii) below may be determined to be less than the Scheduled Value for the applicable Disease, and, in any event, shall not exceed the Maximum Value for such Disease as set forth herein.

(iii)    **Ovarian Cancer Claims that do not meet the Medical/Exposure Criteria.**  The Individual Review Process provides Ovarian Cancer Claimants whose Ovarian Cancer Claims are not diagnosed by a pathology report with an opportunity to have the Trust review the claimant's gynecological oncology records, hospital records, and physician reports.  If the Trust is satisfied that such records establish a diagnosis of Ovarian Cancer and the claimant has met the other Medical/Exposure Criteria set forth in these TDP for an Ovarian Cancer Claim, the Trust may offer the claimant a liquidated value equal to the applicable Scheduled Value for the applicable Ovarian Cancer, subject to the applicable Payment Percentage and, if applicable, the DEF.  Offers shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, before application of the Payment Percentage and the DEF (if applicable).

If an Ovarian Cancer Claimant does not meet other applicable Medical/Exposure Criteria, the Ovarian Cancer Claimant may elect to undergo the Individual Review Process, and if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the applicable tort system, the Trust may offer the claimant a liquidated value equal to up to the Scheduled Value for the applicable Ovarian Cancer disease level, subject to the applicable

Payment Percentage and, if applicable, the DEF. Offers shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, before application of the Payment Percentage and the DEF (if applicable).

(iv) **Mesothelioma Claims and Lung Cancer Claims without Regular or Routine Exposure.** The Individual Review Process provides Mesothelioma Claimants and Lung Cancer Claims that do not satisfy the Regular or Routine Exposure criteria with an opportunity for individual consideration and evaluation; provided, however, that Lung Cancer Claimants with claims based on exposure to Cosmetic Talc may not pursue their claims through the Individual Review Process if they have other significant occupational or industrial exposure (whether direct or bystander) to asbestos. If a Mesothelioma Claimant or Lung Cancer Claimant fails to meet the Regular or Routine Exposure criteria, the Trust shall consider and evaluate the nature, intensity and duration of the exposure to Cyprus Talc and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma or Lung Cancer, subject to the applicable Payment Percentage and, if applicable, the DEF.

(v) **Mesothelioma Secondary Exposure Claims**. If a claimant alleges Mesothelioma from Debtor Exposure based on exposure to Cyprus Industrial Talc and/or Imerys Industrial Talc from close physical contact to a person who was occupationally exposed (whether direct or bystander) to Cyprus Industrial Talc and/or Imerys Industrial Talc (i.e., a "**Secondary Mesothelioma Claim**"), the claimant must seek the Individual Review Process for his or her claim pursuant to Section 5.2(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these TDP that

49

would have been applicable had the occupationally exposed person filed a Mesothelioma Industrial A Claim or a Mesothelioma Industrial B Claim against the Trust, including the requirement of Debtor Exposure.  In addition, the claimant with a Secondary Mesothelioma Claim must establish that he or she is suffering from Mesothelioma, that his or her own exposure to the occupationally exposed person occurred within the same time frame that the occupationally exposed person was exposed to Cyprus Industrial Talc and/or Imerys Industrial Talc, and that such secondary exposure was a cause of the Mesothelioma.  If the Trust is satisfied that the claimant has met these requirements, the Trust may offer the claimant a liquidated value up to the applicable Maximum Value for Mesothelioma, subject to the applicable Payment Percentage and, if applicable, the DEF.

(vi)    **Other Disease Claims**.  The Individual Review Process provides a claimant with an Other Disease Claim with an opportunity for individual consideration and evaluation of the claim.  The claimant must provide the Trust with (a) a disease diagnosis acceptable to the Trust and accompanied by evidence to establish a ten-year latency period between the first date of Debtor Exposure and the diagnosis, (b) medical records demonstrating that the claimant was treated for the diagnosed disease, (c) detailed evidence of Debtor Exposure, (d) a medical report or affidavit by a board-certified Medical Doctor, oncologist, or pathologist with qualified expertise to diagnose the disease that is being asserted establishing the claimant's exposure to Cyprus Talc and/or Imerys Talc or a product containing Cyprus Talc and/or Imerys Talc as a contributing factor in causing the disease identified in the diagnosis, which report or affidavit shall include citation to peer-reviewed medical or scientific literature recognizing a causal association between talc exposure and the asserted disease, and (e) evidence acceptable to the Trust that the medical or scientific community recognizes a causal link between exposure to the Debtors' talc or talc-containing products and the disease identified in the diagnosis.  The claimant must also

50

establish to the Trust's satisfaction that the claimant had no other significant occupational or industrial exposure (whether direct or bystander) to asbestos.  If, based upon the foregoing, the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the applicable tort system, the Trust can offer the claimant a liquidated value amount up to Ten Thousand Dollars ($10,000.00), subject to the applicable Payment Percentage and, if applicable, the DEF.  If the Other Disease Claim is with respect to colorectal cancer, laryngeal cancer, esophageal cancer, stomach cancer, or a type of asbestosis, the claim will be paid from Fund B (each, an "**Other Non-Gynecological Disease Claim**").  If the Other Disease Claim is with respect to uterine cancer, vaginal cancer, endometrial cancer, or vulvar cancer, the claim will be paid from Fund A (each, an "**Other Gynecological Disease Claim**").  If the claim is for a disease other than those identified in this Section and the Trust elects to recognize and resolve the claim in favor of payment, then the Trustees, with the consent of the TACs and the Post-Effective Date FCRs with respect to claims in Fund A or Fund B, will determine whether such Other Disease Claim is an Other Non-Gynecological Disease Claim or an Other Gynecological Disease Claim based on, among other things, the nature of the disease and the biological pathway by which the talc caused the disease.

(vii)    **Valuation Factors to Be Considered in the Individual Review Process**.  The Trust shall liquidate the value of each Talc Personal Injury Claim that undergoes the Individual Review Process based on the historic liquidated values of other similarly situated claims in the tort system as it exists on the Effective Date for similar claims or an analogous disease, or upon such criteria as the Trust may develop in consultation with the applicable TAC and the applicable Post-Effective Date FCR based upon its claims administrative experience and information available on values through continued litigation in the tort system.  Accordingly, the

51

Trust shall take into consideration all of the factors that affect the amount of damages and values in the tort system, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the Medical/Exposure Criteria for the Disease in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by Debtor Exposure (for example, possible alternative causes and the strength of documentation of injuries); (iv) settlement and verdict histories in the Claimant's Jurisdiction for similarly situated or analogous claims; (v) the greater of (a) settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction for similarly situated or analogous claims, and (b) settlement and verdict histories for the claimant's law firm, including all cases where the claimant's law firm satisfies the Trust on the basis of clear and convincing evidence provided to the Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery and/or trial of the cases, irrespective of whether a second law firm was also involved and would also be entitled to include the cases in its "settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without further direct involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of a Talc Personal Injury Claim that undergoes the Individual Review Process, the Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed or the Trust Claim Form was filed with the Trust even if the claimant has subsequently died.

For purposes of evaluating Ovarian Cancer Claims that undergo the Individual Review Process, the Trust will also consider: (i) age at diagnosis; (ii) absence of (a) first degree family

52

history of ovarian cancer, breast cancer, or colorectal cancer, (b) family cancer syndrome, (c) BRCA1 or BRCA2, (d) nulliparity, (e) hormone replacement therapy usage, and (f) endometriosis; and (iii) the presence of a medical report or affidavit by a board certified medical doctor causally linking the Claimant's talcum powder use as a contributing factor in causing the Ovarian Cancer identified in the pathology report (or medical record).

For purposes of evaluating Lung Cancer Claims that undergo the Individual Review Process, the Trust will also consider: (i) non-smoker status; and (ii) limited exposure to other potential causes of lung cancer.

With respect to Claimant's Jurisdiction, if the claim was not filed against any of the Debtors in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant was exposed to Cyprus Talc and/or Imerys Talc or a product containing Cyprus Talc and/or Imerys Talc; (iii) a jurisdiction in which the claimant was exposed to a product containing Cyprus Talc and/or Imerys Talc for which one of the Debtors has legal responsibility; or (iv) any other jurisdiction in which the claimant could have brought suit in the absence of the bankruptcy case.

With respect to the Claimant's Jurisdiction, in the event a claim is made under these TDP for compensatory damages that would otherwise satisfy the criteria for payment under these TDP, but Claimant's Jurisdiction is a Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in this Section 5.2(b)(vii) is applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the

Claimant's Jurisdiction pursuant to this Section 5.2(b)(vii) is determined to be the law of a Foreclosed Jurisdiction, shall govern only the rights between the Trust and the claimant, and, to the extent the Trust seeks recovery from any entity that provided insurance coverage to the Debtors, governing jurisdiction will be determined pursuant to the terms of the insurance policy and applicable law.

(viii)    **Average and Maximum Values for Talc Personal Injury Claims.**

Average and Maximum Values for Talc Personal Injury Claims shall be as follows:

| Disease | Average Value | Maximum Value |
|---|---|---|
| *Ovarian Cancer* | | |
| **Ovarian Cancer IV** | $500,000 | $1,350,000 |
| **Ovarian Cancer III** | $325,000 | $877,500 |
| **Ovarian Cancer II** | $175,000 | $472,500 |
| **Ovarian Cancer I** | $75,000 | $202,500 |
| *Mesothelioma* | | |
| **Mesothelioma Industrial A**[2] | $500,000 | $1,350,000 |
| **Mesothelioma Industrial B** | | $200,000 |
| **Mesothelioma Cosmetic A**[3] | | $1,350,000 |
| **Mesothelioma Cosmetic B** | | $200,000 |

---

[2] Mesothelioma Industrial A Claims will have an Average Value of $800,000 and Mesothelioma Industrial B Claims will have an Average Value of $50,000. Those shall be the Average Values that will be taken into account in the context of payment percentage calculations along with such other information that the Trust determines is necessary. The overall Average Value for the combined Mesothelioma Industrial A Claims and Mesothelioma Industrial B Claims over the life of the Trust is not expected to exceed $500,000.

[3] Mesothelioma Cosmetic A Claims will have an Average Value of $800,000 and Mesothelioma Cosmetic B Claims will have an Average Value of $50,000. Those shall be the Average Values that will be taken into account in the context of payment percentage calculations along with such other information that the Trust determines is necessary. The overall Average Value for the combined Mesothelioma Cosmetic A Claims and Mesothelioma Cosmetic B Claims over the life of the Trust is not expected to exceed $500,000.

US-DOCS\159191443
RLF1 33768894v.1

| Disease | Average Value | Maximum Value |
|---|---|---|
| *Lung Cancer* | | |
| **Lung Cancer (Industrial Talc)** | $25,000 | $67,500 |
| **Lung Cancer (Cosmetic Talc)** | $12,500 | $33,750 |

The foregoing Average Values and Maximum Values shall apply to all Talc Personal Injury Claims filed with the Trust on or before the date three (3) months following the Initial Claims Filing Date and shall continue to apply unless and until changed in accordance with these TDP. On or after such date, the Trust, with the consent of the applicable TAC and the applicable Post-Effective Date FCR may change these values as set forth in Section 4.1. Commencing on January 1, 2026, the Trust shall modify these valuations annually for inflation based on the CPI-U published by the United States Department of Labor, Bureau of Labor Statistics; provided, however, that the annual CPI-U adjustment may not exceed three percent (3%). Any inflation adjustment shall apply to Talc Personal Injury Claims paid by the Trust after the date of the adjustment.

(ix)    **Claims Processing under Individual Review**.    All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Individual Review Process shall file the Trust Claim Form. Following receipt of a Complete Claim Submission, the Trust shall determine the liquidated value, if any, of the claim (as set forth herein) and shall advise the claimant of that determination. The Trust shall tender to the claimant an offer of payment equal to the determined liquidated value subject to the applicable Payment Percentage in accordance with Section 4.3 and, if applicable, the DEF. Offers tendered to Ovarian Cancer I-IV Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, before application of the Payment Percentage and the DEF (if applicable). The Trust's offer shall be

55

delivered together with the form of Acceptance and Release. Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO Payment Queue and the Trust shall make payment on the claim, subject to the limitations, if any, of the applicable Maximum Annual Payment.

**5.3** **Categorizing Claims as Exigent**.

(a) **Exigent Claims**. At any time, the Trust may liquidate and pay Direct Talc Personal Injury Claims that qualify as Exigent Health Claims or Exigent Hardship Claims as set forth below. Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these TDP. An Exigent Claim, following its liquidation, shall be placed first in the applicable FIFO Payment Queue ahead of all other Talc Personal Injury Claims and shall be subject to the applicable Maximum Annual Payment.

(i) **Exigent Health Claims**. A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma, Lung Cancer, or Ovarian Cancer and the claimant is living when the claim is filed, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant talc-related Disease.

(ii) **Exigent Hardship Claims**. A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the relevant Medical/Exposure Criteria for Mesothelioma, Lung Cancer, or Ovarian Cancer and the Trust, in

56

its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's talc-related Disease.

**5.4** **Indirect Talc Personal Injury Claims**. Indirect Talc Personal Injury Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage (and all other limitations applicable to Direct Talc Personal Injury Claims hereunder), as modified by the DEF (if applicable) if (a) such claim satisfied the requirements of the Claims Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by section 502(e) of the Bankruptcy Code (subject to the right of the holder of the Indirect Talc Personal Injury Claim to seek reconsideration by the Trustees under section 502(j) of the Bankruptcy Code) or subordinated under section 509(c) of the Bankruptcy Code, and (b) the Indirect Claimant establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the Direct Claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (and the Direct Claimant has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, (iii) neither the Direct Claim nor Indirect Claim is barred by a statute of limitations or repose or by other applicable law, and (iv) the Indirect Claimant does not owe the Debtors, Reorganized Debtors, or the Trust an obligation to indemnify the liability so satisfied.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount or manner of payment.  In addition, no claim of an Indirect Claimant may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid the

57

related Direct Claimant in respect of such claim for which the Trust would have liability.  Further, in no event shall any Indirect Talc Personal Injury Claim exceed the Maximum Value of the compensable injury.  An Indirect Talc Personal Injury Claim shall be subject to the applicable Payment Percentage (as modified by the DEF (if applicable)) and the other applicable provisions of these TDP.

To establish a presumptively valid Indirect Talc Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with the consent of the Trust and an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order, provided that such claim is valid under applicable law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, and demonstrate that the Indirect Claimant does not owe the Debtors, Reorganized Debtors or the Trust any indemnification obligation in respect of such claim, the Indirect Claimant may request that the Trust review the Indirect Talc Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant.  If the Indirect Claimant can show that it has paid all or a portion of such liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage and, if

US-DOCS\159191443
RLF1 33768894v.1

applicable, the DEF.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP.  Further, the liquidated value of any Indirect Talc Personal Injury Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Talc Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures.  If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Section 5.8 below.

Indirect Talc Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by Final Order shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.4, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims.

To the extent any insurer makes a payment that gives rise to an Indirect Talc Personal Injury Claim, the insurer may submit such a claim to the Trust on a Trust Claim Form for Indirect Claimants in a form and manner approved by the Trustees, with the consent of the TACs and the Post-Effective Date FCRs, as applicable, which shall include, without limitation, the basis for that claim, identification of the Direct Talc Personal Injury Claim for which costs were incurred, the amount incurred, proof of payment, and any insurance policy alleged to give rise to the Indirect

Talc Personal Injury Claim. To the extent such Indirect Talc Personal Injury Claim is allowed by the Trustees, it shall be paid by the Trust in accordance with Section 11.5 of the Plan and Section 2.9 of the TDP, from the same Fund as the Direct Talc Personal Injury Claim would have been paid. The Trustees will make a determination of the validity of such Indirect Talc Personal Injury Claim on the basis of the terms of any relevant policy and applicable law. The Trustees will consider: (1) whether that payment would give rise to a claim against the Protected Parties under applicable law, and (2) if it would give rise to a claim, whether that claim meets the presumptive validity requirements in Section 5.4 of the TDP, or is otherwise allowable under applicable law. To the extent that the insurer disagrees with that determination, the insurer may challenge that determination pursuant to the applicable provisions of the TDP, including the procedures set forth in Sections 5.7 and 7.3 of the TDP. The Trust, and not any Protected Party, will be responsible for any payments or reimbursements to insurers or others covered by Section 11.5 of the Plan.

      **5.5**        **Evidentiary Requirements**.

          **(a)**    **Mesothelioma Medical Evidence.**

              **(i)**    **In General.** A diagnosis of Mesothelioma is required, and it must be based upon either (i) a physical examination by the physician providing the diagnosis or (ii) a diagnosis by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations. If the diagnosis is based upon a physical examination by the physician providing the diagnosis, the diagnosis must be supported by a medical report of the diagnosing physician and medical records demonstrating that the claimant was treated for Mesothelioma.

All diagnoses of Mesothelioma shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first

exposure to Cyprus Talc and/or Imerys Talc or a product containing Cyprus Talc and/or Imerys Talc and the diagnosis, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, other sworn statements, sales receipts, invoices, hospital records, or similar records, or by other credible evidence, sufficient to establish a 10-year latency period.   A physician's statement providing diagnosis shall not excuse the claimant from the requirement to submit a Product Identification Form.

> **(ii)** **Credibility of Medical Evidence.**  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.   Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtors to settle for payment Mesothelioma cases prior to the filing of the applicable Debtor's bankruptcy case, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to Mesothelioma before a state or federal judge, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.   However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3.   The Trust may take any action it deems

US-DOCS\159191443
RLF1 33768894v.1

appropriate to protect the interests of the Trust in response to the submission of medical evidence it deems unreliable.

      **(b)**   **Lung Cancer Medical Evidence.**

         **(i)**     **In General.** A diagnosis of Lung Cancer is required, and it must be based upon either (i) a physical examination by a physician providing the diagnosis or (ii) a diagnosis by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations. If the diagnosis is based upon a physical examination by a physician providing the diagnosis, the diagnosis must be supported by a medical report of the diagnosing physician and medical records demonstrating that the claimant was treated for Lung Cancer.

All diagnoses of Lung Cancer shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to Cyprus Talc and/or Imerys Talc or a product containing Cyprus Talc and/or Imerys Talc and the diagnosis or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, other sworn statements, sales receipts, invoices, hospital records, or similar records, or by other credible evidence, sufficient to establish a 10-year latency period. A physician's statement providing diagnosis shall not excuse the claimant from the requirement to submit a Product Identification Form.

In addition, claimants must provide (i) evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[4], and (ii) a medical report or affidavit by a board-certified medical

---

[4] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Lung Cancer, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for Lung Cancer Claims filed against the Debtors or another defendant in the tort system prior to the Petition Date, if an

doctor establishing the claimant's exposure to Cyprus Talc and/or Imerys Talc or a product containing Cyprus Talc and/or Imerys Talc as a contributing factor in causing the Lung Cancer identified on the pathology report (or medical record).

(ii)    **Credibility of Medical Evidence.**  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtors to settle for payment Lung Cancer cases prior to the filing of the applicable Debtor's bankruptcy case, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to Lung Cancer before a state or federal judge, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent

---

ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Lung Cancer.  Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of these TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims, a physician who is certified or qualified under comparable medical standards or criteria of Canada) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine.

Claim proceeding conducted pursuant to Section 5.3.  The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of medical evidence it deems unreliable.

        **(c)**     **Ovarian Cancer Medical Evidence.**

              **(i)**     **In General.**  All diagnoses of Ovarian Cancer shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to Imerys Talc or Cyprus Talc or a product containing Imerys Talc or Cyprus Talc and the diagnosis, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, other sworn statements, sales receipts, invoices, hospital records or similar records, or by other credible evidence, sufficient to establish a 10-year latency period.  A physician's statement providing diagnosis shall not excuse the claimant from the requirement to submit a Product Identification Form.

In addition, a claimant must establish: (a) claimant was diagnosed with epithelial ovarian cancer, fallopian tube cancer or primary peritoneal cancer; (b) date of diagnosis; (c) the cancer involved one or more of the following subtypes: serous, endometrioid, clear cell, undifferentiated, mixed type, serous borderline, or endometrioid borderline; and (d) the stage of the cancer at the time of diagnosis.  To satisfy this criteria a claimant must produce one of the following: (a) the pathology report for the surgical staging procedure at diagnosis; (b) gynecological oncology records; (c) hospital records; or (d) results of the examination of pathological materials by a board certified gynecologic oncologist, medical oncologist, pathologist, or obstetrician-gynecologist; provided, however that Ovarian Cancer Claimants must have a diagnosis based on a pathology report in order to elect the Expedited Review Process.

US-DOCS\159191443
RLF1 33768894v.1

(ii)     **Credibility of Medical Evidence.**  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical and scientific standards. The Trust may require the submission of pathology reports, laboratory tests, surgical reports, hospitalization records, results of medical examinations or reviews of other medical evidence. Medical evidence that is proof of diagnosis, subtype, and stages of epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer by a treating physician or if not a treating physician, by a board-certified gynecologic oncologist, medical oncologist, pathologist, or obstetrician gynecologist, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3(a).  The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of medical evidence it deems unreliable.

(d)     **Exposure Evidence.**  To receive compensation from the Trust, a claim must demonstrate Debtor Exposure.  Claims based on conspiracy theories that involve no exposure to talc or talc-containing products sold, distributed, marketed, handled, processed or manufactured by the Debtors are not compensable under these TDP.  To meet the presumptive exposure

65

requirements of the Expedited Review Process, the holder of a claim for Ovarian Cancer I-IV must also establish Personal Use Exposure in addition to Debtor Exposure.  To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a Mesothelioma Claim or a Lung Cancer Claim must establish Regular or Routine Exposure in addition to Debtor Exposure.  Credible exposure evidence may be established by an affidavit or sworn statement based on personal knowledge (provided that the Trust finds such evidence reasonably reliable) or by other credible evidence. The Trust may, but is not required to, ask for the submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system.  The Trust has no need for, and therefore claimants are not required to furnish the Trust with, evidence of exposure to specific products other than those for which the Debtors have legal responsibility except to the extent such evidence is required elsewhere in these TDP.  Similarly, failure to identify Debtor Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided that the claimant satisfies the medical and exposure requirements of these TDP.

(e)    **Evidence of Imerys-Cyprus Talc Personal Injury Claim.**  The Dual Estate Factor will only apply to Imerys-Cyprus Talc Personal Injury Claims.  To receive compensation from the Trust on account of an Imerys-Cyprus Talc Personal Injury Claim, a claimant must demonstrate Debtor Exposure prior to January 1, 1993.

5.6    **Claims Audit Program**.  The Trust, with the consent of the TACs and the Post-Effective Date FCRs, shall develop a Claims Audit Program.  The Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of

66

claims submitted to the Trust and shall participate in a Cross-Trust Audit Program which may include a medical audit. The filing of any claim with the Trust, regardless of the treatment sought, shall constitute consent for each other trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other trusts by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and date of any payment on the claim to the Auditor.

To the extent that the Trustees believe that it is relevant, nothing herein shall preclude the Trust or its Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state court complaints or other claims filed against other mass tort trusts. Any claimant subject to the Claims Audit Program shall cooperate and, provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trustees, authorization to obtain from other mass tort trusts any information such claimant has submitted to such other trusts.

In the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by rejecting the Talc Personal Injury Claim or by other means including, but not limited to, requiring the source of such fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Talc Personal Injury Claims and any other appropriate action or sanction.

5.7     **Arbitration**.

(a)     **Establishment of ADR Procedures**. The Trust, with the consent of the TACs and the Post-Effective Date FCRs, shall develop and adopt ADR Procedures, which shall provide for binding or non-binding arbitration to resolve disputes concerning (a) the valuation of

67

a claim by the Trust, (b) whether the Trust's determination that a claim would not receive an offer was proper, or (c) whether the claimant's medical condition or exposure history meets the requirements of these TDP for purposes of categorizing a claim.  In addition, disputes over the validity of an Indirect Talc Personal Injury Claim shall be eligible for ADR.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.5 above.  In the case of an arbitration involving the liquidated value of a claim, the arbitrator shall consider the valuation factors that are set forth in Section 5.2(b) above.  In order to facilitate the Individual Review Process, the Trust may from time to time develop valuation methodologies and/or matrices taking account of the valuation factors set forth in Section 5.2(b) above that enable the Trust to efficiently make initial liquidated value offers on claims being valued in the Individual Review Process.  These valuation methodologies and/or matrices are often referred to as the Individual Review model.  The Trust shall not offer into evidence or describe any model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration.  The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten days prior to the arbitration proceeding.  The claimant and his or her counsel may use the data that is provided by the Trust in the arbitration and shall agree to otherwise maintain the confidentiality of such information.  Any disputes regarding confidentiality shall be resolved by the arbitrator.

With respect to all claims eligible for arbitration, the claimant shall elect either non-binding or binding arbitration.  The Trust will consent to the type of ADR elected by the claimant.  The

68

ADR Procedures may be modified by the Trust with the consent of the TACs and the Post-Effective Date FCRs.

> **(b)    Claims Eligible for Arbitration**.  To be eligible for arbitration on the question of the appropriate liquidated value to be assigned to a claim, the Talc Personal Injury Claimant must first complete the Individual Review Process set forth in Section 5.2(b) above with respect to the disputed issue.  The Individual Review Process shall be treated as completed for these purposes after the Trust has made an offer on the claim (or declined to make an offer on the claim) and the claimant has rejected the liquidated value resulting from the Individual Review Process in writing (or been notified that the Trust declined to make an offer).  If a claim undergoes the Expedited Review Process and the Trust does not offer the claimant the applicable Scheduled Value after reviewing the claim, the claimant may either request that the claim be reviewed pursuant to the Individual Review Process or proceed directly to arbitration.

> **(c)    Limitations on and Payment of Arbitration Awards**.  The arbitrator shall not return an award in excess of the Maximum Value for the applicable Disease level as set forth herein.  A claimant who submits to binding arbitration will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.  If a claimant elects non-binding arbitration and both the claimant and the Trust agree to be bound by the award therein, then the claimant will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

**5.8    Litigation**.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust in the Claimant's Jurisdiction as described by Section 5.2(b)(vii) above.  Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class,

69

and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party) shall be available to both sides at trial; however, the Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or the Trust Claim Form was filed with the Trust, the Trust shall treat the claims as a personal injury case with all personal injury damages to be considered even if the claimant died during the pendency of the litigation.  A claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available cash only as set forth in Section 7.8 below.

## SECTION VI

## CLAIMS MATERIALS

**6.1**    **Claims Materials**.  The Trust shall prepare suitable and efficient Claims Materials for holders of Talc Personal Injury Claims, consisting of (i) detailed Trust Claim Forms; (ii) instructions; and (iii) a copy of these TDP, and shall provide such Claims Materials upon a written request for such materials to the Trust.  Separate Trust Claim Forms shall be prepared for (i) Mesothelioma and Lung Cancer Claims, (ii) Ovarian Cancer Claims, and (iii) Other Disease Claims.  In addition, a separate Trust Claim Form for Indirect Talc Personal Injury Claims shall be developed.  Each Trust Claim Form shall include a certification by the claimant or his or her Representative sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology in the claimants' discretion, including filing claims and supporting documentation over the internet and electronically.  Each Trust Claim Form and set of instructions shall be developed by the Trust and shall require the consent of the applicable TAC and the applicable Post-Effective Date FCR.

Moreover, such materials may be changed by the Trustees, subject to the consent of the applicable TAC and the applicable Post-Effective Date FCR.

      **6.2**      **Withdrawal or Deferral of Claims**.  A claimant may withdraw a Talc Personal Injury Claim at any time upon written notice to the Trust and file another Talc Personal Injury Claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose.  All such claims filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant may also request that the processing of his or her Talc Personal Injury Claim by the Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations or repose purposes, in which case the claimant shall also retain his or her original place in the applicable FIFO Processing Queue.  During the period of such deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for Talc Personal Injury Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Trust's offer is required, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Trust's written offer of payment or of rejection of the claim. Upon written request, for good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months.

      **6.3**      **Filing Requirements and Fees**.  Each claimant must submit a filing fee of Fifty Dollars ($50.00) to have a Talc Personal Injury Claim filed with and processed by the Trust.  A claim shall not be deemed to be filed with the Trust and the statute of limitations will not have been tolled unless the filing fee is remitted to the Trust within sixty (60) days of the submission of the Trust Claim Form to the Trust.  Any filing fee paid to the Trust shall be reimbursed in full

without application of the applicable Payment Percentage if and when such claim is paid by the Trust. Filing fees shall be allocated to the Fund with respect to which the applicable Talc Personal Injury Claim is filed. With respect to filing fees paid for Other Disease Claims, each such filing fee shall be allocated to the Fund from which the Other Disease Claim would be paid if it were approved for payment by the Trust. The Trustees shall have the discretion, with the consent of the applicable TAC and the applicable Post-Effective Date FCR, to change the amount of the filing fee required for any Talc Personal Injury Claims filed with the subject Fund.

6.4     **English Language**. All claims, claims forms, submissions and evidence submitted to the Trust or in connection with any claim or its liquidation not in the English language shall be accompanied by an English translation.

6.5     **Confidentiality of Talc Personal Injury Claimants' Submissions**. All submissions to the Trust by a holder of a Talc Personal Injury Claim, including a claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions. The Trust will preserve the confidentiality of such claimant submissions and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of talc or asbestos personal injury claimants pursuant to sections 105(a) and 524(g) of the Bankruptcy Code or other applicable law, or to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.

Furthermore, the Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Trust may instead provide a copy of the subpoena to counsel for the TACs and Post-Effective Date FCRs and delay providing a copy of the subpoena to counsel for individual holders of Talc Personal Injury Claims until, in the Trustees' judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena.  In such a case, the Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Trust shall on its own initiative or upon request of the claimant or claimants in question take all necessary and appropriate steps to preserve any and all privileges.

Notwithstanding anything in the foregoing to the contrary, with the consent of the TACs and the Post-Effective Date FCRs, the Trust may disclose information, documents, or other materials reasonably necessary in the Trust's judgment to preserve, litigate, resolve or settle coverage or to comply with an applicable obligation under an insurance policy, indemnity, or settlement agreement; provided, however, that the Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party.

US-DOCS\159191443
RLF1 33768894v.1

## SECTION VII

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1**        **Claims Processing.**  The Trust may utilize the services of a Claims Processor.

All Talc Personal Injury Claims shall be resolved and, if determined to be eligible for payment,

paid on an impartial, FIFO basis subject to the Maximum Annual Payment.

A claimant may not assert more than one Talc Personal Injury Claim hereunder. However,

the holder of a Direct Talc Personal Injury Claim for Ovarian Cancer III, Ovarian Cancer II, or

Ovarian Cancer I may assert a new claim for a higher level of Ovarian Cancer or Mesothelioma

that is subsequently diagnosed, and the holder of a Direct Talc Personal Injury Claim for Lung

Cancer or an Other Disease Claim may assert a new claim for Mesothelioma that is subsequently

diagnosed.  Any additional payments as to which such claimant may be entitled shall be reduced

by the amount paid on account of any earlier-diagnosed Disease and the remaining amount due

shall be subject to the then applicable Payment Percentage and, if applicable, the DEF.

Each Talc Personal Injury Claim shall be processed based on its place in the applicable

FIFO Processing Queue based upon the election (Expedited Review Process or Individual Review

Process) the Talc Personal Injury Claimant selects (if such election is available).  The Trust shall

take all reasonable steps to resolve Talc Personal Injury Claims as efficiently and expeditiously as

possible at each stage of claims processing, including mediation and arbitration, which steps may

include, in the Trust's sole discretion, conducting settlement discussions with Representatives with

respect to more than one claim at a time, provided that the claimants' respective positions in the

applicable FIFO Processing Queues are maintained, and each claim is individually evaluated

pursuant to the valuation factors set forth in Section 5.2(b)(vii) herein.  Except as set forth herein,

the Trust shall also make every effort to issue offers each year to at least that number of Talc

74

Personal Injury Claims required to exhaust the applicable Maximum Annual Payment for each Fund.

The Trustees shall use their reasonable best efforts to ensure that the Trust processes claims such that over time the combination of settlements at the Scheduled Values (if applicable) and those resulting from the Individual Review Process should generally result in the applicable Average Values set forth in Section 5.2(b)(viii).

Nothing herein shall prevent the Trust from settling multiple claims at one time.

**7.2**        **Acceptance and Release.**  A claimant may accept an offer of payment from the Trust by completing the acceptance and release form attached hereto as Exhibit A, which may not be amended to eliminate, diminish or otherwise affect the releases and other protections provided therein to any Protected Party without such Protected Party's written consent (the "**Acceptance and Release**").[5]  Notwithstanding anything to the contrary contained in these TDP, the Plans or any Plan Documents, no claimant may receive payment or other distribution from the Trust Assets or otherwise from the Trust unless, as a condition precedent to such payment or distribution, such claimant (or a person or entity acting on the claimant's behalf with authority to bind the claimant

---

[5]  To the extent that the Trustees propose at any time to modify the form of the Acceptance and Release, the Trustees shall provide advance notice to each Protected Party of the proposed modification (each, a "**Modification Notice**"). Modification Notices to be delivered to the Protected Parties shall be sent to the individuals at the addresses identified in Exhibit B hereto (the "Notice Parties"), which list shall be subject to change upon notice to the Trust by a Protected Party.  The Trust will have no continuing obligation to confirm the accuracy of the addresses for the Notice Parties.

If the modification proposed in the Modification Notice delivered to the Notice Parties does not affect the releases provided for in the Acceptance and Release, absent objection from a Protected Party within 30 days of the Modification Notice, the Trust may implement the proposed modification.  If an objection to a modification that does not affect the releases is received and cannot be resolved, the Trust may seek appropriate relief from the Bankruptcy Court.

No modification that affects the releases provided for in the Acceptance and Release shall be made without the written consent of all Protected Parties.  In the event a Protected Party does not approve or reject such modification set forth in the Modification Notice within 30 days, the Trust may seek appropriate relief from the Bankruptcy Court, but no such relief shall eliminate or diminish the releases or other protections provided to (or for the benefit of) the Protected Party under the Acceptance and Release as set forth in Exhibit A hereto.

For purposes of these TDP and the Trust Agreement, written consent for any of the Protected Parties (if given) shall be provided by the applicable Notice Party.

75

as set forth in the next sentence of this Section 7.2), completes, executes and delivers to the Trust the Acceptance and Release.  The Acceptance and Release shall be available for completion electronically and may be executed by the claimant or a person or entity who under applicable law or legal documentation has the legal authority to execute such Acceptance and Release on behalf of (and to bind) the claimant through DocuSign or a similar authorized electronic signature program, or such other simplified and expedient means as the Trust, with the consent of the TACs and Post-Effective Date FCRs, may adopt, provided that such means are sufficient as a matter of law to bind the claimant.

7.3     **Claims Disputes**.  All unresolved disputes regarding a claimant's medical condition, exposure history and/or the liquidated value of the claim may be subject to informal mediation and then, at the election of the claimant, to binding or non-binding arbitration as set forth in Section 5.7 herein under the ADR Procedures to be adopted by the Trust with the consent of the TACs and Post-Effective Date FCRs.  Talc Personal Injury Claims that are the subject of a dispute with the Trust that are not resolved by arbitration may enter the tort system solely as provided in Section 5.8.

7.4     **Costs Considered**.  Notwithstanding any provisions of these TDP to the contrary, the Trustees shall always appropriately consider the cost of ensuring that payment of valid Talc Personal Injury Claims is not further impaired by costs incurred related to the Trust's investigation of the validity of the medical and exposure evidence supporting any claim for Ovarian Cancer, Mesothelioma, or Lung Cancer.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the Trust whatever the costs or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6 above.

76

7.5     **Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity**.  Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues and the applicable Maximum Annual Payments set forth above, the Trustees shall proceed as quickly as possible to liquidate valid Talc Personal Injury Claims and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because each Fund's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that a Fund faces issues with respect to liquidity, the Trustees may, with the consent of the applicable TAC and the applicable Post-Effective Date FCR, (a) suspend the normal order of payment with respect to such Fund, or (b) temporarily limit or suspend payments from such Fund altogether.

7.6     **Punitive Damages**.  Except as provided below with respect to claimants in jurisdictions where punitive damages are the sole recovery provided under applicable law, in determining the value of any liquidated or unliquidated Talc Personal Injury Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system.  Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system

77

pursuant to Section 5.8 herein.  The only damages awarded pursuant to these TDP to claimants who are deceased and whose personal representatives pursue their claims under a law that only provides for punitive damages shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to the choice of law principles.

For the avoidance of doubt, this Section 7.6 shall not affect in any way any claimant's or the Trust's ability to recover from any entity other than the Trust or the Protected Parties.

**7.7**      **Sequencing Adjustments**.

**(a)    General**. Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Talc Personal Injury Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, for the period when the claim was deferred, withdrawn at the claimant's request, the period that the Trust was waiting for a properly completed Acceptance and Release, or during any period where the Trust's provision of payment to a claimant is delayed as the result of deficiencies or the claimant's failure to provide the Trust with additional information as requested on an unliquidated Talc Personal Injury Claim.  The sequencing adjustment factor shall be equal to the federal funds rate per annum, provided that the annual federal funds rate applied shall not exceed three percent (3%).  Such rate (the federal funds rate per annum not to exceed three percent (3%) per annum) shall apply for each of the first five (5) years after the Effective Date; thereafter, the Trust shall have the discretion to change the annual sequencing adjustment factor with the consent of the TACs and the Post-Effective Date FCRs.

US-DOCS\159191443
RLF1 33768894v.1

(b) **Unliquidated Talc Personal Injury Claims**.  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Talc Personal Injury Claim whether the claim is liquidated under Expedited Review Process, Individual Review Process, or by arbitration.  No sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.8 above herein.   Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Processing Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.  Notwithstanding the provisions hereof, a sequencing adjustment shall not accrue during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with information necessary to process a Talc Personal Injury Claim.

7.8        **Payment of Judgments for Money Damages**.  If and when a claimant who elected non-binding arbitration and rejected the arbitral award subsequently obtains a judgment in the tort system, the claim shall be placed in the applicable FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage (as modified by the DEF (if applicable)) and the applicable Maximum Annual Payment) of an amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage (as modified by the DEF (if

79

applicable)), Maximum Value, and the applicable Maximum Annual Payment, if applicable, in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Maximum Values for such Disease Levels as set forth in Section 5.2(a)(viii) above, subject to the applicable Payment Percentage (as modified by the DEF (if applicable)).  Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.7, or (b) interest be paid under any statute on any judgments obtained in the tort system.

7.9    **Third-Party Services**.  Nothing in these TDP shall preclude the Trust from contracting with another claims resolution organization to provide services to the Trust so long as decisions about the categorization and liquidated value of Talc Personal Injury Claims are based on the relevant provisions of these TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

## SECTION VIII

## <u>MISCELLANEOUS</u>

8.1    **Amendments**.  Except as otherwise provided herein, the Trustees may not amend, modify, delete, or add to any provisions of these TDP, without the written consent of the TACs and the Post-Effective Date FCRs, provided, however, that (i) any amendments or modifications to these TDP that affect only Mesothelioma Claims and/or Lung Cancer Claims shall require written consent solely by the Mesothelioma / Lung Cancer TAC and the Post-Effective Date Mesothelioma / Lung Cancer FCR, and (ii) any amendments or modifications to these TDP that affect only Ovarian Cancer Claims shall require written consent solely by the Ovarian Cancer TAC and the Post-Effective Date Ovarian Cancer FCR.  Nothing herein is intended to preclude the TACs or the Post-Effective Date FCRs from proposing to the Trustees, in writing, amendments to these TDP.  For the avoidance of doubt, these TDP may not be amended

80

to alter the allocation of the assets of the Trust between Funds or to modify Section 4.4 regarding the DEF.  Notwithstanding the foregoing, no amendment shall be made to (i) these TDP that would affect the scope and terms of the releases, injunctions and other protections provided in these TDP (including in Section 7.2 hereof), the Plans, the other Plan Documents, the Confirmation Orders and the Affirmation Orders to or for the benefit of any Protected Party or (ii) any definitions in these TDP that would render them inconsistent with the definitions included in either of the Plans, as applicable, to the extent such amendment affects the scope and terms of the releases and injunctions provided in the Plans and Confirmation Orders or otherwise adversely affect a Protected Party, without the advance written consent of any affected Protected Party.  For the avoidance of doubt, (x) except as set forth in footnote 7 of these TDP, the form of the Acceptance and Release may not be amended or modified, and (y) the requirement that a claimant complete, execute and deliver to the Trust an Acceptance and Release as a condition precedent to the claimant's receipt of any payment or other distribution from the Trust Assets, may not be removed, amended or modified, in the case of both (x) and (y) without the prior written consent of each Protected Party.

**8.2**      **Severability**.  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**8.3**      **Governing Law**.  Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the liquidation of Talc Personal Injury Claims in the case of the Individual Review Process, mediation, arbitration or

litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2(b)(vii) above.

8.4     **Administration with Other Comparable Trusts**.   In order to efficiently administer the Trust Assets, the Trustees may determine, with the consent of the TACs and the Post-Effective Date FCRs, to provide for the administration of the Trust Assets and/or these TDP by or in conjunction with another trust or trusts established under sections 105 and/or 524(g) of the Bankruptcy Code, provided, however, that appropriate accounting, trust, confidentiality, or other procedures shall be adopted and followed to ensure that each Fund's assets are maintained separate and segregated from the assets of the other Fund and any other trust's assets or res and each Fund's value can be separately ascertained at all appropriate times, and all claimant information is maintained on a confidential basis.

8.5     **Lack of Precedential Value**.   The asset allocations, claim values, and claim qualification criteria applicable to holders of Talc Personal Injury Claims provided for in the Plans and these TDP are based on the unique facts and circumstances of the Chapter 11 Cases.  The asset allocations, claims values, and claim qualification criteria shall have no precedential effect with respect to the allocation, claim values, or claim qualification criteria that are appropriate with respect to other tort claims against other Persons.

**Exhibit A**

**Acceptance and Release**

## TALC PERSONAL INJURY CLAIMANT ACCEPTANCE AND RELEASE

This Talc Personal Injury Claimant Acceptance and Release (this "**Acceptance and Release**") is made and entered on the date set forth on the signature page hereof by the undersigned who is either the "**Injured Party**" or the "**Official Representative**"[1] (either being referred to herein as the "**Claimant**"), the holder of a Talc Personal Injury Claim.

## RECITALS

WHEREAS, on February 13, 2019, Imerys Talc America, Inc., Imerys Talc Canada Inc., and Imerys Talc Vermont, Inc. (collectively, the "**Imerys Debtors**") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "**Bankruptcy Code**") by filing voluntary petitions for relief with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, on February 11, 2021, Cyprus Mines Corporation (the "**Cyprus Debtor**" and, together with the Imerys Debtors, the "**Debtors**") commenced a case under chapter 11 of the Bankruptcy Code by filing a voluntary petition for relief with the Bankruptcy Court;

WHEREAS, pursuant to the *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated [ ● ], 2025 (together with any amendments or modifications thereto, the "**Imerys Plan**") and the *Third Modified First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code* dated [ ● ], 2025 (together with any amendments or modifications thereto, the "**Cyprus Plan**" and, together with the Imerys Plan, the "**Plans**"), the Protected Parties (as defined in both Plans) are making certain contributions to the Talc Personal Injury Trust (collectively, the "**Talc Personal Injury Trust Contribution**") in consideration of receiving, among other things, the benefit of the Channeling Injunctions and this Acceptance and Release from holders of Talc Personal Injury Claims desiring to receive a distribution from the Talc Personal Injury Trust;

WHEREAS, all Talc Personal Injury Claims have been channeled to the Talc Personal Injury Trust pursuant to the Channeling Injunctions;

WHEREAS, in connection with the Talc Personal Injury Trust Contribution, the Talc Personal Injury Trust has agreed to indemnify, defend, and hold harmless the Protected Parties from Talc Personal Injury Claims in accordance with the terms and provisions of the Plans;

WHEREAS, the Claimant has filed a Talc Personal Injury Claim with the Talc Personal Injury Trust (the "**Filed Talc Claim**") and desires to have the Filed Talc Claim resolved and to receive a distribution from the Talc Personal Injury Trust with respect to the Filed Talc Claim; and

WHEREAS, it is a condition precedent to receiving a distribution from the Talc Personal Injury Trust that the Claimant execute and deliver this Acceptance and Release for the benefit of

---

[1]   The "**Official Representative**" is the/a person who under applicable state law or legal documentation has the authority to execute this Acceptance and Release on behalf of the Injured Party, the Injured Party's estate, or the Injured Party's heirs.

the Protected Parties and the Talc Personal Injury Trust and certain representatives thereof as listed in Section 2.1(c)(xiii) of the Talc Personal Injury Trust Agreement (collectively, the "**Talc Trust Released Parties**").

## ACCEPTANCE AND RELEASE

NOW, THEREFORE, in consideration of the foregoing recitals, which recitals are expressly incorporated herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Claimant agrees as follows:

1.      Capitalized terms not defined herein have the meanings set forth in the Plans, the Talc Personal Injury Trust Agreement, or the Trust Distribution Procedures, as the context requires or as indicated herein, and such definitions are incorporated herein by reference.

2.      The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Acceptance and Release as a whole and not to any particular section, subsection or clause contained in this Acceptance and Release.

3.      On behalf of the Injured Party, the Injured Party's estate, the Injured Party's heirs and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby **COMPLETELY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES** the Talc Trust Released Parties from any and all known or unknown current and future Talc Personal Injury Claims except as expressly provided herein ("**Released Claims**").

4.      Notwithstanding the paragraph immediately above or anything to the contrary contained herein, if the Filed Talc Claim involves a Direct Talc Personal Injury Claim for Ovarian Cancer III, Ovarian Cancer II, Ovarian Cancer I, Lung Cancer, or an Other Disease Claim, the Injured Party may file a new Talc Personal Injury Claim with the Talc Personal Injury Trust for a higher level of Ovarian Cancer or Mesothelioma that is subsequently diagnosed pursuant to the terms of the Trust Distribution Procedures.

5.      The release set forth herein shall inure to the benefit of the Talc Trust Released Parties and their successors and assigns, each of which is an express third-party beneficiary hereof.

6.      The release set forth herein shall be binding on any and all successors and assigns of the Claimant.

7.      The Claimant expressly warrants and represents that the Claimant has not assigned, conveyed, hypothecated, pledged, or otherwise transferred the Filed Talc Claim.  If the Claimant is an Official Representative, the Official Representative represents and warrants that the Official Representative has all requisite legal authority to act for, bind, and accept payment on behalf of the Injured Party and all heirs of the Injured Party on account of the Filed Talc Claim.

8.      The Claimant agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorneys' fees and costs, the Talc Trust Released Parties from any loss, cost, damage, or expense arising out of the rightful claim of any other Entity or Person with respect to the Filed Talc Claim.

US-DOCS\163807432.3RLF1 33768895v.1

9.    The Claimant expressly warrants and represents that, if it is not a natural person, it is in good standing in its place of domicile; that the execution of this Acceptance and Release is fully authorized by it; that the person or persons executing this Acceptance and Release have the necessary and appropriate authority to do so; and that there are no pending agreements, transactions or negotiations to which it is a party that would render this Acceptance and Release or any part thereof void, voidable, or unenforceable.

10.    The Claimant agrees to execute promptly all voluntary dismissals, stipulations, supplemental agreements, releases, affidavits, waivers, and other documents of any nature or kind which any Talc Trust Released Party at any time may reasonably require in order to implement the provisions of this Acceptance and Release.

11.    This Acceptance and Release may be executed in counterparts, including by means of facsimile or electronic signature, each of which shall be deemed an original and which together shall constitute but one and the same instrument.

12.    The Claimant agrees that it will not assert any Released Claims against the Talc Trust Released Parties or, unless compelled to testify by subpoena, voluntarily assist in any way in the prosecution by any other Entity of any Released Claims against the Talc Trust Released Parties.

13.    The Claimant states that the Claimant has carefully read and understands the contents of this Acceptance and Release; that the Claimant has had the opportunity to consult with the Claimant's own counsel (if any) regarding the terms of this Acceptance and Release; and that this Acceptance and Release is entered into freely and voluntarily, and without coercion.

14.    This Acceptance and Release is not intended to bar any cause of action, right, lien, or claim that the Claimant may have against any alleged tortfeasor, or any other Person or Entity, not included in the definition of Talc Trust Released Parties.  The Claimant hereby expressly reserves all of his or her rights against such Persons or Entities.  Notwithstanding anything to the contrary herein, this Acceptance and Release is not intended to release or discharge any Talc Personal Injury Claim or potential Talc Personal Injury Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any), or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to talc or talc-containing products.

15.    The Claimant represents and warrants that all valid liens, subrogation, and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Filed Talc Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Claimant under this Acceptance and Release or otherwise.  It is further agreed and understood that no Talc Trust Released Party shall have any liability to the Claimant or any other person or entity in connection with such liens or reimbursement claims and that the Claimant will indemnify and hold the Talc Trust Released Parties harmless from any and all such alleged liability as provided in the following sentence.  The Claimant will indemnify and hold the Talc Trust Released Parties harmless, to the extent of the amount of payment hereunder, excluding attorney's fees and costs, from any and all liability arising from subrogation, indemnity, or contribution claims related to the Filed Talc Claim released

-3-

herein and from any and all compensation or medical payments due, or claimed to be due, under any applicable law, regulation or contract related to the Filed Talc Claim released herein.

16.    The Claimant understands that the Filed Talc Claim released herein is being resolved by the Talc Personal Injury Trust, and a liquidated value of $_____ has been established for such Filed Talc Claim.  The Claimant acknowledges that, pursuant to the Trust Distribution Procedures, the Talc Personal Injury Trust will only be able to pay the Claimant a percentage of the liquidated value of such Filed Talc Claim.  The percentage applicable to the Filed Talc Claim will be determined in the manner set forth in the Trust Distribution Procedures.  The Claimant further acknowledges that the percentage is based on estimates that change over time, and that other claimants may have in the past received, or may in the future receive, a smaller or larger percentage of the value of their claims than the Claimant.  The Claimant further acknowledges that, other than as specifically set forth in the Trust Distribution Procedures, the fact that earlier or later claimants may have been paid or may in the future be paid a smaller or larger percentage of the value of their claims shall not entitle the Claimant to any additional compensation from the Talc Personal Injury Trust.

17.    In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Talc Personal Injury Trust as a joint tortfeasor legally responsible for the Injured Party's injuries shall be reduced by no more than the total and actual amount paid as consideration for this Acceptance and Release or such lesser amount as allowed by law.

18.    The Claimant understands, represents, and warrants that this Acceptance and Release is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Talc Trust Released Parties.  Neither this Acceptance and Release, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the Talc Personal Injury Trust in any suit, claim, or proceeding of any nature except to enforce this Acceptance and Release.  However, this Acceptance and Release is and may be asserted by the Talc Trust Released Parties as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to any Talc Personal Injury Claim (including the Filed Talc Claim) released herein, except as expressly provided herein.

19.    The Claimant (a) represents that no judgment debtor has satisfied in full or in part, the Talc Personal Injury Trust's liability with respect to the Filed Talc Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Claimant has not entered into a release (other than this Acceptance and Release) that discharges or releases the Talc Personal Injury Trust's liability to the Claimant with respect to the Filed Talc Claim.

20.    The Claimant represents that he or she understands that this Acceptance and Release constitutes a final and complete release of the Talc Trust Released Parties with respect to any and all Talc Personal Injury Claims, including the Filed Talc Claim, except as expressly provided herein.  The Claimant has relied solely upon his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent, and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Talc Personal

-4-

Injury Trust and the legal consequences of this Acceptance and Release, and not on any statement or representation made by or on behalf of the Talc Trust Released Parties.

21.     This Acceptance and Release contains the entire agreement between the parties and supersedes all prior or contemporaneous, oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Filed Talc Claim.

22.     This Acceptance and Release shall be governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

23.     **IT IS THE INTENTION OF THE CLAIMANT EXPRESSLY TO WAIVE AND RELINQUISH ALL CLAIMS THAT ARE RELEASED HEREBY TO THE FULLEST EXTENT PERMITTED BY LAW, INCLUDING, TO THE EXTENT THAT IT IS OR MAY BECOME APPLICABLE, WAIVER OF THE PROVISIONS, RIGHTS, AND BENEFITS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES:**

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY;**

**AND ANY AND ALL PROVISIONS, RIGHTS AND BENEFITS OF ANY SIMILAR STATUTE OR COMMON-LAW RULE OF ANY OTHER JURISDICTION, WHOSE LAW MIGHT BE OR BECOME APPLICABLE TO THIS ACCEPTANCE AND RELEASE. CLAIMANT FURTHER ACKNOWLEDGES THAT CLAIMANT IS AWARE THAT CLAIMANT MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE THAT CLAIMANT NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE SUBJECT MATTER OF THE ACCEPTANCE AND RELEASE, BUT IT IS CLAIMANT'S INTENTION TO, AND CLAIMANT DOES, FULLY, FINALLY, AND FOREVER, RELEASE AND DISCHARGE ANY AND ALL RELEASED CLAIMS KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, THAT MAY NOW EXIST, MAY HEREAFTER EXIST, OR HERETOFORE HAVE EXISTED, WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS.**

24.     The Claimant acknowledges that the Talc Personal Injury Trust's obligation to pay the Claimant is not triggered until the Talc Personal Injury Trust receives this executed Acceptance and Release.

25.     If the Claimant's counsel directed the Talc Personal Injury Trust's claims processing facility (the "**Facility**") to transmit to the Talc Personal Injury Trust any information

US-DOCS\163807432.3RLF1 33768895v.1

from the Facility for purposes of settling the Filed Talc Claim, the Claimant acknowledges that the Claimant consented to the disclosure, transfer, and/or exchange of information related to the Filed Talc Claim (including medical information) between the Talc Personal Injury Trust and the Facility in connection with the Facility's processing of the Filed Talc Claim.

26.    The Claimant authorizes payment pursuant to paragraph 16 to the Claimant or the Claimant's counsel, as agent for the Claimant.

27.    The Claimant acknowledges and agrees that the releases and protections set forth in this Acceptance and Release in favor of, or for the benefit of, Talc Trust Released Parties are in addition to, and not in lieu of, any releases, injunctions and other protections afforded Talc Trust Released Parties under the Plans.

## CERTIFICATION

I state that I have carefully read this Acceptance and Release and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Filed Talc Claim is true according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Acceptance and Release.

## MEDICARE SECONDARY PAYER CERTIFICATION

I further represent and certify to the Talc Personal Injury Trust that, in respect of the Filed Talc Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, the Filed Talc Claim.

[signatures appear on following pages]

IN WITNESS WHEREOF, the undersigned has executed this Acceptance and Release as of this _____ day of _____, 20__.

Claimant:  _____

Name of the Claimant:

Name of the Injured Party if different from the Claimant:

If the Claimant is not executing this Acceptance and Release electronically using a Talc Personal Injury Trust authorized electronic signature program, the Claimant's signature must be authenticated by a notary public or by the signature of two persons who witnessed the signing of this Acceptance and Release.

STATE OF _____ )
                                          ) SS
_____COUNTY)      )

SWORN TO AND SUBSCRIBED before me this _____ day of _____.

_____
Notary Public
My Commission Expires:

**OR**

Signatures of two persons who witnessed the signing of this Acceptance and Release:

_____          _____
Witness Signature                                       Witness Signature

**Exhibit B**

**Protected Party Notice Information**

## PROTECTED PARTY NOTICE INFORMATION

***To the Imerys Reorganized Debtors*:**

    Eric Danner
    Imerys Reorganized Debtors
    c/o CohnReznick LLP
    14 Sylvan Way, 3rd Floor
    Parsippany, NJ 07054

***To the Cyprus Reorganized Debtor*:**

    Cyprus Mines Corporation
    Attn: President
    333 N. Central Ave.
    Phoenix, AZ 85004

With a copy to:

    Reed Smith LLP
    Attn: Paul M. Singer, Esq.
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222

***To the Imerys Protected Parties*:**

    Emmanuelle Vaudoyer, Group General Counsel & Company Secretary
    c/o Imerys
    43 quai de Grenelle
    75015 Paris - France
    E-mail: emmanuelle.vaudoyer@imerys.com

With a copy to:

    Hughes Hubbard & Reed LLP
    Attn: Christopher Kiplok and Erin Diers
    One Battery Park Plaza
    New York, NY 10004
    Chris.kiplok@hugheshubbard.com
    Erin.diers@hugheshubbard.com

***To the Rio Tinto Protected Parties***:

Company Secretary
Rio Tinto
4700 W. Daybreak Parkway
South Jordan, UT 84009

With a copy to:

CompanySecretaryNotices@riotinto.com and the subject line must include the words: "RIO TINTO AMERICA INC." and "THREE CROWNS INSURANCE COMPANY"

With a copy to:

Geoffrey David
General Counsel, Minerals
Rio Tinto
geoffrey.david@riotinto.com

With a copy to:

Erica Villanueva, Esq.
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, CA 94104
evillanueva@fbm.com

and

Philip Anker, Esq.
Lauren Lifland, Esq.
Wilmer Cutler Pickering Hale and
Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
philip.anker@wilmerhale.com
lauren.lifland@wilmerhale.com

**To the Zurich Protected Parties:**

>Robert Koscielniak
>Director, Latent & Environmental Claims
>Zurich North America
>1299 Zurich Way
>Schaumburg, IL 60196-1056
>robert.koscielniak@zurichna.com

With a copy to:

>Mark D. Plevin, Esq.
>Plevin & Turner LLP
>580 California Street, Suite 1200
>San Francisco, CA 94104
>mplevin@plevinturner.com

With a copy to:

>Karen Dixon, Esq.
>Skaryznski Marick & Black LLP
>500 West Madison Street, Suite 3600
>Chicago, IL 60661
>kdixon@skarzynski.com

**To the Cyprus Protected Parties:**

>Scott Statham
>Deputy General Counsel
>Freeport-McMoRan Inc.
>333 North Central Avenue
>Phoenix, AZ 85004
>sstatham@fmi.com

With a copy to:

>Emil A. Kleinhaus
>Michael H. Cassel
>Wachtell, Lipton, Rosen & Katz
>51 West 52 Street
>New York, NY  100019
>EAKleinhaus@wlrk.com
>MHCassel@wlrk.com

**To the XL Protected Parties:**

> Richard W. Gibbs, AIC
> Large Loss Claims Specialist – Major Case Casualty Claims
> AXA XL
> 505 Eagleview Blvd, Suite 100
> Exton, PA 19341-1120
> Email:  rich.gibbs@axaxl.com
> Office:  610-968-2911

**To Old Republic Insurance Company:**

> Thomas A. Dare
> Old Republic Insurance Company
> 307 N. Michigan Avenue
> Chicago, IL 60601-5382
> tdare@oldrepublic.com

**To Stronghold Insurance Company Limited:**

> Stronghold Insurance Company Limited
> Address: 7 More London Riverside, SE1 2RT
> Email: john.x.baker@pwc.com
> Marked for the attention of John Baker

**To the Buyer (Magris Resources Canada Inc.):**

> Magris Resources Canada Inc.
> Attn: Scott Bergen
> 333 Bay Street, Suite 1101
> Toronto, ON M5H 2R2